**EXECUTION VERSION**

**LOAN AGREEMENT**

**$38,500,000.00 MORTGAGE LOAN**

BY

**ARBOR REALTY SR, INC.**
LENDER
TO

**WOODSIDE MEADOWS APTS OWNER LLC**
BORROWER

**Dated:  As of February 18, 2022**

**PROPERTY:**

**Sycamore Townhomes**
**4590 Seaway Drive**
**Lansing, Michigan 48911**

52247332;1

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINED TERMS ................................................................................................ 1

    1.01    Defined Terms .......................................................................................... 1
    1.02    General Construction ............................................................................ 22

ARTICLE 2 LOAN .................................................................................................................... 22

    2.01    Loan ........................................................................................................ 22
    2.02    Computation and Payment of Interest ................................................ 23
    2.03    **Payment of Principal** ......................................................................... 25
    2.04    Method of Payment ............................................................................... 26
    2.05    Application of Payments ...................................................................... 26
    2.06    Extension of Term ................................................................................ 26
    2.07    Late Fee .................................................................................................. 27
    2.08    Prepayments .......................................................................................... 27
    2.09    Exit Fee .................................................................................................. 28
    2.10    Usury Limitation .................................................................................. 29
    2.11    Note ........................................................................................................ 29
    2.12    Use of Proceeds .................................................................................... 29

ARTICLE 3 REPLACEMENT LOANS ................................................................................. 29

    3.01    Replacement Loan ................................................................................ 29

ARTICLE 4 BORROWER'S REPRESENTATIONS, WARRANTIES AND COVENANTS .. 31

    4.01    Payment of Debt ................................................................................... 31
    4.02    Representations, Warranties and Covenants Regarding Borrower ..... 32
    4.03    Anti-Terrorism Law ............................................................................. 37
    4.04    Recording of Mortgage, Etc ................................................................ 37
    4.05    Representations, Warranties and Covenants as to the Property ........... 38
    4.06    Payment of Impositions, Utilities and Taxes, Etc .............................. 42
    4.07    Ownership of Property ......................................................................... 43
    4.08    Transfer ................................................................................................. 43
    4.09    Removal of Liens .................................................................................. 43
    4.10    Cost of Defending and Upholding the Mortgage Lien ...................... 44
    4.11    Use of the Property ............................................................................... 44
    4.12    Maintenance and Repair ...................................................................... 44
    4.13    Alterations ............................................................................................. 45
    4.14    Changes Affecting the Property ........................................................... 45
    4.15    Permits, Laws and Restrictive Covenants .......................................... 45
    4.16    Plans and Specifications ...................................................................... 45
    4.17    Estoppel Statement ............................................................................... 45
    4.18    Compliance with Legal Requirements ................................................ 46
    4.19    Compliance with Insurance Requirements ......................................... 46

i

4.20    Compliance with Property Agreements; No Modifications ........................................ 46
4.21    Right of Inspection ............................................................................................ 46
4.22    Financial Reports ............................................................................................... 47
4.23    Information to Lender ......................................................................................... 49
4.24    General Reporting Requirements ........................................................................ 49
4.25    Rate Cap Agreement .......................................................................................... 49
4.26    Right of Entry .................................................................................................... 50
4.27    Deduction from Value ......................................................................................... 50
4.28    No Joint Assessment ........................................................................................... 51
4.29    No Credits on Account of the Debt ...................................................................... 51
4.30    Documentary Stamps .......................................................................................... 51
4.31    Publicity ............................................................................................................ 51
4.32    Representations Generally ................................................................................... 51
4.33    ERISA ............................................................................................................... 51
4.34    Sale of Assets ..................................................................................................... 52
4.35    Distributions ...................................................................................................... 52
4.36    Authority Documents .......................................................................................... 52
4.37    Name, Address and Structure .............................................................................. 52
4.38    Litigation ........................................................................................................... 52
4.39    Property Management Agreement ......................................................................... 52
4.40    Major Contracts ................................................................................................. 52
4.41    Leases ................................................................................................................ 52
4.42    Issuance of Equity .............................................................................................. 52
4.43    Budget ............................................................................................................... 52
4.44    Survival of Representations ................................................................................. 53
4.45    Borrower's Knowledge ........................................................................................ 53

ARTICLE 5 INSURANCE ............................................................................................. 53

5.01    Conditions of Property ....................................................................................... 53
5.02    Required Insurance ............................................................................................ 53
5.03    Terms of Insurance Policies ................................................................................ 56
5.04    Compliance with Requirements of Insurance Policies ............................................ 57
5.05    Insurance Reporting Requirements ...................................................................... 57
5.06    Assignment To Lender ........................................................................................ 58

ARTICLE 6 CASUALTY, CONDEMNATION AND RESTORATION ................................... 59

6.01    Borrower's Representations ................................................................................. 59
6.02    Insurance Proceeds ............................................................................................ 59
6.03    Restoration ........................................................................................................ 60
6.04    Event of Default During Restoration .................................................................... 63
6.05    Application of Proceeds to Debt Reduction ........................................................... 63
6.06    Condemnation .................................................................................................... 63
6.07    Application ........................................................................................................ 64
6.08    Award ................................................................................................................ 64

ARTICLE 7 LEASES AND OTHER AGREEMENTS AFFECTING THE PROPERTY .......... 65

7.01    Borrower's Representations and Warranties ............................................................. 65
7.02    Assignment of Leases ............................................................................................... 66
7.03    Performance of Obligations ...................................................................................... 67
7.04    Subordinated Leases ................................................................................................. 67
7.05    Leasing Commissions ............................................................................................... 68
7.06    Future Leases ............................................................................................................ 68
7.07    Security Deposits ...................................................................................................... 68

ARTICLE 8 ENVIRONMENTAL HAZARDS ............................................................. 69

8.01    Representations and Warranties ............................................................................... 69
8.02    Covenants ................................................................................................................. 69
8.03    Indemnity ................................................................................................................. 72

ARTICLE 9 INDEMNIFICATION COVERING PROPERTY ...................................... 73

9.01    Indemnification ........................................................................................................ 73

ARTICLE 10 DEFAULTS ............................................................................................. 74

10.01    Events of Default ...................................................................................................... 74
10.02    Remedies .................................................................................................................. 76
10.03    Possession of the Property ....................................................................................... 81
10.04    No Cure or Waiver ................................................................................................... 81
10.05    Borrower's Actions After Default ............................................................................ 81
10.06    Control by Lender After Default .............................................................................. 81
10.07    Right to Cure Defaults ............................................................................................. 82
10.08    Recovery of Sums Required to Be Paid ................................................................... 83
10.09    Marshalling and Other Matters ................................................................................ 83
10.10    Waivers .................................................................................................................... 83
10.11    Tax Reduction Proceedings ..................................................................................... 83
10.12    Costs of Collection .................................................................................................. 83
10.13    Cumulative Rights ................................................................................................... 84
10.14    General Provisions Regarding Remedies ................................................................. 84

ARTICLE 11 RESERVES ............................................................................................. 84

11.01    Tax and Insurance Reserve ....................................................................................... 84
11.02    Intentionally Omitted ............................................................................................... 86
11.03    Renovation Reserve ................................................................................................. 86
11.04    Replacement Reserve ............................................................................................... 89
11.05    Interest Reserve ....................................................................................................... 90
11.06    General Provisions Regarding Reserves ................................................................... 91

ARTICLE 12 CASH MANAGEMENT PROVISIONS .................................................. 92

12.01    Collection Account .................................................................................................. 92
12.02    Security Deposit Account ......................................................................................... 93
12.03    Payments into Collection Account ........................................................................... 93

12.04   Disbursements from Collection Account ................................................................ 94
12.05   Disbursements from Central Account ................................................................... 95
12.06   Security Interest .................................................................................................... 95

ARTICLE 13 MISCELLANEOUS ............................................................................................ 96

13.01   Further Assurances ............................................................................................... 96
13.02   Participation and Sale of Loan ............................................................................. 97
13.03   Replacement of Note ............................................................................................ 99
13.04   Contest of Certain Claims .................................................................................... 99
13.05   Notices .................................................................................................................. 99
13.06   Estoppel Certificate ............................................................................................ 100
13.07   Sole Discretion of Lender ................................................................................... 101
13.08   Waiver of Notice ................................................................................................ 101
13.09   Remedies of Borrower ........................................................................................ 101
13.10   Actions and Proceedings .................................................................................... 101
13.11   Subrogation ........................................................................................................ 101
13.12   Applicable Law ................................................................................................... 101
13.13   Waiver of Counterclaim and Trial By Jury ....................................................... 102
13.14   Consent to Jurisdiction ....................................................................................... 102
13.15   Successors and Assigns ...................................................................................... 103
13.16   Severability ........................................................................................................ 103
13.17   Captions .............................................................................................................. 103
13.18   Time of the Essence ........................................................................................... 103
13.19   No Oral Change .................................................................................................. 103
13.20   Entire Agreement ............................................................................................... 103
13.21   Fees and Expenses .............................................................................................. 103
13.22   Waiver of Bankruptcy Stay ................................................................................ 104
13.23   No Joint Venture; No Third-Party Beneficiaries ............................................... 104
13.24   Joint and Several Obligations ............................................................................ 104
13.25   Duplicate Originals; Counterparts ..................................................................... 104
13.26   Exculpation ........................................................................................................ 104
13.27   Conflict; Construction of Documents; Reliance ................................................ 108
13.28   Set-Off ................................................................................................................ 108

Exhibit A -  Legal Description
Exhibit B – Initial Budget
Exhibit C – Intentionally Omitted
Exhibit D – Intentionally Omitted
Exhibit E – Rent Roll
Exhibit F – Renovations Budget
Exhibit G - Request for Disbursement from Renovation Reserve
Exhibit H - Request for Disbursement from Replacement Reserve
Exhibit I – Tenant Notice Letter
Schedule A – Organizational Chart

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is made as of this 18th day of February, 2022, by WOODSIDE MEADOWS APTS OWNER LLC, a Delaware limited liability company, having a principal place of business at c/o EVU Residential LLC, 100 Franklin Sq. Drive, Suite 402, Somerset New Jersey 08873 ("**Borrower**") and ARBOR REALTY SR, INC., a Maryland corporation, having a principal place of business at 333 Earle Ovington Boulevard, Suite 900, Uniondale, New York 11553 (together with its successors and assigns, collectively, "**Lender**").

## Recitals

**WHEREAS**, Borrower has requested that Lender make a loan to Borrower in the original principal amount of $38,500,000.00.  Lender is willing to make such loan to Borrower on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of such loan and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.01    Defined Terms.  For this Agreement, the following terms shall have the meanings hereinafter set forth.

"**Acceptable Counterparty**" means a Person that is the counterparty to a Rate Cap Agreement and has at all times that the applicable Rate Cap Agreement is in effect a long-term unsecured debt credit rating of not less than "A-" from S&P and not less than A3 from Moody's Investor Services, Inc.

"**Account Agreement**" means that certain Deposit Account Control Agreement to be executed among Borrower, Lender and Bank, pursuant to and in accordance with Section 12.01 hereof.

"**Account Collateral**" means (i) the Collection Account, (ii) the Central Account, (iii) all cash, checks, drafts, securities entitlements, certificates, instruments and other property, including, without limitation, all deposits and/or wire transfers from time to time deposited or held in, credited to or made to the Collection Account, the Central Account; (iv) all interest, dividends, cash, instruments, securities entitlements and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing items; and (v) to the extent not covered by clauses (i) through (iv) above, all proceeds (as defined under the UCC) of any or all of the foregoing.

"**Actual Borrower Payment**" has the meaning specified in Section 11.05.

1

"**Additional Collateral Account**" means a Reserve account established and held by Lender into which excess funds are required to be deposited pursuant to Article 11 and held by Lender as additional collateral for the Loan.

"**Additional Information**" has the meaning specified in Section 3.01(a).

"**Affiliate**" of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"**Agreement**" means this Agreement, as hereafter amended, or modified from time to time.

"**Alternative Rate**" means a per annum rate equal to the sum of (1) the Benchmark Replacement and (2) the Alternative Rate Spread, provided that such Alternative Rate shall not be less than 4.28254% per annum.

"**Alternative Rate Spread**" means the sum of (1) the Spread and (2) the Benchmark Replacement Adjustment.

"**Anti-Terrorism Law**" means any Law relating to terrorism or money-laundering, including Executive Order No. 13224 and the USA Patriot Act.

"**Applicable Interest Rate**" means (A) prior to a Benchmark Replacement Date, as determined by Lender in its sole discretion, (i) the greater of (1) 4.28254% per annum, and (2) Term SOFR plus the Spread per annum or (ii) the Default Rate, whichever is applicable at the time of determination, and (B) from and after a Benchmark Replacement Date, as determined by Lender in its sole discretion, (i) the Alternative Rate or (ii) the Default Rate, whichever is applicable at the time of determination.

"**Appraisal**" means the appraisal of the Property and all supplemental reports or updates thereto previously delivered to Lender in connection with the closing of the Loan, and any new or updated appraisal obtained by Lender.

"**Approved Bank**" means a bank, trust company, or other depository institution insured by the Federal Deposit Insurance Corporation which has a minimum long-term unsecured debt rating of at least "A" by S&P (and, in the event of a Securitization of the Loan, "P-1 by Moody's and "F1" by Fitch) and a minimum short-term unsecured debt rating of at least "A-1" by S&P (and, in the event of a Securitization of the Loan, "A" by Fitch and "A2" by Moody's. For the purposes of this Agreement, Bank shall be deemed to be an Approved Bank.

"**Architect**" has the meaning specified in Section 6.03(a).

"**Asbestos O&M Plan**" has the meaning specified in Section 8.02(i).

"**Assignment and Subordination of Property Management Agreement**" means that certain Assignment and Subordination of Property Management Agreement dated as of the Execution Date, executed by Borrower and Property Manager for the benefit of Lender, as hereafter amended, consolidated, supplemented or modified from time to time.

2

"**Assignment of Leases**" means that certain Assignment of Leases and Rents dated as of the Execution Date, executed by Borrower in connection with the Loan, as hereafter amended, consolidated, supplemented or modified from time to time.

"**Assignment of Rate Cap Agreement**" means the Assignment of Interest Rate Cap as Collateral dated as of the Execution Date, executed by Borrower in connection with the Loan, as hereafter amended, consolidated, supplemented or modified from time to time.

"**Authority Documents**" means, with respect to any Person, all documents and agreements providing for, or related to, the formation, organization and governance of such Person, including such Person's partnership certificate, partnership agreement, certificate of incorporation, by-laws, stockholder's agreement, certificate of formation, operating, membership or limited liability company agreement, or other similar organization or governing documents, as applicable.

"**Bank**" means BankUnited, N.A., a national banking association, or any other nationally recognized banking institution reasonably approved by Lender.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Bankruptcy Law**" has the meaning specified in Section 10.01(f).

"**Benchmark**" means, initially, Term SOFR; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Term SOFR or the then-current Benchmark, then "Benchmark" shall mean the applicable Benchmark Replacement. In no event shall the Benchmark be less than zero.

"**Benchmark Replacement**" means a floating rate index selected by Lender giving due consideration to benchmark rates being utilized by issuers of U.S. dollar denominated variable rate commercial mortgage securities at such time.

"**Benchmark Replacement Adjustment**" means the spread adjustment (which may be a positive or negative value or zero) selected by Lender giving due consideration to any industry-accepted rate of interest as a replacement for the then-current Benchmark for U.S. dollar denominated floating rate first lien mortgage loans at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definitions of "Business Day," "Interest Period," "Payment Date," "U.S. Government Securities Business Day," and/or "Rate Adjustment Date," the timing and frequency of determining rates and making payments of interest, length of lookback periods, the applicability of breakage provisions and preceding and succeeding business day conventions, rounding conventions and other technical, administrative or operational matters) that Lender decides may be appropriate in connection with the use and administration of the Benchmark Replacement or to reflect the adoption of the applicable Benchmark Replacement or the implementation of the Benchmark Replacement, and to permit the administration of the Loan by Lender in a manner substantially consistent with market practice (or, if Lender determines that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for

3

the administration of the applicable Benchmark Replacement exists, in such other manner of administration as Lender decides is necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the date selected by Lender, in its sole discretion, to be an appropriate Benchmark Replacement Date.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark announcing that the administrator has ceased or will cease to provide the Benchmark permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator of the Benchmark that will continue to provide the Benchmark;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark, the central bank for the currency of the Benchmark, an insolvency official with jurisdiction over the administrator for the Benchmark, a resolution authority with jurisdiction over the administrator for the Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for the Benchmark, which states that the administrator of the Benchmark has ceased or will cease to provide the Benchmark permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark; or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark announcing that the Benchmark is no longer representative.

"**Borrower**" has the meaning specified in the introductory paragraph of this Agreement.

"**Borrower's Operating Account**" means the account specified in the Account Agreement or any bank account designated by Borrower in writing to Lender.

"**Budget**" has the meaning specified in Section 4.43.

"**Business Day**" means any day other than (a) a Saturday or Sunday, or (b) a day on which banking and savings and loan institutions in the State of New York are authorized or obligated by Law or executive order to be closed.

"**Business Income**" has the meaning specified in Section 5.02(b)(3).

"**Capital Expenditures**" means, for any period, the amount actually expended for items capitalized under GAAP.

"**Capital Leases**" means any Lease which has been or should be capitalized on the books of the lessee in accordance with GAAP.

4

"**Casualty**" means any casualty, damage, destruction or loss occurring to all or any part of the Property.

"**Casualty Insurance Proceeds**" means all insurance proceeds which Borrower is entitled to receive as a result of a Casualty pursuant to the insurance policies maintained by Borrower.

"**Central Account**" has the meaning specified in Section 12.04(b).

"**CERCLA**" has the meaning specified in the definition of "Environmental Laws" in this Section 1.01.

"**Code**" means the United States Internal Revenue Code of 1986, as amended and in effect from time to time.

"**Collection Account**" has the meaning specified in Section 12.01(a).

"**Collection Period**" means the period from the first (1st) Business Day of each calendar month to the last Business Day of each month.

"**Competing Offer**" has the meaning specified in Section 3.01(a).

"**Completion Guaranty**" means that certain Guaranty of Completion dated as of the Execution Date made by Guarantor for the benefit of Lender in connection with the Loan, as hereafter amended, consolidated, supplemented or modified from time to time.

"**Condemnation**" means any temporary or permanent taking or requisition of any or all right, title and interest in all or any part of the Property or any change of grade which affects the Property or any roadway providing access to the Property, in each case, as a result of the exercise of any right of condemnation or eminent domain.

"**Condemnation Proceeds**" means all funds or proceeds received as a result of, in connection with, in anticipation of, or as a settlement of a Condemnation.

"**Control**" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms "Controlled", "Controlling" and "Common Control" shall have correlative meanings.

"**Controlling Party**" means, if Borrower is a partnership, the general partner of Borrower and, if Borrower is a limited liability company, the manager or managing member of Borrower.

"**Covered Party**" has the meaning specified in Section 4.02(e).

"**Credit Parties**" or "**Credit Party**" means Borrower, and each Guarantor, or any or all of the foregoing, all as the context may require.

"**Debt**" means the aggregate amount of the unpaid principal amount evidenced by the Note, all accrued and unpaid interest, and all other sums evidenced by the Note or secured by the

5

Mortgage and/or any other Loan Documents, including any Prepayment Fee and/or Exit Fee, as well as any additional advances under the Mortgage that may be made to or on behalf of Borrower by Lender following the Execution Date.

"**Debt Service**" means, as of the date of determination, the total of all the principal and interest payments (with interest calculated at the greatest of (a) the then Applicable Interest Rate, (b) the then prevailing market constant for Fannie Mae, and (c) the then prevailing market constant for conduit ten-year fixed rate loans) and required reserve payments required to be made on the Note and the other Loan Documents during the applicable period.

"**Debt Service Coverage Ratio**" means, with respect to any period as set forth in this Agreement, the ratio calculated by Lender in its sole and absolute discretion, of (i) the Net Operating Income for such period to (ii) the Debt Service with respect to such period. Notwithstanding the foregoing, if Borrower shall fail to provide any of the information necessary for Lender to calculate the Debt Service Coverage Ratio, Lender shall have the right to make such calculation based upon such figures or assumptions as Lender determines in its sole and absolute discretion.

"**Default**" means any event that would constitute an Event of Default if all requirements in connection therewith for the giving of notice, the lapse of time, and the occurrence of any further condition, event or act, had been satisfied.

"**Default Rate**" means the lesser of (a) twenty four percent (24%) per annum and (b) the Maximum Legal Rate.

"**Development Laws**" means all applicable subdivision, zoning, environmental protection, wetlands protection, or land use Laws or ordinances, and any and all applicable rules and regulations of any Governmental Authority promulgated thereunder or related thereto.

"**Dollars**" and the sign "$" means lawful money of the United States of America.

"**Early Prepayment Date**" has the meaning specified in Section 2.08.

"**Engineer**" has the meaning specified in Section 6.03(a).

"**Environmental Law(s)**" means any effective, applicable or relevant federal, state or local statute, ordinance, rule or regulation, any judicial or administrative order (whether or not on consent) or judgment applicable to Borrower including, without limitation, any judgment or settlement based on common law theories, and any provisions or condition of any Permit, license or other authorization binding on Borrower relating to (a) the protection of the environment, the safety and health of persons (including employees) or the public welfare from actual or potential exposure (or effects of exposure) to any actual or potential release, discharge, disposal or emission (whether past or present) of any Hazardous Materials or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any Hazardous Materials, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §9601 et seq., the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Solid and Hazardous

6

Waste Amendments of 1984, 42 U.S.C. §6901 et seq., the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. §1251 et seq., the Toxic Substances Control Act of 1976, 15 U.S.C. §2601 et seq., the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §1101 et seq., the Clean Air Act of 1966, as amended, 42 U. S. C. §7401 et seq., the National Environmental Policy Act of 1975, 42 U.S.C. §4321, the Rivers and Harbours Act of 1899, 33 U.S.C. §401 et seq., the Endangered Species Act of 1973, as amended, 16 U.S.C. §1531 et seq., the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §651 et seq., and the Safe Drinking Water Act of 1974, as amended, 42 U.S.C. §300(f) et seq. and all rules, regulations and guidance documents promulgated or published thereunder.

"**Environmental Report**" means the environmental audit report for the Property and any supplements or updates thereto, previously delivered to Lender in connection with the Debt.

"**EPA Mold Guidelines**" has the meaning specified in Section 8.02(f).

"**Equipment**" has the meaning specified in the Mortgage.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"**Event of Default**" means any of the events specified in Section 10.01 or otherwise specifically defined as such in this Agreement, provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"**Execution Date**" means the date of this Agreement.

"**Exit Fee**" has the meaning specified in Section 2.09.

"**Extension DSCR**" has the meaning specified in Section 2.06.

"**Extension Fee**" has the meaning specified in Section 2.06.

"**Extension Notice**" has the meaning specified in Section 2.06.

"**Extraordinary Expense**" has the meaning specified in Section 4.43.

"**First Payment Date**" means April 1, 2022.

"**Fitch**" means Fitch, Inc.

"**Fixtures**" has the meaning specified in the Mortgage.

"**Force Majeure**" has the meaning specified in Section 6.03(h).

"**Full Replacement Cost**" means (1) with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor, and (2) with respect to Personal Property, the cost of replacing such Personal Property.

7

"**Future Lease**" has the meaning specified in Section 7.06.

"**GAAP**" means generally accepted accounting principles in the United States of America, as of the date of the applicable financial report, consistently applied.

"**Governmental Approvals**" means any authorization, consent, or approval of, or any certificate of occupancy, license, Permit, or certification issued by, or any exemption of, registration or filing with, or report or notice to, any Governmental Authority.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Gross Income from Operations**" means, for any period, all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source during such period, including, but not limited to, Rents, utility charges, escalations, forfeited security deposits, interest (if any) on credit accounts and on funds held in the Reserves, business interruption or other loss of income or rental insurance proceeds, service fees or charges, license fees, parking fees, and other pass-through or reimbursements paid by Tenants under the Leases of any nature but excluding (i) Rents from month-to-month Tenants, from Tenants during a free rent period, from non-residential Tenants that are included in any bankruptcy or similar proceeding, or that are payments of past-due amounts from Tenants, (ii) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, (iii) refunds and uncollectible accounts, (iv) proceeds from the sale of furniture, fixtures and equipment, (v) Casualty Insurance Proceeds and Condemnation Proceeds (other than business interruption or other loss of income insurance), (vi) any disbursements to Borrower from any of the Reserves, and (vii) any other non-recurring items identified by Lender in its sole discretion.

"**GSE Competing Offer**" has the meaning specified in Section 3.01(b).

"**GSE Information**" has the meaning specified in Section 3.01(b).

"**GSE Loan**" has the meaning specified in Section 3.01(a).

"**GSE Offer**" has the meaning specified in Section 3.01(b).

"**Guaranties**" means, collectively, the Recourse Guaranty, the Indemnity Agreement, the Completion Guaranty, Shortfall Guaranty and the Guaranty of Interest Reserve; and "Guaranty" means any one (1) of the foregoing.

"**Guarantor**" means Berel Farkas, an individual.

"**Guaranty of Interest Reserve**" means that certain Interest Reserve Replenishment Guaranty dated as of the Execution Date made by Guarantor for the benefit of Lender in connection with the Loan, as hereafter amended, consolidated, supplemented or modified from time to time.

"**Hazardous Material**" means any substance, material or waste which is regulated by any Governmental Authority or the United States of America or other national government, including,

8

without limitation, any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste" or "toxic substance" under any provision of Environmental Law, which includes, but is not limited to, asbestos, polychlorinated biphenyls, petroleum, petroleum products, urea formaldehyde flammable explosives, radioactive materials, paint containing more than one half of one percent (0.5%) lead by dry weight, infectious substances or raw materials which include hazardous constituents, and Mold.

"**Impositions**" means all taxes (including, without limitation, Real Property Taxes, real property transfer, deed transfer and other similar taxes, ad valorem, sales (including those imposed on lease rentals), use, single business, gross receipts, value added, intangible transaction privilege, privilege or license or similar taxes), assessments (including, without limitation, all assessments for public improvements or benefits, whether or not commenced or completed prior to the Execution Date and whether or not commenced or completed within the term of the Loan), ground rents, water, sewer or other rents and charges, excises, levies, fees (including, without limitation, license, Permit, inspection, authorization and similar fees), and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Property and/or any Rent (including all interest and penalties thereon), which at any time prior to, during or in respect of the terms hereof may be assessed or imposed on or in respect of or be a Lien upon (a) Borrower (including, without limitation, all franchise, single business or other taxes imposed on Borrower for the privilege of doing business in the jurisdiction in which the Property is located) or Lender, (b) the Property or any part thereof or any Rent therefrom or any estate, right, title or interest therein, or (c) any occupancy, operation, use or possession of, or sales from, or activity conducted on, or in connection with the Property, or any part thereof, or the leasing or use of the Property, or any part thereof, or the acquisition or financing of the acquisition of the Property, or any part thereof, by Borrower.

"**Improvements**" has the meaning specified in the Mortgage.

"**Indebtedness**"  means any and all liabilities and obligations owing by any Person to any Person, including principal, interest, charges, fees, reimbursements and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, original, renewed or extended, (i) in respect of any borrowed money (whether by loans, the issuance and sale of debt securities or the sale of any property to another Person subject to an understanding, agreement, contract or otherwise to repurchase such property) or for the deferred purchase price of any property or services, (ii) as lessee under any leases which shall have been or should be, in accordance with GAAP, recorded as Capital Leases, (iii) under direct or indirect guarantees and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise assure any creditor against loss in respect of the obligations of others, (iv) in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such indebted Person, (v) in respect of unfunded vested benefits under plans covered by ERISA or any similar liabilities to, for the benefit of, or on behalf of, any employees of such indebted Person, (vi) all obligations secured by any Lien on property owned by such Person, whether or not the obligations have been assumed, or (vii) all obligations under any agreement providing for a swap, ceiling rates, ceiling and floor rates,

9

contingent participation or other hedging mechanisms with respect to interest payable on any of the items described above in this definition.

"**Indemnified Party**" means (i) Lender, (ii) each Person who has been, is or will be involved in the origination of the Loan, (iii) each Person who is or will be involved in the servicing of the Loan, (iv) each Person in whose name the security interest created by the Mortgage is or will be recorded, (v) each Person who holds or acquires or will hold or acquire a full or partial interest in the Loan, including investors or prospective investors in the Loan, (vi) each custodian, trustee and other fiduciary who has held, holds or will hold a full or partial interest in the Loan for the benefit of third parties, (vii) each director, officer shareholder, member, partner, employee, agent, servant, representative, contractor, subcontractor, Affiliate, subsidiary, participant, successor, and assign of any and all of the foregoing Persons, including any other Person who holds or acquires or will hold a participation or other full or partial interest in such Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan, and (viii) each successor and assign of each of the parties specified above in this definition, including any successors or assigns by merger, consolidation or acquisition of all or substantially all of the assets or business of any such party.

"**Indemnity Agreement**" means that certain Hazardous Materials Indemnity Agreement dated as of the Execution Date and executed by Borrower and Guarantor for the benefit of Lender in connection with the Loan, as hereafter amended, consolidated, supplemented or modified from time to time.

"**Independent Manager**" means an individual who is not and has not been at any time in the preceding five (5) years, (i) a stockholder, director, officer, member, employee or partner of the Controlling Party, Borrower or any Affiliate of the Controlling Party and/or Borrower; (ii) a customer, supplier or other Person who derives more than ten percent (10%) of his/her/its purchases or revenues from his/her/its activities with Borrower, Controlling Party, any Affiliate of Borrower and/or Controlling Party or an employee of such customer, supplier or other Person; (iii) a Person Controlling or under Common Control with any such stockholder, director, officer, member, employee, partner, customer, supplier or other Person or (iv) a member of the immediate family of any such stockholder, director, officer, member, employee, partner, customer, supplier or other Person.

"**Initial Budget**" has the meaning specified in Section 4.43.

"**Initial Disbursement**" has the meaning set forth in Section 2.01.

"**Insolvent**" means the inability of a Person to pay its debts as they become due and/or if the fair market value of such Person's assets do not exceed its liabilities, including without limitation, subordinated, unliquidated, disputed or contingent liabilities.

"**Insurance Premiums**" has the meaning specified in Section 5.03(f).

"**Insurance Requirements**" means all terms of any insurance policy required by this Agreement, all requirements of the issuer of any such policy, and all regulations and then current standards applicable to or affecting the Property or any use or condition thereof, which may, at

10

any time, be recommended by the Board of Fire Underwriters, if any, having jurisdiction over the Property, or such other Person exercising similar functions.

"**Interest Period**" means each period commencing on the first (1st) day of each calendar month and ending on the last day of each such calendar month, provided, however, that (i) the first (1st) Interest Period shall commence on the Execution Date and end on the last day of the calendar month in which the Execution Date occurs, and (ii) the final Interest Period shall end on the Maturity Date and in no event shall any Interest Period end after the Maturity Date.

"**Interest Reserve**" has the meaning specified in Section 11.05.

"**Investor**" has the meaning specified in Section 13.02(a).

"**Late Fee**" has the meaning specified in Section 2.07.

"**Law**" or "**Laws**" means, as the context may require, any treaty, federal, state or local statute, law, rule, regulation, ordinance, order, code, policy or rule of common law, now or hereafter in effect, and any judicial or administrative interpretation of any of the foregoing by a Governmental Authority or otherwise, together with any judicial or administrative order, consent decree, judgment or agreement with a Governmental Authority.

"**LBP O&M Plan**" has the meaning specified in Section 8.02(i).

"**Leases**" has the meaning specified in the Mortgage.

"**Leasing Commissions**" has the meaning specified in Section 7.05.

"**Legal Requirement**" means as to any Person, the Authority Documents of such Person, and any Law, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Lender**" has the meaning specified in the introductory paragraph of this Agreement.

"**Lender's Casualty Consultant**" has the meaning specified in Section 6.02(c).

"**Lender's Office**" means 3370 Walden Avenue, Suite 114, Depew, New York 14043.

"**Lien**" means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), or preference, priority, or other security agreement or preferential arrangement, charge, or encumbrance of any kind or nature whatsoever, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Law of any jurisdiction to evidence any of the foregoing.

"**Loan**" has the meaning specified in Section 2.01.

"**Loan Documents**" means this Agreement, the Note, the Mortgage, the Assignment of Leases, the Guaranties, the Assignment of Rate Cap Agreement, the Assignment and Subordination of Property Management Agreement and all other documents executed in connection with, evidencing and/or securing the Loan, as each of the foregoing may from time to time be amended, modified, consolidated, extended, renewed or replaced.

"**Loss Amounts**" has the meaning specified in Section 13.26(c).

"**Losses**" has the meaning specified in Section 13.26(c).

"**Major Contracts**" means (1) each Property Agreement which either provides for total payments in excess of $25,000 or which has a term in excess of one (1) year unless it can be cancelled at any time on thirty (30) days or less notice, (2) all Operating Leases and Capital Leases and (3) all Leases of all or any portion of the Property.

"**Material Action**" means to (i) consolidate or merge Borrower or Controlling Party with or into any Person or divide into multiple entities or series pursuant to Section 18-217 of the Delaware Limited Liability Company Act or otherwise, (ii) Transfer any material portion of the assets of Borrower or Controlling Party, (iii) institute proceedings to have Borrower or Controlling Party be adjudicated a bankrupt Person or an insolvent Person, or consent to the institution of bankruptcy or insolvency proceedings against Borrower or Controlling Party or file a petition seeking, or consent to, reorganization or relief with respect to Borrower or Controlling Party under any applicable federal or state Law relating to bankruptcy, (iv) consent to, or request, the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Borrower or Controlling Party or any part of its property, (v) make any assignment for the benefit of creditors of Borrower or Controlling Party, (vi) admit in writing Borrower's or Controlling Party's inability to pay its debts generally as they become due, (vii) to the fullest extent permitted by Law, dissolve or liquidate Borrower or Controlling Party, or (viii) take action in furtherance of any of the foregoing actions.

"**Material Adverse Change**" means (i) a material adverse change in the status of the business, assets, liabilities, results of operations, conditions (financial or otherwise), property or prospects of Borrower, or Guarantor, and/or (ii) any event or occurrence of whatever nature which has or could have a material adverse effect on the ability of Borrower or Guarantor to perform its obligations under the Loan Documents to which it is a party.

"**Material Business Change**" means (i) a Material Adverse Change and/or (ii) a material adverse change in or regarding Lender and/or the real estate or financial markets (including, but not limited to, the secondary mortgage market and Securitization market).

"**Maturity Date**" means (i) February 17, 2024, subject to extension pursuant to the terms, provisions and conditions of Section 2.06 or (ii) such earlier date on which the Loan shall become due pursuant to the terms of this Agreement; provided however, that if such date is not a Business Day, then the Maturity Date shall be deemed to be the next succeeding Business Day.

"**Maximum Legal Rate**" means the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loan and as provided for in this Agreement or in the other Loan Documents, under the Laws of

52247332;1

the State of New York or the states whose Laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mold**" means fungi that reproduces through the release of spores or the splitting of cells or other means, including but not limited to mold, mildew, fungi, fungal spores, fragments and metabolites such as mycotoxins and microbial volatile organic compounds.

"**Mold O&M Plan**" has the meaning specified in Section 8.02(f).

"**Monthly Payment**" has the meaning specified in Section 11.05.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of the Execution Date made by Borrower, as mortgagor or grantor, to and for the benefit of Lender, as mortgagee or beneficiary, to secure repayment of the Loan, as hereafter amended, consolidated, supplemented  or modified from time to time.

"**Net Operating Income**" means, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period.  Lender's calculation of Net Operating Income shall be final absent manifest error.

"**Non-Consolidation Opinion**" means an opinion of counsel to Borrower (reasonably satisfactory to Lender and each Rating Agency (if any) in form and substance, from counsel reasonably satisfactory to Lender and each Rating Agency (if any) and containing assumptions, limitations and qualifications customary for opinions of such type) to the effect that a court of competent jurisdiction in a proceeding under the Bankruptcy Code would not consolidate the assets and liabilities of Borrower with those of any partner/member or affiliate thereof which became a debtor under the Bankruptcy Code, and if applicable to Borrower, that any Transfer of the Property would not be a fraudulent conveyance under the Bankruptcy Code.

"**Note**" means that certain Promissory Note dated as of the Execution Date in the original principal amount of $38,500,000.00 made by Borrower to the order of Lender, evidencing the Loan, as hereafter amended, consolidated, supplemented or modified from time to time.

"**Obligations**" means any and all present and future liabilities and obligations of Borrower to Lender, including those under or in connection with each Loan Document, together with all reasonable fees and expenses incurred in collecting any or all of such liabilities and obligations or enforcing any rights under each Loan Document, including all reasonable fees and expenses of counsel to Lender and of any experts and agents which may be paid or incurred by Lender in collecting any such items or enforcing any such rights.

"**Operating Expenses**" means, for any period, the total of all expenditures, computed by Lender in accordance with GAAP, of whatever kind relating to the operation, maintenance and management of the Property, which expenditures are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance (as underwritten for such period by Lender in its sole discretion), Tenant Improvements and leasing commissions (as underwritten for such period by Lender in its sole discretion), replacement

reserves (as underwritten for such period by Lender in its sole discretion), insurance, license fees, Impositions, third party ground lease rent payments, advertising expenses, management fees, payroll and related taxes, computer processing charges, general and administrative costs, security costs, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, debt service, Capital Expenditures, and contributions to any of the Reserves.

"**Operating Leases**" means any bona-fide arms-length lease between Borrower and a third party for the operation of the Property; specifically, excluding, however, any residential Leases.

"**Payment Date**" means the first (1st) day of each calendar month and the Maturity Date; provided, however, if such day is not a Business Day, then the Payment Date shall be deemed to be the next succeeding Business Day.

"**Permit**" or "**Permits**" means, as the context may require, all Governmental Approvals issued by or required to be obtained from any Governmental Authority in connection with the transactions contemplated in Loan Documents or the ownership, operation, construction or maintenance of the Property.

"**Permitted Debt**" means (a) the Note and the other obligations, indebtedness and liabilities specifically provided for in the Loan Documents and secured by the Mortgage and the other Loan Documents and (b) trade payables incurred by Borrower in the ordinary course of business, provided that such trade payables (i) do not exceed $250,000.00 in the aggregate, (ii) are not evidenced by a promissory note, (iii) are not secured and (iv) are payable within ninety (90) days.

"**Permitted Encumbrances**" means those property specific exceptions to title recorded in the real estate records of the county in which the Property is located and contained in Schedule B of the title insurance policy which has been approved by Lender and Impositions not yet due and payable.

"**Permitted Materials**" means de minimis amounts of cleaning and maintenance materials of the types and quantities customarily used and stored at properties similar to the Property, provided that same are used, stored, maintained and disposed of in accordance with all Environmental Laws.

"**Person**" means an individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**Personal Property**" means all personal property located on, attached to or used in or about the Improvements, or in connection with any activity conducted at the Real Property.

"**Plan**" has the meaning specified in Section 4.02(p).

"**Prepayment Fee**" has the meaning specified in Section 2.08.

"**Prohibited Person**" means (i) a Person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (ii) a Person owned or Controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (iii) a Person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (iv) a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, (v) a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/ofac/t11sdn.pdf or at any replacement website or at any other official publication of such list, and (vi) a Person who is affiliated with a Person described in clauses (i) through (v) above.

"**Property**" means the Real Property, Improvements, Fixtures, Equipment, and Personal Property, as more particularly described in the Granting Clauses of the Mortgage.

"**Property Agreements**" means all agreements, grants of easements and/or rights-of-way, reciprocal easement agreements, Permits, declarations of covenants, conditions and restrictions, disposition and development agreements, planned unit development agreements, management or parking agreements, party wall agreements or other instruments affecting the Property, including any brokerage agreements, management agreements, service contracts, and Leases.

"**Property Management Agreement**" means the property management agreement between Borrower and Property Manager with respect to the Property, as approved by Lender pursuant to Section 4.05(s).

"**Property Manager**" means EVU Residential LLC, a Delaware limited liability company, and any other managing agent for the Property approved by Lender pursuant to Section 4.05(s).

"**Rate Adjustment Date**" means, for each Interest Period, the date that is (i) with respect to the initial Interest Period, the Business Day immediately prior to the Execution Date and (ii) with respect to any Interest Period after the initial Interest Period, two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period.

"**Rate Cap Agreement**" means an interest rate cap agreement which (1) has a notional amount equal to the scheduled outstanding principal balance of the Loan, (2) provides that to the extent the cap index identified in the rate cap term sheet approved by Lender (the "**Approved Index**") (or, after a Benchmark Replacement Date has occurred, the Benchmark Replacement) exceeds the Strike Rate that the Acceptable Counterparty to such agreement will make payments equal to the amount of interest that would accrue on the Loan at an annual rate equal to the difference between the Approved Index (or, after a Benchmark Replacement Date has occurred, the Benchmark Replacement) and the Strike Rate, (3) has a term equal to the then effective term of the Loan based upon the then effective Maturity Date, (4) is issued by an Acceptable Counterparty, (5) is accompanied by an Assignment of Rate Cap Agreement executed by Borrower and consented to by the Acceptable Counterparty to such agreement, and (6) is in form and substance satisfactory to Lender.

"**Rate Reserve Percentage**" for any calendar month means the reserve percentage applicable during such Interest Period (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such Interest Period during which any such percentage shall be so applicable) under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for Lender with respect to liabilities or assets consisting of the then-current Benchmark.

"**Rating Agency**" means, prior to the final Securitization of the Loan, either of S&P, Moody's, Fitch, DBRS, Inc. and Morningstar Credit Ratings, LLC or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the final Securitization of the Loan, means any of the foregoing that have rated any of the Securities.

"**Real Property**" means that certain real property located at 4590 Seaway Drive, Lansing, Michigan 48911, more particularly described in Exhibit A hereto.

"**Real Property Taxes**" means all taxes, payments in lieu of taxes, assessments, water and sewage charges, governmental impositions, and other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Real Property, required to be paid by Borrower.

"**Rebalance Date**" has the meaning specified in Section 2.03.

"**Rebalance Debt Service Coverage Ratio**" has the meaning specified in Section 2.03.

"**Rebalance Prepayment**" has the meaning specified in Section 2.03.

"**Recourse Guaranty**" means that certain Recourse, Rebalance Prepayment and Out of Balance Payment Guaranty dated as of the Execution Date made by Guarantor for the benefit of Lender in connection with the Loan, as hereafter amended, consolidated, supplemented or modified from time to time.

"**Related Party**" has the meaning specified in Section 13.26(a).

"**Release**" means any intentional or unintentional placing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, discarding, releasing or abandoning of any Hazardous Material, other than in the normal course of business or activities of Borrower or its Tenants, and in compliance with all Environmental Laws.

"**Remedial Work**" means any investigation, inspection, site monitoring, containment, clean up, removal, response, corrective action, mitigation, restoration or other remedial work of any kind or nature because of, or in connection with, the current or future presence, suspected presence, Release or threatened Release in or about the air, soil, ground water, surface water or soil vapor at, on, about, under or within all or any portion of the Property of any Hazardous Materials, including any action to comply with any Environmental Laws or directive of any Governmental Authority with regard to any Environmental Laws.

16

"**Renovation Contracts**" has the meaning specified in Section 11.03(a).

"**Renovation Out of Balance**" has the meaning specified in Section 11.03(b).

"**Renovation Out of Balance Amount**" has the meaning specified in Section 11.03(b).

"**Renovation Reserve**" has the meaning specified in Section 11.03(a).

"**Renovation Reserve Advance**" has the meaning specified in Section 11.03(a).

"**Renovation Reserve Advance Request**" has the meaning specified in Section 11.03(a).

"**Renovation Reserve Full Funding Date**" has the meaning specified in Section 11.03(a).

"**Renovation Reserve Maximum Advance Amount**" has the meaning specified in Section 11.03(a).

"**Renovations**" has the meaning specified in Section 11.03(a).

"**Renovations Budget**" has the meaning specified in Section 11.03(a).

"**Rent Regulations**" has the meaning specified in Section 4.05(t).

"**Rent Roll**" means the rent roll dated February 7, 2022 as set forth on Exhibit E.

"**Rents**" has the meaning specified in the Mortgage.

"**Replacement**" means the restoring, repairing, replacing or rebuilding all or any part of the Property that was affected by a Condemnation.

"**Replacement Deposit**" has the meaning specified in Section 11.04.

"**Replacement Loan**" has the meaning specified in Section 3.01(a).

"**Replacement Loan Lender**" means (i) any Affiliate of Lender, (ii) Arbor Commercial Mortgage, LLC or any of its Affiliates or (iii) any third-party lender selected or arranged by Lender to make a Replacement Loan.

"**Replacement Reserve**" has the meaning specified in Section 11.04.

"**Required Insurance**" means all insurance required to be maintained under this Agreement.

"**Required Records**" has the meaning specified in Section 4.22(c).

"**Reserves**" has the meaning specified in Section 11.06(a).

"**Restoration**" means the restoring, repairing, replacing or rebuilding all or any part of the Property that was affected by a Casualty.

"**Retention Amount**" has the meaning specified in Section 6.03(g).

"**RICO**" has the meaning specified in Section 13.26(c).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**Securities**" has the meaning specified in Section 13.02(a).

"**Securitization**" means a public or private offering of Securities by Lender or any of its Affiliates or their respective successors and assigns.

"**Security Deposit Account**" has the meaning specified in Section 12.02.

"**Shortfall**" has the meaning specified in Section 11.05.

"**Shortfall Guaranty**" means that certain Shortfall Guaranty dated as of the Execution Date made by Guarantor for the benefit of Lender in connection with the Loan, as hereafter amended, consolidated, supplemented or modified from time to time.

"**Single Purpose Entity**" means a Person, other than an individual, which (i) is formed or organized solely for the purpose of acquiring, leasing, owning, developing, using and operating the Property and obtaining the Loan and transacting lawful business that is incidental, necessary or appropriate to accomplish the foregoing, (ii) does not engage in any business other than as set forth in clause (i) above and conducts and operates its business presently conducted, (iii) has not and will not have any assets other than those related to its interest in the Property or the operation, management and financing thereof or any indebtedness other than the Permitted Debt, (iv) maintains its own separate books and records and its own accounts, in each case which are separate and apart from the books and records and accounts of any other Person, (v) holds itself out as being a Person, separate and apart from any other Person (including any Affiliate or constituent party of such Person), (vi) does not and will not commingle its funds or assets with those of any other Person and holds all of its assets in its own name, (vii) conducts its own business in its own name and does not identify itself as a division or department of any other Person, (viii) maintains separate financial statements, (ix) pays its own liabilities and expenses out of its own funds, (x) observes all partnership, corporate or limited liability company formalities, as applicable, and complies with the terms of its Authority Documents, (xi) pays the salaries of its own employees, if any, and maintains a sufficient number of employees, if any, in light of its contemplated business operations, (xii) does not guarantee, assume or otherwise obligate itself with respect to the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, (xiii) does not acquire or assume the obligations or securities of any other Person, including its Affiliates, partners, members or shareholders, (xiv) allocates fairly and reasonably shared expenses, including, without limitation, any overhead for shared office space, if any, (xv) uses separate stationery, invoices and checks bearing its own name, (xvi) maintains an arms-length relationship with its Affiliates on terms that are intrinsically fair and commercially reasonable, (xvii) does not and will not pledge its assets for the benefit of any other Person or make any loans or advances to any other Person, (xviii) does and will continue to correct any known misunderstanding regarding its separate identity, (xix) maintains adequate capital for the normal

18

obligations reasonably foreseeable in a business of its size and character in light of its contemplated business operations, (xx) has and will continue to have Authority Documents which contain the provisions set forth in this definition of "Single Purpose Entity" and Section 4.02(e) hereof and that have been approved by Lender, (xxi) has not and will not, and does not and will not have any constituent party that, engages in, seeks, or consents to the dissolution, winding up, liquidation, consolidation or merger of such Person, and has not and will not, and does not and will not have any constituent party that, engages in, seeks or consents to any asset sale or Transfer of the partnership, membership or shareholder interests, of such Person, or amendments or termination of any of its Authority Documents, or the division of such Person into multiple entities or series pursuant to Section 18-217 of the Delaware Limited Liability Company Act or otherwise, (xxii) files its own tax returns ((unless such Person is treated as a "disregarded entity" for tax purposes and is not required to file tax returns or is required to file consolidated tax returns by law), (xxiii) is and intends to remain Solvent and has paid and intends to pay its debts and liabilities from its own assets, (xxiv) maintains its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its assets from those of any other Person, (xxv) does not permit any Affiliate or constituent party independent access to its bank accounts, other than the Property Manager pursuant to the terms of the Property Management Agreement, and (xxvi) does not have any of its obligations guaranteed by any of its Affiliates, other than pursuant to the Guaranties. If Borrower is a limited partnership or a limited liability company (other than a limited liability company formed in the State of Delaware, meeting the requirements of this definition and having at least two (2) springing members and at least two (2) Independent Managers), Controlling Party shall be either a corporation or a Delaware limited liability company whose sole asset is its interest in Borrower that (w) directly owns at least one-half-of-one percent (0.5%) of the equity of Borrower,  (x) at all times has been, is and shall remain a Single Purpose Entity (as such definition is modified to take into account that Controlling Party owns the interest in Borrower and is not obtaining the Loan), (y) comply, and will cause Borrower to comply, with each of the representations, warranties, and covenants contained in Section 4.02(e) of this Agreement as if such representation, warranty or covenant was made directly by Controlling Party, and (z) have at least two (2) Independent Managers.

"**SOFR**" means, with respect to any calendar day, the secured overnight financing rate as published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator), on the Federal Reserve Bank of New York's Website.

"**Solvent**" means, as to any Person, that (a) the sum of the assets of such Person, at a fair valuation, exceeds its liabilities, including contingent liabilities, (b) such Person has sufficient capital with which to conduct its business as presently conducted and as proposed to be conducted and (c) such Person has not incurred Indebtedness, and does not intend to incur Indebtedness, beyond its ability to pay such Indebtedness as it matures.  With respect to any such contingent liabilities, such liabilities shall be computed in accordance with GAAP at the amount which, in light of all the facts and circumstances existing at the time, represents the amount which can reasonably be expected to become an actual or matured liability.

"**Spread**" means four and fifteen-hundredths of one percent (4.15%).

"**State**" means the State in which the applicable portion of the Property is located.

19

"**Strike Rate**" means one percent (1%), as the same may be adjusted by Lender in its reasonable discretion after a Benchmark Replacement Date occurs.

"**Sublease**" means any lease, tenancy, license or other agreement affecting the use, enjoyment or occupancy of any demised premises under a Lease by the Tenant thereunder to any Person.

"**Tax and Insurance Deposits**" has the meaning specified in Section 11.01(a).

"**Tax and Insurance Reserve**" has the meaning specified in Section 11.01(a).

"**Tenant**" or "**Tenants**" means, as the context may require, each tenant, lessee, licensee or other party to a Lease.

"**Tenant Improvements**" means all work performed by Borrower to prepare space in the Property for initial occupancy by a Tenant pursuant to a Future Lease and all work performed by such Tenant for which Borrower is obligated to reimburse such Tenant pursuant to the terms of such Future Lease.

"**Tenant Notice Letter**" has the meaning specified in Section 12.03(c).

"**Term SOFR**" means for any Interest Period, the one-month forward looking term rate based on SOFR for a one month tenor, as reported on the CME Market Data Platform (or any alternative source designated by the Term SOFR Administrator, from time to time) for the rate currently identified as "1 Month CME Term SOFR" as of the Rate Adjustment Date for such Interest Period; provided, that if as of 5:00 p.m. (New York City time) on any Rate Adjustment Date such one-month forward looking term rate has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then Term SOFR will be such one-month forward looking term rate as published by the Term SOFR Administrator on the first preceding U.S. Government Business Day for which such one-month forward looking term rate was published by the Term SOFR Administrator; provided, further, that if Term SOFR determined as provided above shall ever be less than zero, then Term SOFR shall be deemed to be zero.

"**Term SOFR Administrator**" shall mean CME Group Benchmark Administration Limited (CBA), or a successor administrator of Term SOFR selected by Lender in its discretion.

"**Transfer**" means the conveyance, assignment, sale, mortgaging, encumbrance, pledging, hypothecation, granting of a security interest in, granting of options with respect to, or other disposition of (directly or indirectly, voluntarily or involuntarily, by operation of Law or otherwise, and whether or not for consideration or of record) all or any portion of any legal or beneficial interest (i) in all or any portion of the Property; (ii) in Borrower (or any trust of which Borrower is a trustee); or (iii) in any Person having a direct or indirect legal or beneficial ownership in Borrower; and shall also include, without limitation to the foregoing, the following: (a) a change in Control of the direct or indirect management of Borrower, Controlling Party or Guarantor, (b) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof or all interest therein for a price to be paid in installments, (c) all agreements by Borrower leasing all

20

or a substantial part of the Property to one or more Persons pursuant to a single or related transactions (excluding leases to third party Tenants entered in the normal course of Borrower's business and in compliance with the terms of the Mortgage), or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or all Rent, (d) any instrument subjecting the Property to a condominium regime or transferring ownership to a cooperative corporation, (e) the issuance of any new or additional legal or beneficial ownership interests in Borrower or any Person having a direct or indirect legal or beneficial ownership interest in Borrower, including, without limitation issuance of preferred equity or new stock in a corporation or the admission of new partners or members, (f) the dissolution or termination of Borrower or any Person having a direct or indirect legal or beneficial ownership interest in Borrower or the merger or consolidation of Borrower or such Person with any other Person, and (g) any division of a limited liability company into multiple entities or series pursuant to Section 18-217 of the Delaware Limited Liability Company Act or otherwise, with an allocation of collateral held by Lender to any such Person or series.

Notwithstanding the foregoing, a transfer of the interests in Borrower or any Person having a direct or indirect legal or beneficial ownership interest in Borrower, by or on behalf of an individual owner thereof who is deceased or declared judicially incompetent, to such owner's heirs, legatees, devisees, executors, administrators, trustees, estate or personal representatives shall not constitute a "Transfer", provided that (v) such transferee is not a Prohibited Person, (w) no Event of Default exists at the time of such Transfer, (x) notice of such Transfer is delivered to Lender not less than thirty (30) days prior to such Transfer (or in the case of a Transfer by operation of law in the event of the death of such individual, not more than thirty (30) days after such Transfer) together with any instruments evidencing the Transfer; (y) there is no change in the management of the Property or in the Control of Borrower or Controlling Party as a result of such Transfer; and (z) if any transferee shall own twenty percent (20%) or more of the direct or indirect interests in Borrower as a result of such Transfer then Lender shall have the right to obtain criminal and credit searches in respect of such transferee (i.e., bankruptcy, litigation, judgment and lien searches), and such searches shall be reasonably acceptable to Lender.

"**UCC**" or "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect in the State (with respect to fixtures), the State of New York or the state in which any of the Reserves of the Collection Account is located, as the case may be.

"**UCC Collateral**" has the meaning specified in Section 10.02(a)(xvi).

"**USA Patriot Act**" means the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56).

"**Use Requirements**" means any and all building codes, Permits, certificates of occupancy or compliance, Laws, regulations, or ordinances (including, without limitation, health, pollution, fire protection, medical and day-care facilities, waste product and sewage disposal regulations), restrictions of record, easements, reciprocal easements, declarations or other agreements affecting the use of the Property or any part thereof.

21

"**U.S. Government Securities Business Day**" shall mean any day except for (i) a Saturday, (ii) a Sunday, or (iii) a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**Work**" has the meaning specified in Section 11.04.

1.02   <u>General Construction</u>.   Defined terms used in this Agreement may be used interchangeably in singular or plural form, and pronouns are to be construed to cover all genders. All references to this Agreement or any agreement or instrument referred to in this Agreement means such agreement or instrument as originally executed and as hereafter amended, supplemented, extended, consolidated or restated from time to time.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular subdivision; and the words "Article" and "Section" refer to the entire article or section, as applicable and not to any particular subsection or other subdivision.  Reference to days for performance means calendar days unless Business Days are expressly indicated. In the event any financial test under Sections 2.03 and/or 2.06 hereof are stated to be measured as of a calendar day that is not a Business Day, the testing date set forth therein shall be deemed to be the next succeeding Business Day.  All references to a Law include any amendment or modification to such Law.  All references to a Person include such Person's permitted successors and assigns.

## ARTICLE 2
## LOAN

2.01   <u>Loan</u>.

(a)     Subject to the terms and conditions of this Agreement, Lender agrees to make a loan pursuant to this Agreement to Borrower on the Execution Date in the maximum principal amount of $38,500,000.00 (the "**Loan**"). Amounts prepaid or repaid on the Loan cannot be re-borrowed.

(b)     Upon the Execution Date, Lender shall make the initial Disbursement of Loan Proceeds in the amount of Thirty-Seven Million and No/100 Dollars ($37,000,000.00) (the "**Initial Disbursement**").

(c)     Lender shall make Renovation Reserve Advances in accordance with Section 11.03 hereof. To the extent that Lender makes any Renovation Reserve Advance to Borrower pursuant to and in accordance with the terms and conditions of Section 11.03 hereof, then any such amount shall be deemed to be first deposited into the Renovation Reserve and then immediately advanced to Borrower therefrom.  Prior to the Renovation Reserve Full Funding Date, interest on Renovation Reserve Advances shall accrue and be payable, pursuant to and in accordance with the Note and this Article 2, commencing as of the date such Renovation Reserve Advance is advanced by Lender into the Renovation Reserve in accordance with Section 11.03 hereof.

(d)     The Loan shall be disbursed in full by the Renovation Reserve Full Funding Date.  If the full amount of the Renovation Reserve Maximum Advance Amount is not fully advanced prior to the Renovation Reserve Full Funding Date, Lender may, advance the remaining balance of the Renovation Reserve Maximum Advance Amount to the Renovation Reserve pursuant to Section 11.03 hereof.  Notwithstanding anything to the contrary, from and after the Renovation Reserve Full Funding Date, interest shall accrue and be payable, pursuant to and in accordance with the Note and this Article 2, on the entire amount of the Renovation Reserve Maximum Advance Amount, whether or not such funds have been disbursed to Borrower.

2.02     Computation and Payment of Interest.

(a) Except as set forth in Section 2.01(c) and (d) above, Borrower agrees to pay interest to Lender on the outstanding and unpaid principal amount of the Loan at a rate per annum equal to the Applicable Interest Rate. Interest for each Interest Period shall be paid on the Payment Date immediately following each Interest Period, except that interest for the period from the Execution Date to the last day of the calendar month in which the Execution Date occurs shall be payable on the Execution Date (provided that Term SOFR for the period from the Execution Date to such last day of the calendar month shall be set as of the Business Day immediately prior to the Execution Date).

(b) Subject to the provisions of the following paragraph with respect to the application of the Default Rate, the Applicable Interest Rate for each Interest Period shall be the Applicable Interest Rate as of the Rate Adjustment Date at the beginning of such Interest Period. Lender shall determine the Applicable Interest Rate for each Interest Period on each Rate Adjustment Date, except that the Applicable Interest Rate for the period from the Execution Date to the last day of the calendar month in which the Execution Date occurs shall be determined by Lender as of the Business Day immediately prior to the Execution Date. Not later than five (5) days prior to each Payment Date Lender shall give notice to Borrower of the then effective Applicable Interest Rate and the amount of the payment required to be made in the next Payment Date. During the applicable Interest Period, interest shall accrue on the outstanding principal amount of the Loan at the Applicable Interest Rate for such Interest Period.

(c) Any amount of principal or interest or any other amount due under the Note, this Agreement and/or any other Loan Document which is not paid when due will, at the option of Lender, bear interest from the date when due until paid in full, payable on demand, at a rate per annum equal to the Default Rate.  During any period in which there is an outstanding Event of Default, at the option of Lender, the Loan will bear interest at the Default Rate.  Interest accruing under this Agreement shall be calculated on the basis of a year of three hundred sixty (360) days for the actual number of days elapsed.  All calculations by Lender of the Applicable Interest Rate and the interest payments due under this Agreement shall be conclusive absent manifest error.

(d) If a Benchmark Transition Event occurs after the date hereof, then Lender shall give written notice thereof to Borrower as soon as practicable thereafter, which notice shall contain the identity of the Benchmark Transition Event, and if known at such time, the Benchmark Replacement, the Benchmark Replacement Adjustment and the Benchmark Replacement Date and any Benchmark Replacement Conforming Changes. If any such notice is given, the Applicable Interest Rate with respect to the Loan for any Interest Period commencing after the Benchmark

52247332;1

Replacement Date shall be (i) the Alternative Rate or (ii) the Default Rate, whichever is applicable at the time of determination. In connection with the implementation of a Benchmark Replacement, Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(e) If, at any time, Lender determines that it has miscalculated the Applicable Interest Rate (whether because of a miscalculation of Term SOFR or otherwise), Lender shall notify Borrower of the necessary correction.  If the corrected Applicable Interest Rate represents an increase in the applicable monthly payment, Borrower shall, within ten (10) days thereafter, pay to Lender the corrected amount.  If the corrected Applicable Interest Rate represents an overpayment by Borrower to Lender and no Event of Default then exists, Lender shall refund the overpayment to Borrower or, at Lender's option, credit such amounts against Borrower's payment next due hereunder.

(f) All payments made by Borrower hereunder shall be made free and clear of, and without reduction for, or on account of, any income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority (other than taxes on the overall net income or overall gross receipts of Lender imposed as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing same provided, that this exclusion shall not apply to a connection arising solely from Lender's having executed, delivered, performed its obligations under, received a payment under, or enforced this Agreement or any other Loan Document).  If any such amounts are required to be withheld from amounts payable to Lender, the amounts payable to Lender under the Loan Documents shall be increased to the extent necessary to yield to Lender, after payment of such amounts, interest or any such other amounts payable at the rates or in the amounts specified herein.  If any such amounts are payable by Borrower, Borrower shall pay all such amounts by their due date and promptly send Lender a copy of an original official receipt showing payment thereof.  If Borrower fails to pay such amounts when due or to deliver the required receipt to Lender, Borrower shall indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failure.

(g) Borrower shall pay to Lender, so long as Lender shall be required under regulations of the Board of Governors of the Federal Reserve System to maintain reserves with respect to liabilities or assets consisting of or including Term SOFR, additional interest on the unpaid principal amount of the Loan at an interest rate per annum equal at all times to the remainder obtained by subtracting (i) Term SOFR for any calendar month from (ii) the rate obtained by dividing such Term SOFR by a percentage equal to one hundred percent (100%) minus the Rate Reserve Percentage for such calendar month, payable in arrears on each Payment Date.  Such additional interest shall be determined by Lender and notified to Borrower.

(h) If Lender determines that the adoption of any Law, regulation, rule or guideline (including, without limitation, any change regarding the imposition or increase in reserve requirements), whether or not having the force of Law, does or will have the effect of reducing Lender's rate of return on the Loan, then, from time to time, within ten (10) Business Days after

written demand by Lender, Borrower shall pay Lender such additional amount as will compensate Lender for its reduction.  In addition, if any Law, regulation, rule or guideline hereafter is enacted or modified, whether or not having the force of Law, and compliance therewith results in an increase in the cost to Lender (including, without limitation, a reduction in the income received by Lender) in making, funding or maintaining interest on the Loan at the rate herein provided, then, within five (5) Business Days after written demand by Lender, Borrower shall pay Lender the additional amounts necessary to compensate Lender for such increased costs.

(i) Notwithstanding anything to the contrary contained herein, if Borrower is prohibited by Law from paying any amount due to Lender under any of the prior three (3) paragraphs, Lender may elect to declare the unpaid principal balance of the Loan, together with all unpaid interest accrued thereon and any other amounts due hereunder, due and payable within ninety (90) days of Lender's written notice to Borrower.  Lender's delay or failure in accelerating the Loan upon the discovery or occurrence of an event under such paragraph shall not be deemed a waiver or estoppel against the exercise of such right.

2.03    **Payment of Principal**.  Borrower agrees to pay the entire unpaid principal balance of the Loan on the Maturity Date.  All amounts due under each Loan Document shall be made without any setoff, or defense and irrespective of, and without deduction for, counterclaims.

Notwithstanding the foregoing or anything to the contrary set forth herein, (i) on August 18, 2023, and (ii) at all times upon, and following, the occurrence of an Event of Default (each, a "**Rebalance Date**"), the Debt Service Coverage Ratio, as determined by Lender in its sole and absolute discretion, must be equal to or greater than 1.10:1.00 (the "**Rebalance Debt Service Coverage Ratio**"), with respect to subsection (i) above, based on a trailing three (3) month basis for Gross Income from Operations (annualized) based upon data from April 1, 2023 through June 30, 2023, and a trailing twelve (12) month basis for normalized Operating Expenses (annualized) based upon data from July 1, 2022 through June 30, 2023, and with respect to subsection (ii) above, based upon data for a period of time as determined by Lender in its sole discretion. If the Rebalance Debt Service Coverage Ratio has not been achieved on the Rebalance Date, then, at Lender's option in its sole and absolute discretion, Lender may deliver written notice to Borrower demanding payment of, and Borrower shall pay to Lender within ten (10) days of receipt of such notice, an amount to prepay and reduce the principal balance of the Loan such that the Debt Service Coverage Ratio equals the Rebalance Debt Service Coverage Ratio (the "**Rebalance Prepayment**"). The Rebalance Prepayment shall be made in accordance with the provisions of Section 2.08, with payment of the applicable Exit Fee.  The nonpayment of the Rebalance Prepayment together with the applicable portion of the Exit Fee as herein prescribed shall be an immediate Event of Default.

For the avoidance of doubt, Lender may exercise or elect not to exercise its rights under this Section 2.03 as set forth herein for any or no reason whatsoever, and Lender's exercise, failure to exercise or delay in exercising its right to measure the Debt Service Coverage Ratio or demand the Rebalance Prepayment pursuant to this Section 2.03 shall not be deemed a waiver of nor preclude any further exercise thereof by Lender to measure the Debt Service Coverage Ratio or demand the Rebalance Prepayment under this Section 2.03 and Borrower hereby waives any defense Borrower might assert or have by reason of Lender's exercise, failure to exercise or delay in exercising its rights hereunder.

52247332;1

2.04     Method of Payment.   Borrower agrees to make each payment to Lender under this Agreement, the Note and each of the other Loan Documents on the date when due at Lender's Office or such other location as may be designated by written notice from Lender to Borrower. All payments under this Agreement, the Note or any of the other Loan Documents shall be made in lawful money of the United States of America by wire transfer in federal or other immediately available funds to the account specified from time to time by Lender.  Whenever any payment to be made under this Agreement, the Note or any of the other Loan Documents is stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day; however, except with respect to any payments due on the Maturity Date, such extension of time shall not in such case be included in the computation of the payment of interest.   Each payment received by Lender after 2:00 p.m. local time at the place then designated by Lender for payment shall be deemed received on the next Business Day for all purposes under this Agreement, the Note and any of the other Loan Documents, including the payment and accrual of interest.  Any regularly scheduled payment of interest that is received by Lender before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due.

2.05     Application of Payments.   All payments received by Lender shall be applied as follows: first, to the payment of all fees and expenses due from Borrower to Lender; second, to the payment of accrued and unpaid interest; third, to the payment of the Exit Fee; fourth, to the payment of the Prepayment Fee due hereunder, if any; and lastly, to the payment of principal on the Loan.

2.06     Extension of Term.   Borrower has an option to extend the Maturity Date two (2) times for an additional twelve (12) months for each extension, provided all of the following terms and conditions precedent are strictly satisfied: (a) at least thirty (30) days prior to the then scheduled Maturity Date, Borrower delivers to Lender written notice ("Extension Notice") of Borrower's election to extend the Maturity Date for an additional twelve (12) months, such Extension Notice to be delivered only by certified mail or by nationally recognized overnight courier service, to Lender's Office, in each case with return receipt or delivery confirmation requested and retained to evidence strict compliance with the terms and conditions of this Section 2.06, (b) upon five (5) Business Days' demand from Lender, and in any event prior to the date on which the extension commences, Borrower pays to Lender all of Lender's reasonable expenses, if any, incurred in connection with the exercise by Borrower of its option to extend the Maturity Date, (c) no Default or Event of Default exists at any time during the period from the date Borrower delivers the applicable Extension Notice to and including the date on which the extension commences, (d) Borrower pays to Lender an extension fee equal to $385,000.00 ("Extension Fee"), which payment must be in the form of a certified check or official bank check and must accompany the applicable Extension Notice, (e) upon five (5) Business Days' demand from Lender, and in any event prior to the date on which the extension commences, Borrower shall have deposited into the Interest Reserve an amount determined by Lender in its sole discretion, (f) only if required by Lender in its sole and absolute discretion, the Debt Service Coverage Ratio, as determined by Lender in its sole and absolute discretion, (A) as of February 1, 2024, with respect to the first extension, is not less than 1.25:1.00 based on a trailing three (3) month basis for Gross Income from Operations (annualized) based on data from October 1, 2023 to December 31, 2023 and a trailing twelve (12) month basis for normalized Operating Expenses (annualized) based upon data from January 1, 2023 to December 31, 2023  and (B) as of February 1, 2025, with respect to the second extension, is not less than 1.25:1.00 based on a trailing three (3) month basis for Gross

26

Income from Operations (annualized) based on data from October 1, 2024 to December 31, 2024 and a trailing twelve (12) month basis for normalized Operating Expenses (annualized) based upon data from January 1, 2024 to December 31, 2024 (each, an "Extension DSCR"); provided, however, if the actual Debt Service Coverage Ratio for such period is less than the applicable Extension DSCR, Borrower may satisfy this condition by making a prepayment of the Loan by the original Maturity Date in an amount sufficient to increase the actual Debt Service Coverage Ratio to meet or exceed the applicable Extension DSCR, (g) Borrower shall, if required by Lender in its sole and absolute discretion, purchase a Rate Cap Agreement based on the new Maturity Date in form and substance satisfactory to Lender and with a Strike Rate which is determined by Lender to be sufficient to cause the Debt Service Coverage Ratio, as determined by Lender in its sole and absolute discretion, to be not less than 1.10 to 1.0, which Rate Cap Agreement shall have been collaterally assigned to Lender pursuant to the terms of an Assignment of Rate Cap Agreement in form and substance satisfactory to Lender.

For the avoidance of doubt, Lender may exercise or elect not to exercise its rights under Section 2.06(f) for any or no reason whatsoever, and Lender's exercise, failure to exercise or delay in exercising its right to measure the Extension DSCR pursuant to this Section 2.06 shall not be deemed a waiver of nor preclude any further exercise thereof by Lender to measure the Extension DSCR under this Section 2.06 and Borrower hereby waives any defense Borrower might assert or have by reason of Lender's exercise, failure to exercise or delay in exercising its rights hereunder.

If Borrower pays the Extension Fee but then fails to qualify for the extension because of a failure to strictly satisfy any of the conditions precedent for such extension, then Lender shall retain the Extension Fee and apply the Extension Fee to the outstanding principal balance of the Loan at the time Borrower repays the Loan in full, which prepayment shall be made in accordance with the terms of Section 2.08, with the payment of the applicable Exit Fee.

2.07    Late Fee.  If any amount payable under any Loan Document is not received by Lender within five (5) days after such amount is due, Borrower shall pay to Lender, within five (5) days of when requested by Lender, a late charge equal to five percent (5%) of such amount (the "**Late Fee**").  The Late Fee is payable in addition to, and not in lieu of, any interest payable at the Applicable Interest Rate or the Default Rate.  Borrower agrees that the payment of the Late Fee is to cover the expenses incurred by Lender in processing the delinquent payment.

2.08    Prepayments.  Borrower may prepay the Loan in whole or in part in accordance with the following provisions:  (1) at least thirty (30) days prior to the date proposed for prepayment Borrower delivers to Lender written notice of such prepayment and such notice specifies the date and the amount of such prepayment, (2) Borrower pays to Lender all amounts due and owing under each Loan Document, including all accrued and unpaid interest, including interest accrued at the Default Rate (if any), all fees and expenses, including all Late Fees (if any), the Exit Fee, the Prepayment Fee and all legal fees, property inspection fees and other loan processing and servicing fees, (3) each partial prepayment shall be in a principal amount of not less than $100,000, and (4) if any prepayment is tendered on a day which is not a Payment Date, Borrower pays to Lender an amount equal to the interest that would have accrued on the Loan after the date of prepayment through and including the date immediately preceding the next Payment Date had the prepayment not been made, and such sum shall constitute additional consideration for the prepayment and not a penalty.  Lender shall submit a certificate to Borrower setting forth

52247332;1

in reasonable detail the amount required to be paid, which certificate shall be conclusive absent manifest error. No principal amount repaid may be re-borrowed.

If a prepayment of principal, or any payment of the Loan upon acceleration of the Loan following the occurrence of an Event of Default, is made prior to February 18, 2023 (the "**Early Prepayment Date**") Borrower shall also pay to Lender together with such prepayment, or such payment upon acceleration, as applicable, an amount (the "**Prepayment Fee**") equal to the interest (at the Applicable Interest Rate or the Alternative Rate, as applicable) which would have otherwise been payable on such prepaid amount from the date of such prepayment through and including the Early Prepayment Date. Notwithstanding the foregoing, no Prepayment Fee shall be due for partial prepayments resulting from Lender applying Casualty Insurance Proceeds or Condemnation Proceeds to reduce the outstanding principal balance of the Loan or partial prepayments made pursuant to Section 2.03 and/or Section 2.06 hereof.  Borrower acknowledges that Lender has relied upon the anticipated investment return under this Agreement and the Note in entering into transactions with, and in making commitments to, third parties and that the tender of any prepayment, shall, to the extent permitted by Law, include the Prepayment Fee. Borrower agrees that the Prepayment Fee represents the reasonable estimate of Lender and Borrower of a fair average compensation for the loss that may be sustained by Lender as a result of a prepayment of the Loan and it shall be paid without prejudice to the right of Lender to collect any other amounts provided to be paid under the Loan Documents.

Mandatory prepayments made in connection with the application, pursuant to this Agreement, of Casualty Insurance Proceeds or Condemnation Proceeds shall be paid in the amounts and at the times specified in this Agreement, without the payment of the Prepayment Fee, but with payment of the applicable Exit Fee.

2.09    Exit Fee.  If all or any part of the unpaid principal balance of the Loan is repaid, at any time and for any reason, including (1) any regularly scheduled payment of the Loan, including payments made on the Maturity Date, (2) any payment of the Loan upon acceleration of the Loan following the occurrence of an Event of Default, (3) any optional prepayment of the Loan, or (4) any mandatory prepayment of the Loan, including any Rebalance Prepayment, then Borrower agrees to make a payment in an amount equal to one percent (1.0%) of the amount of such principal payment or prepayment (the "**Exit Fee**"); provided, however, and for the avoidance of doubt, to the extent that interest is not yet accruing on certain amounts which have not been advanced to Borrower and/or deposited in the Renovation Reserve in accordance with Section 11.03 hereof, upon prepayment of the full outstanding principal balance of the Loan, the calculation of the Exit Fee shall include the full amount of the Loan, including, without limitation, the entire Renovation Reserve Maximum Advance Amount, whether or not disbursed to Borrower, on the date of such prepayment.  Borrower acknowledges that the Exit Fee is earned by Lender at the time of making the Loan. Notwithstanding the foregoing, (x) if Borrower obtains permanent financing or a Replacement Loan on the Property from a Replacement Loan Lender, Lender shall waive its right to receive the Exit Fee in connection with such permanent financing or Replacement Loan, as applicable and (y) upon the repayment of the Debt in full resulting directly from a sale of the Property to a third party purchaser unaffiliated in any respect with Borrower, Guarantor and/or any Related Party (the "**Purchaser**"), if such Purchaser shall acquire the Property through acquisition financing provided by Lender or any Affiliate of Lender, and Guarantor was the primary cause for such Purchaser obtaining the acquisition financing from Lender or an Affiliate of Lender, as

28

determined by Lender in Lender's sole but reasonable discretion, then Lender shall provide a credit to Borrower in an amount equal to one-half (1/2) of the Exit Fee that is paid in connection with the repayment of the Loan.

2.10    Usury Limitation.   This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate of interest in excess of the Maximum Legal Rate.  If, by the terms of any Loan Document, Borrower is at any time required to pay interest on the principal balance of the Loan at a rate in excess of the Maximum Legal Rate, then the Applicable Interest Rate shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due under this Agreement or the Note.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate in effect from time to time and applicable to the Loan for so long as the Loan is outstanding.

2.11    Note.  Subject to Section 13.02, the Loan shall be evidenced by, and repaid with interest in accordance with, a single promissory note of Borrower.

2.12    Use of Proceeds.  The proceeds of the Loan shall be used by Borrower only (a) to acquire the Property and/or pay and discharge any existing loans, if any, relating to the Property, (b) to pay all past-due Impositions and Insurance Premiums, if any, in respect of the Property, (c) to make initial deposits of the Reserves, as required in this Agreement, (d) to pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, and (e) to the extent any proceeds remain after satisfying clauses (a) through (d) above, for such lawful purposes as Borrower shall designate, provided such purposes do not violate the terms of any of the Loan Documents.  Borrower shall not, directly or indirectly, use any part of the proceeds of the Loan for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or to extend credit to any Person for the purpose of purchasing or carrying any such margin stock.

## ARTICLE 3
## REPLACEMENT LOANS

3.01    Replacement Loan.

(a)    Borrower acknowledges that as an inducement to make the Loan, Lender shall have the exclusive right (but not the obligation) of first refusal to provide to Borrower or an affiliate thereof, directly or through a Replacement Loan Lender, any financing, re-financing, take-out financing or other replacement financing with respect to the Property (any such financing, re-financing, take-out financing or other replacement financing, a "**Replacement Loan**").  If Borrower shall receive a written commitment, written offer or written term sheet for a Replacement Loan from a third party institutional lender (any such written commitment, written offer or written term sheet, a "**Competing Offer**"), Borrower shall promptly submit such Competing Offer to Lender; provided, however, in no event shall Borrower sign any Competing Offer which provides

such third party institutional lender with an exclusive right to provide a Replacement Loan, and, if such third party institutional lender insists on including such an exclusive right in its written offer, then Borrower shall deliver the Competing Offer to Lender unsigned without any related deposit funded to such third party institutional lender. Upon receipt of such Competing Offer, Lender shall have ten (10) days to request of Borrower, in writing, any additional information needed by Lender or Replacement Loan Lender to analyze the Competing Offer, including but not limited to an application to be completed by Borrower for such Replacement Loan on Lender's, and, if applicable, Replacement Loan Lender's, standard application form (collectively, "**Additional Information**"). Borrower shall deliver to Lender all such Additional Information as has been requested within fifteen (15) days after receipt of Lender's request for the Additional Information. Lender shall have twenty (20) days after receipt from Borrower of the Additional Information to match the terms of the Competing Offer.  If Lender agrees to match such terms either directly or through Replacement Loan Lender, Borrower shall enter into such Replacement Loan with Lender or Replacement Loan Lender, as applicable, upon such matched terms.  If Lender does not agree to match the terms of the Competing Offer, Borrower may enter into the Replacement Loan with the other institutional lender on the same terms as the Competing Offer delivered to Lender; provided, however, that if such Replacement Loan with the other institutional lender (i) does not close within sixty (60) days after the date on which Lender did not agree to match the terms of the Competing Offer and/or (ii) is modified so that the terms are not the same as those contained in the Competing Offer delivered to Lender, Borrower shall again have to comply with all of the aforementioned terms of this Section 3.01(a).  If Lender or any Replacement Loan Lender matches a Competing Offer, Borrower shall be obligated to accept such Replacement Loan from Lender or Replacement Loan Lender, as applicable.  Borrower shall cooperate in good faith with Lender, and, if applicable, Replacement Loan Lender. For the purposes of this Section 3.01(a), the terms "match" or "matching" means agreeing to match (i) the principal amount of the Replacement Loan, (ii) the overall yield payable in connection to the Replacement Loan (including any placement fees, broker fees, arrangement fees or any other fee associated with the arranging of the financing), (iii) the term of the Replacement Loan and (iv) the types of guaranties required for the Replacement Loan (provided, however, that nothing contained herein shall be deemed to require Lender or any Replacement Loan Lender to match any specific terms or provisions of any guaranties set forth in any Competing Offer).  The foregoing provisions of this Section 3.01(a) shall not apply with respect to any financing, refinancing, take-out financing or other replacement financing through the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Federal Housing Administration (or any successor to programs originally established with the aforementioned entities) or an Arbor CMBS refinancing program, as well as any government-sponsored enterprise similar to any of the aforementioned or any successor to programs originally established with any of the aforementioned (collectively, a "**GSE Loan**"), all of which shall instead be subject to the provisions of Section 3.01(b) below.

(b)     Before discussing a potential GSE Loan with any lender or receiving any commitment, offer or term sheet (written or otherwise) for a GSE Loan from a lender, Borrower or an affiliate thereof shall request in writing that Lender provide proposed terms for a GSE Loan through Lender or a Replacement Loan Lender. When so requesting, Borrower shall provide Lender with any information needed and/or requested by Lender or Replacement Loan Lender to analyze the potential GSE Loan, including but not limited to an application to be completed by Borrower for such GSE Loan on Lender's, and, if applicable, Replacement Loan Lender's, standard application form (collectively, the "**GSE Information**"). Lender shall have twenty (20)

30

days after receipt from Borrower of all of the GSE Information to make Borrower a written offer to provide the GSE Loan ("**GSE Offer**"). If Borrower either accepts such GSE Offer in writing, or fails to respond to the GSE Offer in writing, then Borrower shall enter into such GSE Loan with Lender or Replacement Loan Lender, as applicable, upon the terms in such GSE Offer.  If Borrower rejects such GSE Offer in writing, then Borrower may enter into the GSE Loan with another third-party institutional lender so long as none of the terms of such other lender's loan ("**GSE Competing Offer**") are more beneficial or favorable to such lender than the terms set forth for the benefit of Lender or Replacement Loan Lender in the GSE Offer; provided, however, that (i) if such GSE Loan with the other third-party institutional lender does not close within sixty (60) days after the date on which Borrower rejected the GSE Offer, then Borrower will again have to comply with all of the aforementioned terms of this Section 3.01(b) and/or (ii) if the proposed terms of such GSE Loan with the other third-party institutional lender are modified so that any of the terms of such GSE Competing Offer are more beneficial or favorable to such lender than the terms set forth for the benefit of Lender or Replacement Loan Lender in the GSE Offer , Borrower shall provide a copy of the GSE Competing Offer to Lender, in which case Lender or any Replacement Loan Lender shall have ten (10) days to elect to match such GSE Competing Offer, and if it does so, then Borrower shall be obligated to accept such GSE Loan from Lender or Replacement Loan Lender, as applicable.  Borrower shall cooperate in good faith with Lender, and, if applicable, Replacement Loan Lender. For the purposes of this Section 3.01(b), the terms "match" or "matching" means agreeing to match (i) the principal amount of the GSE Loan, (ii) the overall yield payable in connection with the GSE Loan (including any placement fees, broker fees, arrangement fees or any other fee associated with the arranging of the financing), (iii) the term of the GSE Loan and (iv) the types of guaranties required for the GSE Loan (provided, however, that nothing contained herein shall be deemed to require Lender or any Replacement Loan Lender to match any specific terms or provisions of any guaranties set forth in any GSE Competing Offer).

(c)     It shall be an immediate Event of Default if Borrower fails to comply with any of the terms of this Section 3.01.  Further, failure to comply with any of the terms set forth in this Section 3.01 shall result in Borrower owing a fee equal to two percent (2%) of the maximum principal balance of the Loan as of the Execution Date (irrespective of the fact that the entire Renovation Reserve Maximum Advance Amount may not have been advanced to Borrower and/or deposited into the Renovation Reserve), which fee will be payable upon: (1) payment made on the Maturity Date which results in a full payoff of the Loan, (2) any payment of the Loan which results in a full payoff of the Loan, upon acceleration of the Loan following the occurrence of an Event of Default, (3) any optional prepayment of the Loan which results in a full payoff of the Loan, (4) any mandatory prepayment of the Loan which results in a full payoff of the Loan, or (5) demand by Lender, after payment of the Debt in full.  Lender's rights under this Section 3.01 shall survive payment in full of the Debt and shall be in addition to all other rights of Lender under this Agreement, the Mortgage, the Note and the other Loan Documents.

## ARTICLE 4
## BORROWER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

4.01   <u>Payment of Debt</u>.  Borrower will pay the Debt at the time and in the manner provided in this Agreement, the Note and the other Loan Documents, all in lawful money of the United States of America.

4.02    Representations, Warranties and Covenants Regarding Borrower.    Borrower represents, warrants and covenants to Lender:

(a)    Organization and Authority.  Borrower (i) is a limited liability company, duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation, (ii) has all requisite power and authority and all necessary licenses and Permits to own and operate the Property and to carry on its business as now conducted and as presently proposed to be conducted, and (iii) is duly qualified, authorized to do business and in good standing in the jurisdiction where the Property is located and in each other jurisdiction where the conduct of its business or the nature of its activities makes such qualification necessary.

Controlling Party(a) is a limited liability company, duly formed, validly existing, and in good standing under the Laws of the jurisdiction of its formation, (b) has the power and authority, to own its assets and to transact the business in which it now engages or proposes to engage in, and (c) is duly qualified and is in good standing, under the Laws of each other jurisdiction in which such qualification is required.

(b)    Power.  Borrower has full power and authority to own its property and assets and to carry on its business and operations as now being conducted and as presently contemplated, to execute, deliver and perform, as applicable, the Loan Documents to which it is a party, to make the borrowings hereunder, to execute and deliver the Note and to grant to Lender a first, prior, perfected and continuing Lien on and security interest in the Property, subject only to the Permitted Encumbrances.

(c)    Authorization of Borrowing.  The execution, delivery and performance of the Loan Documents to which it is a party, the making of the borrowings thereunder, the execution and delivery of the Note, the grant of the Liens on the Property pursuant to the Loan Documents to which it is a party and the consummation of the Loan Documents are within the powers of Borrower and have been duly authorized by Borrower and will constitute the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as enforcement may be stayed or limited by bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether considered in proceedings at law or in equity) and will not (i) violate any provision of its Authority Documents or, any Law, judgment, injunction, decree, determination, award, order, rule or regulation of any court, arbitration panel or other Governmental Authority, domestic or foreign, or other Person affecting or binding upon Borrower or the Property, or (ii) violate any provision of any indenture, agreement, mortgage, contract or other instrument to which Borrower is a party or by which any of its property, assets or revenues are bound, or be in conflict with, result in an acceleration of any obligation or a breach of or constitute (with notice or lapse of time or both) a default or require any payment or prepayment under, any such indenture, agreement, mortgage, contract or other instrument, or (iii) result in the creation or imposition of any Lien, except those in favor of Lender as provided in the Loan Documents to which it is a party.

(d)    Other Agreements.  Borrower is not in violation of its Authority Documents or other restriction or any agreement or instrument  by which it is bound or any claim, cause of action, judgment, decree, writ, injunction, order or award of any arbitrator, court or Governmental Authority, or any Legal Requirement, in each case, applicable to Borrower or the Property.

(e)     <u>Maintenance of Existence</u>.  Each of Borrower and the Controlling Party has been, at all times since its formation duly formed and validly existing.  Borrower and the Controlling Party have been and shall at all times continue to be a Single Purpose Entity.  Each of Borrower and the Controlling Party at all times since its formation has complied, and will continue to comply, with the provisions of its Authority Documents.  Any borrowings made by Borrower in connection with the Loan do not and will not render Borrower Insolvent; Borrower is not contemplating either the new filing of a petition by it under any state or federal bankruptcy or insolvency Laws or the liquidation of all or a major portion of its property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it.  Borrower and the Controlling Party shall not take any action that might cause Borrower to become Insolvent.  Borrower has not made and will not make any loans or advances to any third party (including any Affiliate).  At all times during the term of the Loan, Borrower shall continue to be a limited liability company organized under the laws of the State of Delaware which at all times shall continue to be a Single Purpose Entity and have at least two (2) duly appointed Independent Managers, and Borrower and the Controlling Party shall not cause or permit a Material Action unless at the time of such action there shall be at least two (2) members who are Independent Managers, and both Independent Managers and the Controlling Party consent in writing to such Material Action.  Borrower shall conduct its business and shall cause each Covered Party (as hereinafter defined) to conduct business so that the assumptions made with respect to each party (each, a "**Covered Party**") addressed in the Non-Consolidation Opinion delivered by Law Offices of Eric A. Heinz, P.C. in connection with the Loan shall be true and correct in all respects.  Each of Borrower and Controlling Party hereby represents that: (i) any amendment or restatement of any of its Authority Documents has been accomplished in accordance with, and was permitted by, the relevant provisions of such Authority Document prior to its amendment or restatement from time to time, (ii) it has always been a Single Purpose Entity from the date of its formation to the date hereof, (iii) it has no judgments or Liens of any nature against it except for Permitted Encumbrances, (iv) it is in compliance in all material respects with all Laws and orders applicable to it and has received all Permits necessary for it to operate, (v) it is not involved in any material dispute with any taxing authority, (vi) it has paid all taxes which have been due and payable by it, (vii) it has no material contingent or actual obligations not related to the Property, and (viii) it is not involved in any litigation, nor to the best of its knowledge, has any litigation been threatened against it, that could result in a Material Adverse Change.

(f)     <u>No Defaults</u>.  No Default or Event of Default has occurred and is continuing or would occur as a result of the consummation of the transactions contemplated by the Loan Documents.  Borrower is not in default in the payment or performance of any of its contractual obligations in any material respect.

(g)     <u>Governmental Consents and Approvals</u>.  Borrower has obtained or made all necessary (i) consents, approvals and authorizations, and registrations and filings of or with all Governmental Authorities (except to the extent that the obtaining of such consents, approvals and authorizations, registrations and filings is contemplated by the Loan Documents) and (ii) consents, approvals, waivers and notifications of members, partners, stockholders, creditors, lessors and other nongovernmental Persons, in each case, which are required to be obtained or made by

33

Borrower in connection with the execution and delivery of, and the performance by Borrower of its obligations under, the Loan Documents.

(h)      <u>Investment Company Act Status</u>.  Borrower is not an "investment company," or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

(i)      <u>Compliance with Law</u>.  Borrower is in compliance in all material respects with all Legal Requirements to which it or the Property is subject, including, without limitation, all Environmental Laws, the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act and ERISA.  Borrower is not in default with respect to any order, writ, demand, injunction or decree of any Governmental Authority.  Borrower possesses and is in compliance with all Governmental Approvals required to conduct its business as now conducted and as presently proposed to be conducted.  Neither Borrower nor any other Person in occupancy of or involved in the operations or use of the Property has committed any act or omission affording any Governmental Authority the right of forfeiture as against any or all of the Property, any collateral for any or all of the Obligations, or any or all monies paid in performance of Borrower's obligations under any of the Loan Documents.

(j)      <u>Information</u>.  No information, exhibit, or report furnished by Borrower or any other Person to Lender in connection with the making of the Loan contains any material misstatement of fact or omits to state a material fact or any fact necessary to make the statements contained therein not misleading. There has been no Material Adverse Change in any condition, fact, circumstance or event that would make any of the information, exhibits or reports furnished in connection with the making of the Loan inaccurate, incomplete or otherwise misleading in any material respect. Borrower has disclosed to Lender in writing any and all facts that have or could result in a Material Adverse Change.

(k)      <u>Financial Information</u>.   All financial data that has been delivered by Borrower to Lender (i) is complete and correct in all material respects, (ii) accurately represents the financial condition of the Persons covered thereby as of the date on which the same shall have been furnished, and (iii) has been prepared in accordance with GAAP (or such other accounting basis as is reasonably acceptable to Lender) throughout the periods covered.  Neither Borrower nor the Controlling Party has incurred any obligation or liability, contingent or otherwise not reflected in such financial statements.  There has been no Material Adverse Change since the date of such financial statements.  Neither Borrower, Controlling Party nor any such Person covered in such financial statements has entered into any contracts or agreements not reflected in such financial statements, other than in the ordinary course of business.

(l)      <u>Tax Filings</u>.  Borrower and Controlling Party have, prior to the required filing dates, filed all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower and Controlling Party, if any.  Borrower and Controlling Party believe that their respective tax returns properly reflect the income and taxes of Borrower and Controlling Party, if any, for the periods covered thereby, subject only to reasonable adjustments required by the United States Internal Revenue Service or other applicable tax authority upon audit.  The charges, accruals and reserves on the books of Borrower for taxes or other governmental charges

are adequate. No additional tax liability has been asserted against Borrower or any assessment received by Borrower which remains open and unpaid.

(m)   The Loan.  There are no offsets, counterclaims or defenses with respect to Borrower's obligations pursuant to the Loan Documents.

(n)   Additional Indebtedness.  Borrower shall not, without Lender's prior written consent, create, incur or assume any Indebtedness, except for the Permitted Debt.

(o)   Borrower's Legal Status and Structure.  Borrower's exact legal name as indicated on the signature page hereto, organizational identification number and place of business or, if more than one, its chief executive office, as well as Borrower's mailing address, if different, which were identified by Borrower to Lender and contained in this Agreement, are true, accurate and complete.  Borrower will not change its name, its place of business or, if more than one place of business, its chief executive office, or its mailing address or organizational identification number if it has one without giving Lender at least thirty (30) days prior written notice of such change.  If Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of such organizational identification number.  Borrower will not change its type of organization, jurisdiction of organization or other legal structure. Borrower's EIN is 84-4624979.

(p)   ERISA.  Borrower hereby represents, warrants and agrees that: (i) Borrower is acting on its own behalf and is not an employee benefit plan as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, nor a plan as defined in Section 4975(e)(1) of the Code (each of the foregoing hereinafter referred to collectively as a "**Plan**"); (ii) Borrower's assets do not constitute "plan assets" of one or more such Plans within the meaning of Department of Labor Regulation Section 2510.3-101; and (iii) Borrower will not be reconstituted as a Plan or as an entity whose assets constitute "plan assets."

(q)   Business Purpose of Loan.  In accordance with Section 2.12 of this Agreement, Borrower will use the proceeds of the Loan solely for the purpose of carrying on a business or commercial enterprise and not for personal, family or household purposes.

(r)   Solvency; No Bankruptcy.  Each of Borrower and the Controlling Party, (i) is and has at all times been Solvent and will remain Solvent immediately upon the consummation of the transactions contemplated by the Loan Documents and (ii) is not subject to any bankruptcy, reorganization or arrangement proceedings or a general assignment for the benefit of creditors and is not contemplating the filing of a petition under any state or federal bankruptcy or insolvency Laws or the liquidation of all or a major portion of such Person's assets or property and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower or Controlling Party.  None of the transactions contemplated hereby will be or have been made with an intent to hinder, delay or defraud any present or future creditors of Borrower, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Borrower's assets do not, and immediately upon consummation of the transaction contemplated in the Loan Documents will not, constitute unreasonably small capital to carry out its business as presently conducted or as proposed to be conducted.  Borrower does not intend to,

nor believes that it will, incur debts and liabilities beyond its ability to pay such debts as they may mature.

(s)     <u>Partnerships and Joint Ventures</u>.   Borrower is not a partner in any partnership nor a party to a joint venture.

(t)     <u>Intellectual Property</u>.  Borrower possesses all licenses, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, to conduct its business as now conducted and as presently proposed to be conducted, and Borrower is not in violation of any valid rights of others with respect to any such items.

(u)     <u>Acts of God</u>.   Neither the business nor the properties of Borrower are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy, or other Casualty (whether or not covered by insurance) which has resulted in, or could result in, a Material Adverse Change.

(v)     <u>Other Agreements</u>.  Borrower is not a party to any indenture, loan, or credit agreement, or to any lease or other agreement or instrument, or subject to any Authority Document restriction which has resulted in, or could result in, a Material Adverse Change.  Borrower is not in default in any respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party where such default has resulted in, or could result in, a Material Adverse Change.

(w)     <u>FIRPTA</u>.  Neither Borrower nor Guarantor is a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

(x)     <u>Governmental Regulation</u>.  Borrower is not subject to any Law limiting its ability to incur its obligations under any of the Loan Documents to which it is a party, including the Public Utility Holding Company Act of 1935, the Investment Company Act of 1940, the Interstate Commerce Act, the Federal Power Act or the Bank Holding Company Act of 1956.

(y)     <u>Filing and Recording Taxes</u>.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under applicable Law in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid under applicable Law in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Mortgage, have been paid or are being paid simultaneously herewith.  All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established pursuant to the Loan Documents, or are insured against by the applicable title insurance policy.

(z)     <u>Organizational Chart</u>.  The organizational chart attached as Schedule A hereto, relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the Execution Date, and shall not be changed or otherwise modified without the prior written consent of Lender.

(aa)    Rate Cap Agreement.  Borrower has delivered to Lender, a true, correct and complete copy of the Rate Cap Agreement, including all amendments and supplements thereto. The Rate Cap Agreement is in full force and effect, there are no outstanding defaults by any Person party thereto and no Person party thereto has given or received any notice of default thereunder that remains uncured or is in dispute.

(bb)    Minimum Equity.  Borrower has contributed at least $9,990,000.00 in cash equity to the Property and costs relating to this transaction (including, without limitation, the costs and expenses relating to obtaining the Loan) and Guarantor has contributed to Borrower no less than ten percent (10%) of the total equity required for the acquisition of the Property and costs relating to this transaction (including, without limitation, the costs and expenses relating to obtaining the Loan), net of any fees, commissions or other amounts earned by Guarantor and/or any Persons Controlled by Guarantor and/or any affiliate of the foregoing Persons, and Borrower has delivered evidence of such contribution to Lender.

(cc)    Purchase Agreement.  The transactions contemplated pursuant to that certain Agreement of Purchase and Sale, between Woodside Meadows Apts Owner LLC, as seller, and Lightstone RE LLC, as purchaser, are arms-length transactions and the parties thereunder are not affiliates of each other nor are they related entities comprised of the same individuals.

4.03    Anti-Terrorism Law.  Borrower covenants, represents and warrants as follows: (i) neither Borrower nor Guarantor is or, to the best of Borrower's knowledge, will be in violation of any Anti-Terrorism Law; (ii) neither Borrower nor Guarantor is or, to the best of Borrower's knowledge, will be a Prohibited Person; (iii) neither Borrower nor Guarantor (A) conducts any business or engages in any transaction or dealing with any Prohibited Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 or (C) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law; neither Borrower nor Guarantor will engage in any of the foregoing activities in the future; (iv) no Tenant at the Property is a Prohibited Person; (v) Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its sole reasonable discretion, confirming Borrower's and Guarantor's compliance with this Section 4.03; and (vi) Borrower has implemented procedures, and will consistently apply those procedures throughout the term of the Loan, to ensure the foregoing representations and warranties remain true and correct during the term of the Loan.

4.04    Recording of Mortgage, Etc.  Borrower forthwith upon the execution and delivery of the Mortgage and thereafter, from time to time, will cause the Mortgage, and any security instrument creating a Lien or security interest or evidencing the Lien thereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future Law in order to publish notice of and fully protect the Lien or security interest of the Mortgage upon, and the interest of Lender in, the Property.  Borrower will pay all filing, registration or recording fees, and all reasonable expenses incident to the preparation, execution and acknowledgment of the Mortgage, any mortgage supplemental thereto, any security instrument with respect to the Property and any instrument of

further assurance, and all federal, state, county and municipal, taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Mortgage, any mortgage supplemental thereto, any security instrument with respect to the Property or any instrument of further assurance, except where prohibited by Law to do so.  Borrower shall hold harmless and indemnify Lender, and its successors and assigns, against any liability incurred as a result of the imposition of any tax on the making and recording of the Mortgage.

     4.05   <u>Representations, Warranties and Covenants as to the Property</u>.  Borrower represents, warrants and covenants with respect to the Property as follows:

     (a)   <u>Lien Priority</u>.  The Mortgage is a valid and enforceable first priority Lien on the Property, free and clear of all encumbrances and Liens having priority over the Lien of the Mortgage, except for the Permitted Encumbrances.  The Permitted Encumbrances do not (a) materially interfere with the use or operation of all or any portion of the Property or (b) materially and adversely affect the value of any or all of the Property.  All Real Property Taxes and municipal charges, including water and sewer charges, in respect of the Property due and owing as of the Execution Date have been paid as of the date when due.

     (b)   <u>Title</u>.  Borrower has, subject only to the Permitted Encumbrances, good, insurable and marketable fee title to the Property and to all easements and rights benefiting the Property and has the right to mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confine, pledge, assign and/or hypothecate the Property.  Borrower will preserve its interest in and title to the Property and will forever warrant and defend the same to Lender against any and all claims made by, through or under Borrower and will forever warrant and defend the validity and priority of the Lien and security interest created by the Mortgage against the claims of all Persons whomsoever claiming by, through or under Borrower.  The foregoing warranty of title shall survive the foreclosure of the Mortgage and shall inure to the benefit of and be enforceable by Lender in the event Lender acquires title to the Property pursuant to any foreclosure.  The Property is free and clear of any mechanics' liens or Liens in the nature thereof, and no rights are outstanding that under Law could give rise to any such Liens.  In addition, there are no outstanding options or rights of first refusal or first offer to purchase the Property or Borrower's ownership thereof.

     (c)   <u>Casualty; Flood Zone</u>.  The Property is in good repair and free and clear of any damage, destruction or casualty (whether or not covered by insurance) that would materially affect the value of the Property or the use for which the Property was intended.  The Improvements and Fixtures are structurally sound, in good repair and free of patent or latent defects in materials and workmanship, and all major building systems located within the Improvements, including the heating, air conditioning, electrical and plumbing systems, are in good working order and condition.  No portion of the Property is situated in a flood hazard area as defined by the Federal Insurance Administration or Borrower has obtained the flood insurance required by Section 5.02(b)(4) hereof.  To the best knowledge of Borrower, no portion of the Property is located on or adjacent to navigable waters and no portion of the Real Property consists of filled-in land.

     (d)   <u>Completion, Encroachment</u>.  All Improvements necessary for the efficient use and operation of the Property that were included for purposes of determining the appraised value of the Property in the Appraisal have been completed and none of said Improvements lie outside the boundaries and building restriction lines of the Real Property.  Except as set forth in

52247332;1

the title insurance policy insuring the Lien of the Mortgage, no improvements on adjoining properties encroach upon the Real Property.  There are no easements or other encumbrances upon the Property which encroach upon any of the Improvements so as to affect the value or marketability of the Property.  Borrower does not have any knowledge that any facts or assumptions on which the Appraisal of the Property was based are false or incomplete in any material respect.  Borrower does not have any information that reasonably supports that the fair market value determined in the Appraisal does not reflect the actual fair market value of the Property.

(e)     Separate Lot.  The Real Property (i) is taxed separately without regard to any other real estate, (ii) constitutes one (1) or more legally subdivided lots under all applicable Legal Requirements (or, if not subdivided, no subdivision or platting of the Real Property is required under applicable Legal Requirements), and (iii) for all purposes may be mortgaged, conveyed or otherwise dealt with as an independent parcel(s).

(f)     Use.  The existence of all Improvements, the present use and operation thereof and the access of the Real Property and the Improvements to all of the utilities and other items referred to in Section 4.05(j) below are in compliance in all material respects with all applicable Legal Requirements, including, without limitation, Environmental Laws, Development Laws and Use Requirements.  Borrower has not received any notice from any Governmental Authority alleging any uncured violation relating to the Property of any applicable Legal Requirements.

(g)     Licenses and Permits.  Borrower currently holds and will continue to hold all certificates of occupancy, licenses, registrations, Permits, consents, franchises and approvals of any Governmental Authority or any other Person that are material for the lawful occupancy and operation of the Property or which are material to the ownership or operation of the Property or the conduct of Borrower's business.  All such certificates of occupancy, licenses, registrations, Permits, consents, franchises and approvals are current and in full force and effect.

(h)     Environmental Matters.    Borrower has received and reviewed the Environmental Report and has no reason to believe that the Environmental Report contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or herein, in light of the circumstances under which such statements were made, not misleading in any material respect.

(i)     Proceedings.  There are no actions, suits or proceedings pending or, to the best of Borrower's knowledge, threatened, in any court or before any Governmental Authority or arbitration board or tribunal against or affecting Borrower, Guarantor or the Property, including those (i) relating to (A) the zoning of the Property or any part thereof, (B) any certificates of occupancy, licenses, registrations, Permits, consents or approvals issued with respect to the Property or any part thereof, (C) the condemnation of the Property or any part thereof, or (D) the condemnation or relocation of any roadways abutting the Real Property required for access or the denial or limitation of access to the Real Property or any part thereof from any point of access to the Real Property, (ii) asserting that (x) any such zoning, certificates of occupancy, licenses, registrations, Permits, consents and/or approvals do not permit the operation of any material portion of the Property as presently being conducted, (y) any material improvements located on

39

the Property or any part thereof cannot be located thereon or operated with their intended use or (z) the operation of the Property or any part thereof is in violation in any material respect of any Environmental Laws, Development Laws or other Legal Requirements or Leases or Property Agreements, or (iii) that might affect the validity or priority of any Loan Document.  Borrower is not aware of any facts or circumstances that may give rise to any actions, suits or proceedings described in the preceding sentence.  Borrower has not received any notice from any Governmental Authority alleging any uncured violation of any Law with respect to the Property.

        (j)    <u>Utilities</u>.  The Real Property has all necessary legal access to water, gas and electrical supply, storm and other required public utilities (with respect to each of the aforementioned items, by means of either a direct connection to the source of such utilities or through connections available on publicly dedicated roadways directly abutting the Real Property or through permanent insurable easements benefiting the Real Property), sanitary sewer facilities (which may be provided by public or private utilities), fire and police protection, parking and means of direct access between the Real Property and public highways over recognized curb cuts (or such access to public highways is through private roadways that may be used for ingress and egress pursuant to permanent insurable easements).

        (k)    <u>Insurance</u>.  The Property is insured in accordance with the requirements set forth in Article 5 hereof.

        (l)    <u>Labor Matters</u>.  No organized work stoppage or labor strike is pending or, to the best of Borrower's knowledge, threatened by employees or other laborers at the Property and neither Borrower nor Property Manager (i) is involved in or, to the best of Borrower's knowledge, threatened with any labor dispute, grievance or litigation relating to labor matters involving any employees and other laborers at the Property, including, without limitation, violation of any federal, state or local labor, safety or employment Laws (domestic or foreign) and/or charges of unfair labor practices or discrimination complaints; (ii) has engaged in any unfair labor practices within the meaning of the National Labor Relations Act or the Railway Labor Act; (iii) is a party to, or bound by, any collective bargaining agreement or union contract with respect to employees and other laborers at the Property and no such agreement or contract is currently being negotiated by Borrower, Property Manager or any of their Affiliates; or (iv) is subject to any successor owner liability due to employment practices of Borrower's predecessor-in-interest.

        (m)    <u>Property Agreements</u>.  Borrower has entered into each Property Agreement required for the ownership, operation and maintenance of the Property.  Each Property Agreement is in full force and effect.  No party to any Property Agreement has failed to perform any material obligation under any such Property Agreement.  Borrower has delivered to Lender true, correct and complete copies of all Property Agreements.  No default exists or with the passing of time or the giving of notice or both would exist under any Property Agreement.  No Property Agreement provides any party with the right to obtain a Lien or encumbrance upon the Property superior to the Lien of the Mortgage or the other Loan Documents, and no condition exists whereby Borrower or any future owner of the Property may be required to purchase any other parcel of land that is subject to any Property Agreement or that gives any Person a right to purchase, or right of first refusal with respect to, the Property.  To the best knowledge of Borrower, no offset or any right of offset exists respecting continued contributions to be made by any party to any Property Agreement except as expressly set forth therein.  All work, if any, to be performed by Borrower

52247332;1

under each of the Property Agreements has been substantially performed (except to the extent that the Loan Documents contemplate that such work may be performed after the Execution Date), all contributions to be made by Borrower to any party to such Property Agreements have been made, and all other conditions to such party's obligations thereunder have been satisfied.  There are no outstanding defaults under any Property Agreement. No offset or any right of offset exists with respect to continued contributions to be made by any party to any Property Agreement.  No material exclusions or restrictions on the use, operation, management of, or construction on the Property (including non-compete agreements) exists in any Property Agreement.  No party to any Property Agreement has given notice of a breach or default under any such agreement.

(n)     <u>Access to and Use of Property</u>. All streets, roads, highways, bridges and waterways necessary for access to, and full use, occupancy, operation and disposition of the Real Property and the Improvements are completed, are dedicated to and accepted by all appropriate Governmental Authorities and are open and available to the Property and the Improvements without further condition or cost to Borrower.

(o)     <u>Personal Property</u>.  Borrower has delivered to Lender a true, correct and complete schedule of all Personal Property, if any, owned by Borrower and located upon the Property or that is material to the use or operation of the Property and Borrower represents that it has good and marketable title to all such Personal Property, free and clear of any Liens, except for Liens created under the Loan Documents.  The Personal Property has not been used and shall not be used or bought for personal, family, or household purposes, but shall be bought and used solely for the purpose of carrying on Borrower's business.  Borrower will not remove the Personal Property without the prior written consent of Lender, except the items of Personal Property which are consumed or worn out in ordinary usage shall be promptly replaced by Borrower with other Personal Property of value equal to or greater than the value of the replaced Personal Property.

(p)     <u>Commercial Property</u>. There is no homestead or other exception available to Borrower which could materially interfere with the right to sell the Property.

(q)     <u>Use of Property</u>. The Property is used exclusively as a multi-family residential apartment property.

(r)     <u>Illegal Activity</u>. No portion of the collateral held by Lender as security for any or all of the Obligations nor the Property has been or will be purchased with proceeds of any illegal activity.

(s)     <u>Managing Agent</u>.  The Property shall at all times be managed on Borrower's behalf in a competent and professional manner appropriate as a first-class multifamily residential apartment project by a prominent professional managing agent.  Prior to engaging any managing agent or executing any management agreement, such managing agent and management agreement shall be subject to approval by Lender, in its sole and absolute discretion, it being understood that EVU Residential LLC, a Delaware limited liability company, is hereby approved by Lender as a Property Manager for the Property and the Property Management Agreement, dated as of the Execution Date, by and between Borrower and such Property Manager in existence as of the Execution Date, which Borrower represents that it has delivered to Lender a true, correct and complete copy of, is hereby approved by Lender, subject to the terms of the Assignment and

Subordination of Property Management Agreement; provided, however, that the terms and conditions of any subsequent Property Management Agreement between Property Manager and Borrower or any amendment or modification of any Property Management Agreement between Property Manager and Borrower and any compensation of Property Manager with respect to its services performed at or in connection with the Property (other than an extension of the Property Management Agreement for compensation which is no greater, and on terms and conditions no less favorable to Borrower, than those contained in the Property Management Agreement last approved by Lender) are subject to approval by Lender in its sole and absolute discretion.  As a condition to its retention as managing agent, each managing agent shall be required to execute and deliver to Lender an agreement that all fees due such managing agent are subordinate to all amounts due to Lender, substantially the same in form and substance as the Assignment and Subordination of Property Management Agreement.

(t)     Rent Regulations.  Borrower shall (1) operate and manage the Property, or cause the Property to be operated and managed, in compliance with any present or future requirements of rent control, rent stabilization and similar Laws, rules and regulations, and compliance obligations of the City of Lansing, State of Michigan or United States of America (collectively, "Rent Regulations"), (2) promptly perform and observe all of the requirements of the Rent Regulations, including, but not limited to, collecting only lawful rents, (3) do all things necessary to preserve and maintain its rights under the Rent Regulations, including, but not limited to, timely filing and serving rent registration statements, (4) immediately notify Lender of any claims that it is not in compliance with the Rent Regulations, and (5) immediately deliver to Lender a copy of any notice relating to the Rent Regulations given or received by it, including, but not limited to, complaints of rent overcharge or reduction in services.

4.06     Payment of Impositions, Utilities and Taxes, Etc.

(a)     All Impositions and governmental assessments due and owing in respect of, and affecting, the Property have been paid.  Borrower has paid all Impositions that constitute special governmental assessments in full, except for those assessments that are permitted by applicable Legal Requirements to be paid in installments, in which case all installments that are due and payable have been paid in full.  There are no pending, or to Borrower's best knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(b)     Subject to Section 13.04 hereof, Borrower shall pay or cause to be paid all Impositions as and when due, and shall furnish to Lender, upon request, receipted bills of the appropriate taxing authority or other documentation reasonably satisfactory to Lender evidencing the payment thereof.  If Borrower shall fail to pay any Imposition in accordance with this Section and is not contesting or causing a contesting of such Imposition in accordance with Section 13.04 hereof, Lender shall have the right (upon five (5) Business Days' prior notice, which notice shall not be required if an Event of Default exists and is continuing), but shall not be obligated, to pay such Imposition and Borrower shall repay to Lender, on demand, any such amount paid by Lender, with interest thereon at the Default Rate from the date of the advance thereof to the date of repayment.  Such amount shall constitute a portion of the Debt secured by the Mortgage.

(c)     Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies imposed upon Lender by reason of or in connection with its ownership of any Loan Document or any other instrument related thereto, or resulting from the execution, delivery and recording of, or the Lien created by, or the obligation evidenced by, any of them, other than income, franchise and other similar taxes imposed on Lender and shall pay all corporate stamp taxes, if any, and other taxes, required to be paid on the Loan Documents.  If Borrower shall fail to make any such payment within ten (10) days after written notice thereof from Lender, Lender shall have the right, but shall not be obligated, to pay the amount due, and Borrower shall reimburse Lender therefor, within five (5) Business Days after demand, with interest thereon at the Default Rate from the date of the advance thereof to the date of repayment.  Such amount shall constitute a portion of the Debt secured by the Mortgage.

4.07    Ownership of Property.  Borrower shall at all times maintain good, indefeasible and marketable title in fee simple to the Real Property and Improvements and good and marketable title to the rest of the Property, subject only to Permitted Encumbrances. Borrower will not and will not permit, and will not enter into any agreement which provides for, any Transfer of any or all of the Property or its interest therein, except for Permitted Encumbrances or as set forth in the following Section 4.08. Borrower will take all actions required to defend and preserve all of its right, title and interest in the Property.  Borrower will not create, incur, assume or suffer to exist any Lien, upon or with respect to any or all of the Property, except Permitted Encumbrances.  Any Transfer in violation of this Section 4.07 is null and void and of no force and effect.

4.08    Transfer.

(a)     Borrower shall not cause or permit any Transfer to occur.

(b)     Lender may declare the Debt immediately due and payable upon the occurrence of any Transfer without Lender's prior written consent without regard to whether any impairment of its security or any increased risk of default hereunder can be demonstrated.  This provision shall apply to every Transfer of the Property or any part thereof or interest in the Property or in Borrower regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

4.09    Removal of Liens.

(a)     Borrower shall, at its expense, maintain the Mortgage as a first lien on the Property and shall keep the Property free and clear of all Liens of any kind and nature other than the Permitted Encumbrances.  Borrower shall, within thirty (30) days following the filing thereof, promptly discharge of record, by bond or otherwise, any such Liens and, promptly upon request by Lender, shall deliver to Lender evidence reasonably satisfactory to Lender of the discharge thereof.

(b)     Without limitation to the provisions of Section 4.09(a), Borrower shall (i) pay, from time to time when the same shall become due, all claims and demands of mechanics, materialmen, laborers and others that, if unpaid, might result in, or permit the creation of, a Lien on the Property or any part thereof, or on the revenues, rents, issues, income or profits arising therefrom, (ii) cause to be removed of record (by payment or posting of bond or settlement or

43

otherwise) any mechanics' or other Lien on the Property, or any part thereof, or on the revenues, rents, issues, income or profit arising therefrom, and (iii) in general, do or cause to be done, without expense to Lender, everything reasonably necessary to preserve in full the Lien of the Mortgage. If Borrower fails to comply with the requirements of this Section, then, Lender may, but shall not be obligated to, pay any such Lien or take other action to preserve in full the Lien of the Mortgage, and Borrower shall, within five (5) Business Days after Lender's demand therefor, reimburse Lender for all sums so expended, together with interest thereon at the Default Rate from the date advanced, all of which shall be deemed part of the Debt. Nothing contained herein shall be deemed a consent or request of Lender, express or implied, by inference or otherwise, to the performance of any alteration, repair or other work by any contractor, subcontractor or laborer or the furnishing of any materials by any materialmen in connection therewith.

4.10    Cost of Defending and Upholding the Mortgage Lien. If any action or proceeding is commenced to which Lender is made a party relating to the Loan Documents and/or the Property or Lender's interest therein or in which it becomes necessary to defend or uphold the Lien of the Mortgage or any other Loan Document, Borrower shall, on demand, reimburse Lender for all reasonable expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Lender in connection therewith, and such sum, together with interest thereon at the Default Rate from and after such demand until fully paid, shall constitute a part of the Debt.

4.11    Use of the Property. Borrower will use, or cause to be used, the Property for such use as is permitted pursuant to applicable Legal Requirements (including, without limitation, the certificate of occupancy applicable to the Property) and as is required by the Loan Documents. Borrower shall not suffer or permit the Property or any portion thereof to be used by the public, any Tenant, or any Person not subject to a Lease, in a manner as is reasonably likely to impair Borrower's title to the Property, or in such manner as may give rise to a claim or claims of adverse usage or adverse possession by the public, or of implied dedication of the Property or any part thereof. Borrower shall not (a) desert or abandon the Property; (b) change the use of the Property or cause or permit the use or occupancy of any part of the Property to be discontinued if such discontinuance or use change would violate any zoning or other Law, ordinance or regulation; (c) consent to or seek any change of the zoning classification, or greater zoning restriction affecting the Property; or (d) take any steps whatsoever to convert the Property, or any portion thereof, to a condominium or cooperative form of ownership.

4.12    Maintenance and Repair. Borrower shall, at its expense, (a) take good care of the Property including grounds generally, and utility systems and sidewalks, roads, alleys, and curbs therein, and shall keep the same in good, safe and insurable condition and in compliance with all applicable Legal Requirements, (b) promptly make all repairs to the Property, above grade and below grade, interior and exterior, structural and nonstructural, ordinary and extraordinary, unforeseen and foreseen, and maintain the Property in a manner appropriate for the facility and (c) not commit or suffer to be committed any waste of the Property or do or suffer to be done anything that will increase the risk of fire or other hazard to the Property or impair the value thereof. Borrower shall keep the sidewalks, vaults, gutters and curbs comprising, or adjacent to, the Property, clean and free from dirt, snow, ice, rubbish and obstructions. All repairs made by Borrower shall be made with first-class materials, in a good and workmanlike manner, shall be equal or better in quality and class to the original work and shall comply with all applicable Legal Requirements and Insurance Requirements. To the extent any of the above obligations are

44

obligations of Tenants under Leases or other Persons under Property Agreements, Borrower may fulfill its obligations hereunder by causing such Tenants or other Persons, as the case may be, to perform their obligations thereunder.  As used herein, the terms "repair" and "repairs" shall be deemed to include all necessary replacements.  Borrower will not permit any drilling or exploration or extraction, removal or production of any minerals from the surface or subsurface of the Real Property.

4.13    Alterations.    Borrower shall not demolish, remove, construct, or, except as otherwise expressly provided herein, restore, or alter the Property or any portion thereof; nor consent to or permit any such demolition, removal, construction, restoration, addition or alteration that would diminish the value of the Property without Lender's prior written consent in each instance, which consent shall not be unreasonably withheld or delayed.  Notwithstanding the provisions of this Agreement to the contrary, Borrower shall have the right, at any time and from time to time, to remove and dispose of Equipment which may have become obsolete or unfit for use or which is no longer useful in the management, operation or maintenance of the Property. Borrower shall promptly replace any such Equipment so disposed of or removed with other Equipment of equal value and utility, free of any security interest or superior title, Liens or claims, except that, if by reason of technological or other developments, replacements of the Equipment so removed or disposed of is not necessary or desirable for the proper management, operation or maintenance of the Property, Borrower shall not be required to replace the same.  All such replacements or additional equipment shall be deemed to constitute "Equipment" and shall be covered by the security interest granted herein and in the Mortgage.

4.14    Changes Affecting the Property.    Borrower shall not (1) cause or permit any partition of the Property, (2) initiate, join in or acquiesce in, or consent to, any change in the zoning classification, including any variance under any existing zoning ordinance applicable to the Property, restrictive covenant, zoning Law or other public or private restriction, limiting or defining the uses which may be made of all or any part of the Property, (3) permit the use of the Property to become a non-conforming use under applicable zoning Laws, (4) file any subdivision or parcel map affecting the Property, (5) amend, modify or consent to any easement or restrictive covenant pertaining to the Property, or (6) take any steps to convert the Property, or any portion thereof, to a condominium or cooperative form of ownership, without Lender's consent.

4.15    Permits, Laws and Restrictive Covenants.  Borrower will take all actions required to obtain and maintain all Permits required for the construction, ownership, use, operation, maintenance, repair and restoration of the Property.  Borrower will comply with all applicable Laws, Permits and restrictive covenants applicable to the construction, ownership, use, operation, maintenance, repair and restoration of the Property.

4.16    Plans and Specifications.  Borrower shall maintain a complete set of final plans, specifications, blueprints and drawings for the Improvements either at the Property or in a particular office at the headquarters of Borrower to which Lender will have access upon reasonable advance notice.

4.17    Estoppel Statement.    Borrower shall use its best efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from each non-residential Tenant, as required by Lender, attesting to such facts regarding the related Lease as Lender may require,

45

including, but not limited to, attestations that each Lease is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, except as security, and that the Tenant claims no defense or offset against the full and timely performance of its obligations under the Lease.

4.18    Compliance with Legal Requirements.  Borrower shall promptly comply with all present and future Legal Requirements, foreseen and unforeseen, ordinary and extraordinary, whether requiring structural or nonstructural repairs or alterations including, without limitation, all zoning, subdivision, building, safety and environmental protection, land use and Development Laws, all Legal Requirements that may be applicable to the curbs adjoining the Property or to the use or manner of use thereof, and all rent control, rent stabilization and all other similar Legal Requirements relating to rents charged and/or collected in connection with the Leases.  Borrower represents and warrants that the Property is in compliance in all material respects with all Legal Requirements as of the Execution Date, no notes or notices of violations of any Legal Requirements have been entered or received by Borrower and that Borrower reasonably believes there is no basis for the entering of such note or notices.

4.19    Compliance with Insurance Requirements.  Borrower promptly shall comply with, and shall cause the Property to comply with, all Insurance Requirements.  If Borrower shall use the Property or any portion thereof in any manner that could permit the insurer to cancel any insurance required to be provided hereunder, Borrower immediately shall obtain a substitute policy that shall satisfy the requirements of this Agreement and that shall be effective on or prior to the date on which any such other insurance policy shall be canceled.  Borrower shall not by any action or omission invalidate any insurance policy required to be carried hereunder unless such policy is replaced as aforesaid, or materially increase the premiums on any such policy above the normal premium charged for such policy.  Borrower shall cooperate with Lender in obtaining for Lender the benefits of any insurance proceeds lawfully or equitably payable to Lender in connection with the transaction contemplated hereby.

4.20    Compliance with Property Agreements; No Modifications.    Borrower shall promptly perform and observe or cause to be performed and observed, all of the terms, covenants and conditions of all Property Agreements and all things necessary to preserve intact and unimpaired any and all appurtenances or other interests or rights affecting the Property.  Borrower will enforce all of the rights of Borrower under each such Property Agreement.  Borrower will not modify, waive in any material respect or release any Property Agreement, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent may be granted or denied in Lender's sole discretion.

4.21    Right of Inspection.  Borrower will permit Lender and any Persons authorized by Lender, upon reasonable advance notice to Borrower and at reasonable times, to examine and inspect any financial and accounting records of Borrower and to make copies and take abstracts from such records and to discuss the affairs, finances and business of Borrower with their officers and managers and independent public accountants.  During the occurrence of an Event of Default, Borrower shall pay any reasonable costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall reasonably determine to be necessary or appropriate in the protection of Lender's interest.  Except as otherwise permitted hereunder, Lender shall have the right, at Borrower's sole cost and expense, to obtain an update to

46

for the Property including cash flow projections for the upcoming year and all proposed capital replacements and improvements for Lender's approval pursuant to Section 4.43 hereof;

(vii)    not later than the tenth (10th) day of each month, certified monthly rent rolls;

(viii)    not later than the tenth (10th) day of each month, certified monthly operating statements of the Property showing, in reasonable detail, total revenues received, including line item breakouts for all other ancillary income, and total expenses, including a line item expense breakout with capital expenditures detailed, certified as true and correct by Borrower;

(ix)    not later than the tenth (10th) day of each month, certified monthly balance sheet and report of aged receivables and aged payables for the Property;

(x)    not later than (1) ten (10) days after the date required by Law, copies of all reports submitted by Borrower to any Governmental Authority pursuant to any Rent Regulations, and (2) ten (10) days after requested by Lender, copies of all documents (including, without limitation, all books records, reports, correspondences, leases, plans, notices and other documents) relating to Rent Regulations in Borrower's possession or control;

(xi)    such other information as may be reasonably requested by Lender;

(xii)    as soon as available and in any event within five (5) days after filing, copies of all tax returns filed by Borrower and each Guarantor, certified by the chief financial officer of Borrower or applicable Guarantor, as applicable, as being complete and correct; and

(xiii)    not later than March 31 of each year and, in addition, upon the request of Lender, updated personal financial statements of each Guarantor on a form acceptable to Lender, including or together with a listing of contingent obligations of the applicable Guarantor, and certified by the applicable Guarantor to be complete and correct.

(c)    If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "**Required Records**") required by this Section 4.22 within thirty (30) days of the applicable time periods set forth in this Section 4.22, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $10,000 for each Required Record that is not delivered within fifteen (15) days after written notice by Lender to Borrower thereof (and at any time during such fifteen (15) day period, Borrower shall have the right to cure such breach). In addition, if Borrower fails to deliver any Required Records to Lender with fifteen (15) days of the applicable time periods set forth in this Section 4.22, Lender shall have the option, upon fifteen (15) days' notice to Borrower, to gain access to Borrower's books and records and prepare or have prepared, at Borrower's expense, any Required Records not delivered by Borrower.

4.23    Information to Lender.  Upon written request from Lender, Borrower shall furnish within five (5) Business Days to Lender:

(a)    Property Management Report. A property management report for the Property, showing the number of inquiries made and/or rental applications received from Tenants or prospective Tenants and deposits received from Tenants and any other information requested by Lender, in reasonable detail and certified by the chief financial officer of Borrower or Guarantor to be true and complete,

(b)    Accounting for Security Deposits. An accounting of all security deposits held in connection with any Lease, including the name and identification number of the accounts in which such security deposits are held, the name and address of the financial institutions in which such security deposits are held and the name of the Person to contact at such financial institution, along with any authority or release necessary for Lender to obtain information regarding such accounts directly from such financial institutions.

4.24    General Reporting Requirements.  Borrower agrees that Borrower will furnish:

(a)    Litigation. Promptly after their commencement, notice of all actions, suits, and proceedings before any Governmental Authority or arbitrator involving or affecting Borrower or the Property.

(b)    Material Adverse Change. Promptly after the occurrence of any Material Adverse Change, written notice of such Material Adverse Change.

(c)    Default or Event of Default. Promptly after the occurrence of any Default or Event of Default written notice, and the nature of, such Default or Event of Default.

(d)    General Information. Promptly after a request by Lender, such other information respecting the status of the business, assets, liabilities, results of operations, and/or condition (financial or otherwise) of Borrower, the Property or Guarantor as Lender may reasonably request from time to time.

4.25    Rate Cap Agreement.  (a) On or before the Execution Date, Borrower will obtain, execute, pay and deliver to Lender a true, correct and complete Rate Cap Agreement satisfying the terms and conditions determined by Lender in its sole discretion (including, without limitation, the applicable Strike Rate), together with the Assignment of Rate Cap Agreement and a consent of the Acceptable Counterparty thereunder with respect thereto. Borrower shall deliver to Lender on or before the date that is five (5) days after the Execution Date a legal opinion from counsel of the Acceptable Counterparty with respect to the Rate Cap Agreement that is reasonably acceptable to Lender. Borrower acknowledges and agrees that if requested by Lender during the term of the Loan, Borrower shall, prior to the termination of the Rate Cap Agreement provided in connection with the origination of the Loan, obtain, execute, pay for and deliver to Lender an extension or modification of the Rate Cap Agreement or a new Rate Cap Agreement which terminates no earlier than the then scheduled Maturity Date, which amended or new Rate Cap Agreement shall (i) be issued by an Acceptable Counterparty, (ii) satisfy the terms and conditions determined by Lender in its sole but reasonable discretion (including, without limitation, a Strike Rate determined by Lender), and (iii) become effective simultaneously with the expiration of the existing Rate Cap

Agreement (or such later date as approved by Lender, in its sole but reasonable discretion). Additionally, in connection with the amended or new Rate Cap Agreement, Borrower shall cause to be delivered to Lender a new Assignment of Rate Cap Agreement no later than the date on which such Rate Cap Agreement is purchased, a consent of the Acceptable Counterparty thereunder with respect thereto within two (2) Business Days of the effective date of the Rate Cap Agreement and a legal opinion from counsel to the Acceptable Counterparty with respect to the Rate Cap Agreement that is reasonably satisfactory to Lender. Borrower shall comply with all of the terms and provisions of the Rate Cap Agreement. Borrower shall enforce all of its rights under the Rate Cap Agreement.  Borrower will not waive, amend or otherwise modify any of the terms or provisions of the Rate Cap Agreement, except for the extension of the term of the Rate Cap Agreement.  If the current counterparty under a Rate Cap Agreement no longer qualifies as an Acceptable Counterparty, within ten (10) days of the counterparty's disqualification as an Acceptable Counterparty, Borrower shall obtain, execute, pay for and deliver to Lender a true, correct and complete replacement Rate Cap Agreement that satisfies the requirements of this Agreement and is from an Acceptable Counterparty, together with an assignment of rate cap agreement by Borrower to Lender and the consent of the Acceptable Counterparty thereunder with respect thereto, each in form and substance acceptable to Lender.  Furthermore, if any violation or default shall occur under any of the terms of the Rate Cap Agreement or the Assignment of Rate Cap Agreement, within ten (10) days of the occurrence of such violation or default, Borrower shall obtain, execute, pay for and deliver to Lender a true, correct and complete replacement Rate Cap Agreement that satisfies the requirements of this Agreement, together with the assignment of rate cap agreement by Borrower to Lender and a consent of the Acceptable Counterparty thereunder with respect thereto, each in form and substance acceptable to Lender.

(b)      Notwithstanding anything to the contrary contained in this Section 4.25 or elsewhere in this Agreement, if, at any time, a Benchmark Transition Event occurs, then, within thirty (30) days after the designation of the Alternative Rate (but no later than five (5) days prior to the applicable Benchmark Replacement Date), Borrower shall enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of, a substitute Rate Cap Agreement (and in connection therewith, but not prior to Borrower taking all the actions described herein, Borrower shall have the right to terminate any then-existing Rate Cap Agreement) which provides Borrower the protection against rising interest rates that is no less beneficial to Borrower and Lender than the then-existing Rate Cap Agreement required hereunder, and otherwise acceptable to Lender in its sole discretion.

4.26    Right of Entry.  Subject to the rights of individual tenants at the Property, Borrower shall permit Lender and its agents to enter and inspect the Property or any part thereof at all reasonable times, and, except in the event of an emergency, upon reasonable notice and in compliance with the terms of the Leases, and to inspect Borrower's books and records and to make abstracts and reproductions thereof.  Notwithstanding the foregoing, if there is an existing Event of Default the provisions of Section 10.03 shall govern Lender's right of entry.

4.27    Deduction from Value.  In the event of the passage after the Execution Date of any Legal Requirement deducting from the value of the Property for the purpose of taxation, any Lien thereon or changing in any way the Legal Requirements now in force for the taxation of the Mortgage (excluding any income tax that is calculated on the income of Lender) and/or the Debt for federal, state or local purposes, or the manner of the operation of any such taxes so as to

50

adversely affect the interest of Lender, or impose any tax or other charge on any Loan Document, then Borrower will pay such tax, with interest and penalties thereon, if any, within the statutory period.  In the event the payment of such tax or interest and penalties by Borrower would be unlawful, or taxable to Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender shall have the option, by written notice of not less than sixty (60) days, to declare the Debt immediately due and payable.

4.28    No Joint Assessment.  Borrower shall not consent to or initiate the joint assessment of the Property or the Improvements thereon (a) with any other real property constituting a separate tax lot and Borrower represents and covenants that the Property and the Improvements thereon are and shall remain a separate tax lot or lots, and (b) with any portion of the Property that may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes that may be levied against such personal property shall be assessed or levied or charged to the Property as a single Lien.

4.29    No Credits on Account of the Debt.  Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Impositions assessed against the Property or any part thereof and no deduction shall otherwise be made or claimed from the taxable value of the Property, or any part thereof, by reason of the Mortgage or the Debt.  In the event such claim, credit or deduction shall be required by Legal Requirements, Lender shall have the option, by written notice of not less than thirty (30) days, to declare the Debt immediately due and payable.

4.30    Documentary Stamps.  If, at any time, the United States of America, any state or Commonwealth thereof or any subdivision of any such state shall require revenue or other stamps to be affixed to the Note or the Mortgage, or impose any other tax or charges on the same, Borrower will pay the same, with interest and penalties thereon, if any.

4.31    Publicity.  Borrower shall not publicize or advertise any information regarding the Loan or Lender's financing of the Property without first submitting any proposed publication or advertisement to Lender, and then receiving the written approval of Lender (such approval to be granted or not granted in Lender's sole discretion) (the "**Non Publication Covenants**"); and further, Borrower shall cause its affiliates, the Guarantor and any broker which it engaged with respect to the Loan (and with respect to acquisition of the Property, if applicable) to adhere to the Non Publication Covenants.

4.32    Representations Generally.  The representations and warranties contained in this Agreement, and the review and inquiry made on behalf of Borrower and Guarantor therefor have all been made by persons having the requisite expertise and knowledge to provide such representations and warranties.  No statement of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any certificate, document or schedule furnished to Lender pursuant hereto, contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.

4.33    ERISA.  Borrower will not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under any Loan Document) to be a non-exempt (under a statutory or administrative class

51

exemption) prohibited transaction under ERISA.  Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of this Agreement, as requested by Lender in its sole discretion, that the ERISA representations specified above are still true.

4.34     Sale of Assets.  Borrower will not sell, lease, assign, transfer, or otherwise dispose of, any of its now owned or hereafter acquired assets, except for the sale or other disposition of assets no longer used or useful in the conduct of its business.

4.35     Distributions.  Borrower will not declare or make any distribution to any of its members or partners at any time after Borrower is aware an Event of Default exists.

4.36     Authority Documents.  Borrower will not enter into any amendment, modification, waiver, termination or restatement of any Authority Document.

4.37     Name, Address and Structure.  Borrower will not change its name, its place of business or, if more than one place of business, its chief executive office, or its mailing address or organizational identification number if it has one without giving Lender at least thirty (30) days written notice of such change, or change its type of organization, jurisdiction of organization or other legal structure.

4.38     Litigation.  Borrower will not commence any material litigation.

4.39     Property Management Agreement.  Borrower will not amend or modify any of the material provisions of the Property Management Agreement without the prior written consent of Lender.

4.40     Major Contracts.  Borrower will not enter into, modify or amend any Major Contract without the prior written consent of Lender.

4.41     Leases.  Borrower will not enter into, modify or amend any Operating Lease or Capital Lease without the prior written consent of Lender.

4.42     Issuance of Equity.  Borrower will not issue any additional equity interest, including membership interests.

4.43     Budget.  As soon as available and in any event at least thirty (30) days prior to the start of each calendar year, Borrower shall deliver to Lender a budget ("**Budget**") for such calendar year showing, in such format and detail as Lender may reasonably require, showing on a cash and/or accrual basis as specified by Lender, all estimated revenues (including contingency items) and expenses for such calendar year.  In addition, the Budget shall include such additional information as Borrower or Lender deems appropriate, including but not limited to the business plans for the operation and marketing of the Property, an assessment of existing market conditions, and a review of the Property's performance in the prior calendar year.  Lender shall have the right to ask questions regarding the items set forth in the Budget, and Borrower shall make itself and the other relevant parties available to respond to Lender's questions.  Lender shall approve or disapprove each entire Budget or any proposed amendment to a current Budget within thirty (30) days after delivery of such Budget or amendment to Lender and, if such Budget or amendment is

disapproved, Borrower shall promptly make or cause to be made changes to the applicable Budget or amendment as Lender shall require and shall resubmit such Budget or amendment to Lender for its reasonable approval. If Lender fails to approve a proposed Budget prior to the start of the year for which such Budget was prepared, the applicable Budget for the immediately preceding year (with actual increases for any non-discretionary items) shall control until approval is obtained. In the event that Borrower must incur an extraordinary operating expense or capital expenditure not set forth in the Budget (each, an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval.

Furthermore, the budget approved by Lender as of the Execution Date (the "**Initial Budget**") is attached as Exhibit B hereto. The Initial Budget shall control until Lender's approval of any subsequent budget submitted in accordance with this Section 4.43.

4.44    Survival of Representations. The representations and warranties set forth in this Article 4 and elsewhere in this Agreement and the other Loan Documents shall (a) survive until the Debt has been paid in full, and (b) be deemed to have been relied upon by Lender notwithstanding any investigation beforehand or hereafter made by Lender or on its behalf.

4.45    Borrower's Knowledge.  When used in this Agreement or in any other Loan Documents, terms such as "to Borrower's knowledge", "to the best knowledge of Borrower", "to Borrower's best knowledge" or like phrases shall mean the actual or constructive awareness or knowledge of any member, manager, officer or director of Borrower, assuming that such Person conducted such due diligence as a reasonable property purchaser and owner would deem appropriate in connection with the Property, Borrower or the Loan and the representations that are qualified so in this Agreement and/or any of the other Loan Documents.

# ARTICLE 5
# INSURANCE

5.01    Conditions of Property.  Borrower represents and warrants that Borrower has not received any notice or other communication from any insurance company or bonding company of any defects or inadequacies in all or any portion of the Property which could (1) adversely affect the insurability of all or any portion of the Property, (2) cause the imposition of extraordinary premiums or charges or (3) cause the termination of any insurance policy or bond.

5.02    Required Insurance.

(a)    During the term of this Agreement, Borrower at its sole cost and expense must provide ACORD 28 and ACORD 25 certificates of insurance and, upon the request of Lender certified copies of policies of insurance, satisfactory to Lender as to amounts, types of coverage and the companies underwriting these coverages.  In no event will such policies be terminated or otherwise allowed to lapse. Borrower shall be responsible for its own deductibles.  Borrower shall also pay for any insurance, or any increase of policy limits, not described in this Agreement which Borrower requires for its own protection or for compliance with Law.  Borrower's insurance shall be primary and without contribution from any insurance procured by Lender.

53

(b)      Policies of insurance shall comply with the following requirements:

(1)      "**All-risk**"/Special Form property insurance (i) in an amount equal to one hundred percent (100%) of the Full Replacement Cost of the Improvements, Fixtures, Equipment, furniture, furnishings and other personal property, which for purposes of this Article means actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation and with a "Replacement Cost" endorsement; (ii) containing either no coinsurance or, if coinsurance, containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions; (iii) providing for no deductible in excess of $25,000 (except in the case of windstorm coverage for high risk, Tier 1 locations, which must have a deductible of no more than five percent (5%) of the insurable value, per occurrence; $25,000 per occurrence for all other Wind/Hail occurrences); and (iv) including contingent liability from "Operation of Building Laws," Ordinance or Law coverage, coverage for loss to the undamaged portion of the building (with sublimits acceptable to Lender in its sole discretion) cost, "Demolition Costs" (with sublimits acceptable to Lender in its sole discretion) and "Increased Cost of Construction" (with sublimits acceptable to Lender in its sole discretion) endorsements in an amount acceptable to Lender.   The Full Replacement Cost shall be determined from time to time by an appraiser or contractor designated and paid by Borrower and approved in writing by Lender or by an engineer or appraiser in the regular employ of the insurer issuing such policy. If not included within the "All-risk"/Special Form coverage above, Borrower shall also carry (A) coverage against damage due to backing up of sewers and drains with a sublimit acceptable to Lender, (B) earthquake insurance in amounts satisfactory to Lender if the Property is considered to be in a high risk seismic zone, and (C) terrorism coverage – both foreign and domestic in an amount equal to the full replacement cost of such improvements.  The maximum deductible under such insurance will not exceed $25,000.

(2)      Commercial general liability insurance (including foreign and domestic terrorism coverage) on an occurrence basis with a deductible not greater than $1,000 per claim, including terrorism coverage, against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (i) to be on the so-called "occurrence" form with minimum limits per occurrence of $1,000,000 and $2,000,000  in the aggregate, (ii) to continue at not less than this limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (iii) to cover at least the following hazards:  (a) premises and operations; (b) products and completed operations on an "if any" basis; (c) independent contractors; (d) blanket contractual liability for all written and oral contracts; and (e) contractual liability covering the indemnities contained in this Agreement to the extent available.

(3)      Business income insurance in an amount sufficient to prevent Borrower from becoming a co-insurer within the terms of the applicable

54

policies, and sufficient to recover twelve (12) months' "Business Income" (as hereinafter defined), plus one hundred eighty (180) days extended period of indemnity. **"Business Income"** means the sum of (i) the total anticipated gross income from occupancy of the Property, (ii) the amount of all charges (such as, but not limited to, operating expenses, insurance premiums and taxes) which are the obligation of Tenants or occupants to Borrower, (iii) the fair market rental value of any portion of the Property which is occupied by Borrower, and (iv) any other amounts payable to Borrower or to any Affiliate of Borrower pursuant to the Leases.

(4)     If any of the Improvements on the Property or any part thereof is located in an area identified on a Flood Hazard Boundary Map or Flood Insurance Rate Map issued by the Federal Emergency Management Agency as having special flood hazards and Borrower shall maintain a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration with a generally acceptable insurance carrier, in an amount not less than the lesser of (i) one hundred percent (100%) of the replacement cost of the Property, (ii) the maximum amount of insurance which is available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973) or the National Flood Insurance Reform Act of 1994, as amended, or (iii) such other amount as required by Lender in its sole discretion.  The maximum deductible under such insurance will not exceed $5,000.

(5)     (During the period of any construction or renovation or alteration of the Improvements, a so-called "Builder's All Risk" insurance policy in non-reporting, "completed value" form for any Improvements under construction, renovation or alteration including, without limitation, for demolition and increased cost of construction or renovation, in an amount approved by Lender, including an "Occupancy" endorsement and worker's compensation insurance covering all persons engaged in the construction, renovation or alteration in an amount at least equal to the minimum required by statutory limits of the State.  Such insurance will include an agreed amount endorsement waiving co-insurance provisions. Coverage will be in form and substance and with deductibles approved by Lender and consistent with the insurance required from Section 5.02(b)(1) above.

(6)     Workers' compensation insurance, subject to the statutory limits of the State, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 for disease in the aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operations (if applicable).

(7)     Boiler & machinery insurance covering the major components of the central heating, air conditioning and ventilating systems, boilers, other pressure vessels, high pressure piping and machinery, elevators and escalators, if any, and other similar equipment installed in the Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost of all

55

equipment installed in, on or at the Improvements, unless otherwise approved by Lender in writing in advance of placement.  These policies shall insure against physical damage to and loss of occupancy and use of the Improvements arising out of an accident or breakdown.

(8)     If applicable, automobile liability insurance for bodily injury and property damage in the amount of $1,000,000 combined and covering all owned, non-owned and hired vehicles.

(9)     Umbrella liability insurance (including foreign and domestic terrorism coverage) covering bodily injury and property damage with limits of not less than $10,000,000 per occurrence in excess of Sections 5.02(b)(2), (6) and (8) above.

(10)     Such other insurance and such higher limits as may from time to time be reasonably required by Lender against other insurable hazards, including, but not limited to, vandalism, earthquake, sinkhole and mine subsidence.

5.03     Terms of Insurance Policies.

(a)     Lender's interest must be clearly stated by endorsement in the insurance policies described in Section 5.02 as follows:

(1)     The policies of insurance referenced above shall identify Lender as Mortgagee, Lender's Loss Payable, and additional insured, as applicable.

(b)     All of the policies referred to in Section 5.02 shall (i) be for a term of not less than one (1) year, (ii) in the case of Property policies, and when available Liability policies, provide for at least thirty (30) days' written notice to Lender in the event of policy cancellation and/or material change, (iii) contain an endorsement or agreement that the insurer that any loss shall be payable to Lender in accordance with the terms of such policy notwithstanding any act or negligence of Borrower which might otherwise result in forfeiture of such insurance; (iv) waive all rights of subrogation against Lender; (v) in the event that any Lease requires that any insurance policies affecting the Property contain a waiver of subrogation provision, either by their terms or by endorsement, provide such a waiver, (vi) in the case of property damage insurance policies such policies, automatically reinstate after a Casualty, (vii) provide that no mortgagee, loss payee or additional insured is responsible for any insurance premiums on or assessments pursuant to any such policy, (viii) permit Lender to pay the premiums and continue such policy upon failure of Borrower to pay such premium and (ix) provide a waiver of subrogation endorsement as to Lender. Lender may, but shall not be obligated to, make premium payments to prevent such cancellation.

(c)     Unless otherwise approved by Lender in writing in advance of placement, all the insurance companies must be authorized to do business in the State and be approved by Lender. The insurance companies must have a general policy rating of policy rating of A or better with S&P and "A:VIII" or better by A.M. Best Company, Inc. Notwithstanding the foregoing, Lender has agreed that in connection with the closing of the Loan, Borrower shall be permitted to maintain the coverage required hereunder with insurance companies which do not meet the foregoing requirements, provided that if the current AM Best rating of any such insurer is

56

withdrawn or downgraded, Borrower shall replace such carrier with an insurance company meeting the ratings requirements set forth hereinabove.  Borrower shall deliver evidence satisfactory to Lender of payment of premiums due under the insurance policies.

(d)     Copies of the policies, Schedules of Locations and Values, and any endorsements, shall be made available for inspection by Lender upon request.  If any policy is canceled before the Debt is satisfied, and Borrower fails to immediately procure replacement insurance, Lender reserves the right but shall not have the obligation immediately to procure replacement insurance at Borrower's cost.

(e)     Borrower shall be required during the term of the Loan to continue to provide Lender with certified copies of renewal policies or replacements of the insurance policies referenced in Section 5.02(b).  Lender may accept certificates of insurance evidencing insurance policies in addition to requiring the actual policies.  Lender shall be provided with renewal certificates of insurance not less than fifteen (15) days prior to each expiration. The failure of Borrower to maintain the insurance required under this Article shall not constitute a waiver of Borrower's obligation to fulfill these requirements.

(f)     Borrower shall pay the premiums for all Required Insurance (the "Insurance Premiums") as the same become due and payable and furnish to Lender evidence of the renewal of each Required Insurance policy (unless such Insurance Premiums have been paid by Lender) together with receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If Borrower does not furnish such evidence and receipts at least fifteen (15) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.  Borrower shall deliver to Lender a certified copy of each Required Insurance policy within thirty (30) days after its effective date.  Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability Laws, and changes in prudent customs and practices.

5.04   <u>Compliance with Requirements of Insurance Policies</u>.  Borrower shall (1) pay when due all Insurance Premiums for all Required Insurance, (2) comply with and conform to (a) all provisions of each such Required Insurance policy, and (b) all requirements of the insurers applicable to Borrower or to the Property or to the use, manner of use, occupancy, possession, operation, maintenance, alterations or repair of any of the Property, and (3) not use or permit the use of the Property in any manner which permits any insurer to cancel or void any Required Insurance policy.

5.05   <u>Insurance Reporting Requirements</u>.  Borrower shall give Lender prompt notice of, and copies of documents delivered or received by Borrower in connection with, each of the following: (1) any claims made against Borrower for any personal injury, bodily injury or property damage incurred on or about the Property, (2) any Casualty, and (3) any cancellation or non-renewal of any Required Insurance policy.

57

From time to time, Lender may request that Borrower deliver to Lender, within ten (10) Business Days of receipt of such request, a report from a reputable and experienced insurance broker or from the insurer, setting forth the particulars as to all insurance policies obtained by Borrower pursuant to this Agreement and then in effect and stating that all Insurance Premiums then due on all such policies have been paid in full to the applicable insurers (or the insurance brokers on behalf of the insurers), that such insurance policies are in full force and effect and that, in the opinion of such insurance broker or insurer, such insurance policies otherwise comply with the requirements of this Agreement.

      5.06   <u>Assignment To Lender</u>.

      (a)    Borrower hereby assigns to Lender the proceeds of all insurance (other than liability insurance) obtained pursuant to this Agreement, all of which proceeds shall be payable to Lender as collateral and further security for the payment of the Debt and the performance of Borrower's obligations hereunder and under the other Loan Documents, and Borrower hereby authorizes and directs the issuer of any such insurance to make payment of such proceeds directly to Lender.  Except as otherwise expressly provided in Article 6, Lender shall have the option, in its discretion, and without regard to the adequacy of its security, to apply all or any part of the proceeds it may receive pursuant to this Article in such manner as Lender may elect to any one or more of the following: (i) the payment of the Debt (without the payment of the Prepayment Fee but with the payment of the applicable Exit Fee), whether or not then due, in any proportion or priority as Lender, in its discretion, may elect, (ii) the repair or restoration of the Property, (iii) the cure of any Default or Event of Default, or (iv) the reimbursement of the costs and expenses of Lender incurred pursuant to the terms hereof in connection with the recovery of the insurance proceeds.  Nothing herein contained shall be deemed to excuse Borrower from repairing or maintaining the Property as provided in this Agreement or restoring all damage or destruction to the Property, regardless of the sufficiency of the insurance proceeds, and the application or release by Lender of any insurance proceeds shall not cure or waive any Default or Event of Default or notice of Default.

      (b)    In the event of the foreclosure of the Mortgage or any other transfer of title or assignment of all or any part of the Property in extinguishment, in whole or in part, of the Debt, all right, title and interest of Borrower in and to all Required Insurance policies shall inure to the benefit of the successor in interest to Borrower or the purchaser of the Property.  If, prior to the receipt by Lender of any insurance proceeds, the Property or any portion thereof shall have been sold on foreclosure of the Mortgage or by deed in lieu thereof or otherwise, or any claim under such insurance policy arising during the term of the Loan is not paid until after the extinguishment of the Mortgage, and Lender shall not have received the entire amount of the Debt outstanding at the time of such extinguishment, whether or not a deficiency judgment on the Mortgage shall have been sought or recovered or denied, then, the proceeds of any such insurance to the extent of the amount of the Debt not so received, shall be paid to and be the property of Lender, together with interest thereon at the Default Rate, and the reasonable attorneys' fees, costs and disbursements incurred by Lender in connection with the collection of the insurance proceeds and Borrower hereby assigns, transfers and sets over to Lender all of Borrower's right, title and interest in and to such insurance proceeds.  Notwithstanding any provisions of this Agreement to the contrary, Lender shall not be deemed to be a trustee or other fiduciary with respect to its receipt of any such insurance proceeds and such insurance proceeds may be commingled with any other monies of

58

Lender; provided, however, that Lender shall use such insurance proceeds for the purposes and in the manner permitted by this Agreement.  The provisions of this Section shall survive the termination of the Mortgage by foreclosure, deed in lieu thereof or otherwise as consequence of the exercise of the rights and remedies of Lender after a Default.

**ARTICLE 6**
**CASUALTY, CONDEMNATION AND RESTORATION**

6.01    <u>Borrower's Representations</u>.  Borrower represents and warrants as follows:

(a)    No Casualty or damage to any part of the Property has occurred which has not been fully restored or replaced.

(b)    No part of the Property has been taken in Condemnation or other similar proceeding or transferred in lieu of Condemnation, nor has Borrower received notice of any proposed Condemnation or other similar proceeding affecting the Property.

6.02    <u>Insurance Proceeds</u>.

(a)    In the event of any Casualty, Borrower shall give prompt written notice to Lender (which notice shall set forth Borrower's good faith estimate of the cost of Restoration, or if Borrower cannot reasonably estimate the anticipated cost of Restoration, Borrower shall nonetheless give Lender prompt notice of the occurrence of such Casualty, and will diligently proceed to obtain estimates to enable Borrower to quantify the anticipated cost and time required for such Restoration, whereupon Borrower shall promptly notify Lender of such good faith estimate).

(b)    Borrower shall not adjust, compromise or settle any claim for Casualty Insurance Proceeds without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed; provided, however, that, except during the continuance of an Event of Default, Lender's consent shall not be required with respect to the adjustment, compromising or settlement of any claim for Casualty Insurance Proceeds in an amount less than $100,000.

(c)    Provided that (i) Restoration does not violate any Legal Requirements, (ii) an independent engineer selected by Lender ("**Lender's Casualty Consultant**") agrees with Borrower's estimate of the cost of Restoration, (iii) less than fifteen percent (15%) of the reasonably estimated aggregate fair market value of the Property is damaged or destroyed, (iv) the Property can, in Lender's judgment, with diligent Restoration, be returned to a condition at least equal to the condition thereof that existed prior to the Casualty within the earlier to occur of (1) six (6) months after the receipt of Casualty Insurance Proceeds, and (2) six (6) months prior to the Maturity Date, (v) no Default or Event of Default is then continuing hereunder or under any of the other Loan Documents, (vi) if such Casualty results in the loss of access to the Property or the Improvements then such access is replaced by new Improvements to the Property or an access easement, (vii) the Casualty Insurance Proceeds are deposited with Lender, (viii) the insurance carrier has not denied liability to Borrower, (ix) Borrower submits plans and specifications for such Restoration and such plans and specifications are approved by Lender, (x) Borrower submits

59

a budget for such Restoration, together with reasonably satisfactory evidence to support such budget, and such budget is approved by Lender, (xi) Borrower obtains all Permits required for the Restoration and provides copies of all such Permits to Lender, (xii) Borrower provides evidence reasonably satisfactory to Lender that, as a result of either the Casualty or the Restoration, none of the commercial Tenants (if applicable) will terminate its Lease and (xiii) Borrower delivers to Lender a pro forma computation, satisfactory to Lender, demonstrating that during the period of time required to complete the Restoration and for the twelve (12) months thereafter, Borrower will be able to make all payments of principal and interest required under the Loan Documents, then Lender shall make the Casualty Insurance Proceeds available to Borrower in accordance with Section 6.03 below.  Borrower shall promptly commence and diligently prosecute to completion the Restoration to a condition such that the Property shall be at least equal in value to that immediately prior to the Casualty to the extent practicable, in full compliance with all Legal Requirements and the provisions of all Leases, and in accordance with Section 6.03 below.  All costs and expenses of Lender's Casualty Consultant shall be paid by Borrower within ten (10) days after demand of Lender.

(d)     In all other cases, Lender shall have the option, in its sole discretion to apply any Casualty Insurance Proceeds it may receive pursuant to this Agreement (less any cost to Lender of recovering and paying out such proceeds incurred pursuant to the terms hereof and not otherwise reimbursed to Lender, including, without limitation, reasonable attorneys' fees and expenses) to the payment of the Debt, without the payment of the Prepayment Fee but with the payment of the applicable Exit Fee, or to allow such proceeds to be used for the Restoration pursuant to the terms and subject to the conditions of the applicable sections of this Article.

(e)     In the event that Lender allows Casualty Insurance Proceeds to be used for the Restoration, any excess proceeds remaining after completion of such Restoration shall be (i) applied to the payment of the Debt without any prepayment fee or charge but with payment of the applicable Exit Fee and/or (ii) deposited in the Replacement Reserve and applied in accordance with the terms and provisions of Section 11.04 herein, which application or deposit shall be in any manner and amounts as Lender shall determine in its sole discretion.

(f)     Except with respect to de minimis proceeds of up to $100,000 paid prior to an Event of Default hereunder, Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to collect and receive any Casualty Insurance Proceeds paid with respect to any portion of the Property or the insurance policies required to be maintained hereunder, and to endorse any checks, drafts or other instruments representing any insurance proceeds whether payable by reason of loss thereunder or otherwise

6.03    Restoration.    If any Casualty Insurance Proceeds are to be applied to the Restoration, then such Casualty Insurance Proceeds shall be held by Lender and shall be paid out from time to time to Borrower as the Restoration progresses (less any cost to Lender of Lender's Casualty Consultant and of recovering and paying out such Casualty Insurance Proceeds, including, without limitation, reasonable attorneys' fees and costs allocable to inspecting the Restoration and the plans and specifications therefor but without duplication of expenditures between Borrower or Lender) subject to all of the following conditions:

(a)  An architect or engineer selected by Borrower and reasonably acceptable to Lender (an "**Architect**" or "**Engineer**") or a Person otherwise reasonably acceptable to Lender, shall have delivered to Lender a certificate estimating the cost of completing the Restoration, and, if the amount set forth therein is or if Lender's Casualty Consultant shall estimate the cost of completing the Restoration to be more than the sum of the amount of Casualty Insurance Proceeds then being held by Lender in connection with a Casualty and amounts agreed to be paid as part of a final settlement under the insurance policy upon or before completion of the Restoration, Borrower shall have delivered to Lender (i) cash collateral in an amount equal to such excess, (ii) an unconditional, irrevocable, clean sight draft letter of credit, in form, substance and issued by a bank reasonably acceptable to Lender, in the amount of such excess and draws on such letter of credit shall be made by Lender to make payments pursuant to this Article following exhaustion of the Casualty Insurance Proceeds therefor or (iii) a completion bond in form, substance and issued by a surety company reasonably acceptable to Lender.

(b)  If the cost of the Restoration is reasonably estimated by an Architect or Engineer in a certification reasonably acceptable to Lender or by Lender's Casualty Consultant to be equal to or exceed $100,000, such Restoration shall be performed under the supervision of an Architect or Engineer, it being understood that the plans and specifications with respect thereto shall provide for Restoration so that, upon completion thereof, the Property shall be at least equal in replacement value and general utility to the Property prior to the damage or destruction.

(c)  Each request for payment shall be made on not less than ten (10) days' prior notice to Lender and shall be accompanied by a certificate of an Architect or Engineer, or, if the Restoration is not required to be supervised by an Architect or Engineer, by a certificate of an officer of Borrower or the Controlling Party, stating (i) that payment is for Restoration completed in compliance with the plans and specifications, if required under Section 6.03(b) above, (ii) that the sum requested is required to reimburse Borrower for payments by Borrower to date, or is due to the contractor, subcontractors, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Restoration  (giving a brief description of such services and materials), and that when added to all sums previously paid out by Lender does not exceed the value of the Restoration done to the date of such certificate, (iii) if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Property, that title to the personal property items covered by the request for payment is vested in Borrower (unless Borrower is a lessee of such personal property), and (iv) that the Casualty Insurance Proceeds and other amounts deposited by Borrower held by Lender after such payment is more than the estimated remaining cost to complete such Restoration; provided, however, that if such certificate is given by an Architect or Engineer, such Architect or Engineer shall certify as to clause (i) above, and such officer shall certify as to the remaining clauses above, and provided, further, that Lender shall not be obligated to disburse such funds if Lender's Casualty Consultant determines that the requirements in clause (i) or clause (iv) shall not have been satisfied or Lender determines, in Lender's sole discretion, that Borrower shall not be in compliance with Section 6.03(h) hereof.  Additionally, each request for payment shall contain a statement signed by Borrower stating that the requested payment is for Restoration satisfactorily done to date.

(d)  Each request for payment shall be accompanied by waivers of Lien, in customary form and substance, covering that part of the Restoration for which payment or reimbursement is being requested and, if required by Lender, a search prepared by a title company

or licensed abstractor, or by other evidence satisfactory to Lender that there has not been filed with respect to the Property any mechanic's or other Lien or instrument for retention of title relating to any part of the Restoration not discharged of record.  Additionally, as to any personal property covered by the request for payment, Lender shall be furnished with evidence of having incurred a payment obligation therefor and such further evidence reasonably satisfactory to assure Lender that UCC filings therefor provide a valid first Lien on the personal property.

(e)     Lender and Lender's Casualty Consultant shall have the right to inspect the Restoration at all reasonable times upon reasonable prior notice and may condition any disbursement of Casualty Insurance Proceeds upon satisfactory compliance by Borrower with the provisions hereof.  Neither the approval by Lender or Lender's Casualty Consultant of any required plans and specifications for the Restoration nor the inspection by Lender or Lender's Casualty Consultant of the Restoration shall make Lender or Lender's Casualty Consultant responsible for the preparation of such plans and specifications, or the compliance of such plans and specifications of the Restoration, with any applicable Law, regulation, ordinance, covenant or agreement.

(f)     Casualty Insurance Proceeds shall not be disbursed more frequently than once every thirty (30) days.

(g)     Until such time as the Restoration has been substantially completed, Lender shall not be obligated to disburse up to ten percent (10%) of the cost of the Restoration (the "**Retention Amount**") to Borrower.  Upon substantial completion of the Restoration, Borrower shall send notice thereof to Lender and, subject to the conditions of Section 6.03(e), Lender shall disburse one-half (1/2) of the Retention Amount to Borrower; provided, however, that the remaining one-half (1/2) of the Retention Amount shall be disbursed to Borrower when Lender shall have received copies of any and all final certificates of occupancy or other certificates, licenses and Permits required for the ownership, occupancy and operation of the Property in accordance with all Legal Requirements.  Borrower hereby covenants to diligently seek to obtain any such certificates, licenses and Permits.

(h)     Upon failure on the part of Borrower promptly to commence the Restoration or to proceed diligently and continuously to completion of the Restoration, which failure shall continue after notice for thirty (30) days, Lender shall apply any such Casualty Insurance Proceeds it then or thereafter holds to the payment of the Debt in accordance with the provisions of the Note; provided, however, that Lender shall be entitled to apply at any time all or any portion of the Casualty Insurance Proceeds it then holds to the extent necessary to cure any Event of Default under this Agreement, the Mortgage, the Note or any other Loan Document.  Notwithstanding the foregoing, if such failure on the part of Borrower is the result of a strike, lockout, labor dispute, inability to obtain labor or materials (or reasonable substitutes therefor), acts of God, severe weather conditions, governmental restriction, regulation or control, enemy or hostile governmental action, civil commotion, insurrection, sabotage or other similar conditions beyond the Control of Borrower (except if such failure is attributable to lack of funds or the inability to obtain financing) (each, a "**Force Majeure**"), then Borrower shall be afforded additional time to commence or proceed diligently with the Restoration provided that (i) Borrower delivers to Lender notice within two (2) Business Days after its discovery of commencement of such Force Majeure setting forth in detail the Force Majeure event, estimate of the length of such event and the actions being taken by Borrower in response thereto and (ii) Borrower will not be subject to criminal or civil penalties

62

resulting from such delay in performance (other than de minimis civil penalties which (A) are monetary in nature only, (B) are ascertainable and (C) which if deposited with Lender would wholly protect Lender from such civil penalty and Borrower shall so deposit such penalties as a condition to any claimed delay due to Force Majeure).

6.04    Event of Default During Restoration.  Notwithstanding anything to the contrary contained in this Agreement including, without limitation, the provisions of this Article, if, at the time of any Casualty, or at any time during any Restoration, or at any time that Lender is holding or is entitled to receive any Casualty Insurance Proceeds pursuant to this Agreement, an Event of Default exists and is continuing, Lender shall then have no obligation to make such proceeds available for Restoration and Lender shall have the right and option, to be exercised in its sole and absolute discretion and election, with respect to the Casualty Insurance Proceeds, either to retain and apply such proceeds in reimbursement for the actual costs, fees and expenses incurred by Lender in accordance with the terms hereof in connection with the adjustment of the loss and any balance toward payment of the Debt in such priority and proportions as Lender, in its sole discretion, shall deem proper, or towards the Restoration, upon such terms and conditions as Lender shall determine, or to cure such Event of Default, or to any one or more of the foregoing as Lender, in its sole and absolute discretion, may determine.  If Lender shall receive and retain such Casualty Insurance Proceeds, the Lien of the Mortgage shall be reduced only by the amount thereof received, after reimbursement to Lender of expenses of collection, and actually applied by Lender in reduction of the principal sum payable under the Note in accordance with the Note.

6.05    Application of Proceeds to Debt Reduction.

(a)    No damage to the Property, or any part thereof, by fire or other casualty whatsoever, whether such damage be partial or total, shall relieve Borrower from its liability to pay in full the Debt and to perform its obligations under this Agreement and the other Loan Documents except to the extent any rent (business interruption) insurance is paid to Lender and applied to the Debt.

(b)    If any Casualty Insurance Proceeds are applied to reduce the Debt, Lender shall apply the same in accordance with the provisions of the Note and this Agreement.

6.06    Condemnation.  Borrower shall notify Lender promptly of the commencement or threat of any Condemnation of the Property or any portion thereof.  Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain the proceeds of any such Condemnation and to make any compromise or settlement in connection with such proceedings (subject to Borrower's reasonable approval, except after the occurrence of an Event of Default, in which event Borrower's approval shall not be required), subject to the provisions of this Agreement; provided, however, that Borrower may participate in any such proceedings and shall be authorized and entitled to compromise or settle any such proceeding with respect to Condemnation Proceeds in an amount less than $100,000. Borrower shall execute and deliver to Lender any and all instruments reasonably required in connection with any such proceeding promptly after request therefor by Lender.  Except as set forth above, Borrower shall not adjust, compromise, settle or enter into any agreement with respect to such proceedings without the prior consent of Lender.  All Condemnation Proceeds of any Condemnation, or purchase–in-lieu thereof, of the Property or any portion thereof are hereby

63

assigned to and shall be paid to Lender.  Except as otherwise provided for herein, Lender shall apply such Condemnation Proceeds (less any cost to Lender of recovering and paying out such Condemnation Proceeds, including, without limitation, reasonable attorneys' fees and costs allocable to inspecting any Replacement and the plans and specifications therefor) toward the reduction of the Debt.  If the Condemnation Proceeds are used to reduce the Debt, they shall be applied in accordance with the provisions of the Note and this Agreement, with no prepayment penalty but with payment of the applicable Exit Fee.  Borrower shall promptly execute and deliver all instruments reasonably requested by Lender for the purpose of confirming the assignment of the Condemnation Proceeds to Lender.

6.07     <u>Application</u>.

(a)     Provided that (i) less than five percent (5%) of the Property has been affected by the Condemnation, (ii) the portion of the Property not taken would under then current economic conditions, applicable zoning Laws, building regulations and other applicable Legal Requirements, permit the Replacement so as to constitute a complete, rentable facility of the same sort as existed prior to the Condemnation, having adequate ingress and egress to the Property, (iii) such Replacement can, in Lender's judgment, be completed within the earlier to occur of (1) six (6) months after the receipt of the Condemnation Proceeds, and (2) six (6) months prior to the Maturity Date, (iv) Lender has determined, that its security has not been impaired, and (v) no Default or Event of Default is then continuing hereunder or under any of the other Loan Documents, Lender shall receive the Condemnation Proceeds and shall pay the same: first, to any cost to Lender of recovering and paying out such Condemnation Proceeds, including, without limitation, reasonable attorneys' fees and costs allocable to inspecting any Replacement and the plans and specifications therefor; second, to Borrower to the extent of any portion of the Condemnation Proceeds as may be necessary to pay the reasonable cost of Replacement, including costs of the collection, compromise or settlement (including, without limitation, reasonable attorney fees); and third, to Lender in reduction of the Debt without the payment of the Prepayment Fee but with the payment of the applicable Exit Fee.

(b)     In all other cases, the Condemnation Proceeds shall be payable, after payment of all necessary and proper expenses incurred in the collection of such award to Lender, in reduction of the Debt, without the payment of the Prepayment Fee but with the payment of the applicable Exit Fee.  If subsequent to payment of the Debt in full, Lender shall receive payment of any subsequent Condemnation Proceeds, then such Condemnation Proceeds shall be paid to Borrower.  Borrower agrees to promptly execute any and all documents that may be reasonably required in order to facilitate collection by Lender of such awards.

6.08     <u>Award</u>.  In the event Lender makes Condemnation Proceeds available for the Replacement, such Condemnation Proceeds shall be disbursed in the manner and subject to the conditions set forth in Section 6.03 hereof as though such Condemnation Proceeds were Casualty Insurance Proceeds.  No application of the Condemnation Proceeds or payment in lieu thereof to the reduction of the Debt shall have the effect of releasing the Lien of the Mortgage until the remainder of the Debt has been paid in full.  In the case of any Condemnation, Lender shall be entitled, as a first priority out of the Condemnation Proceeds, to reimbursement for all costs of collection, compromise or settlement, (including, without limitation, reasonable attorneys' fees and costs allocable to inspecting any Replacement and the plans and specifications therefor)

64

incurred in connection with any the Condemnation Proceeds.  All the Condemnation Proceeds deposited with Lender pursuant to this Article, until expended or applied as provided herein, shall constitute additional security for the payment of the Debt and the payment and performance of Borrower's obligations under the Loan Documents.  For purposes hereof, any reference to the Condemnation Proceeds shall be deemed to include interest, if any, which has accrued thereon. Notwithstanding any taking by eminent domain, alteration of the grade of any street or other injury to or decrease in value of the Property, Borrower hereby expressly agrees that Lender shall not be limited to the interest paid on the Condemnation Proceeds and further agrees to pay Lender the difference, if any, between (i) the interest received by Lender on such Condemnation Proceeds and (ii) the Applicable Interest Rate provided in the Note from the date of the Condemnation of the Property or any portion thereof to the Maturity Date of the Loan.  The obligations and agreements of Borrower contained in this Section shall survive the payment to Lender of any awards or compensation for an appropriation, Condemnation or other taking and shall terminate only upon payment in full by Borrower to Lender of the sums referred to herein.

## ARTICLE 7
## LEASES AND OTHER AGREEMENTS AFFECTING THE PROPERTY

7.01    <u>Borrower's Representations and Warranties</u>.  Borrower represents and warrants to Lender with respect to the Property as follows:

(a)    Borrower is the sole owner of the entire lessor's interest in the Leases.

(b)    There are no commercial or retail leases, subleases or occupancy agreements affecting the Property and there are no residential leases, subleases or occupancy agreements affecting the Property except as set forth on the Rent Roll.

(c)    There are no defaults by Borrower under the Leases and, to the best knowledge of Borrower, there are no defaults by any Tenants under the Leases.

(d)    Each of the Leases are in full force and effect.

(e)    No Tenant under any Lease has, as of the Execution Date, paid Rent more than thirty (30) days in advance. The Rents under the Leases have not been waived, released, or otherwise discharged or compromised.

(f)    All work to be performed by Borrower under the Leases required to be performed to date has been substantially performed, all contributions to be made by Borrower to the Tenants thereunder have been made except for any held-back amounts, and all other conditions precedent to each such Tenant's obligations thereunder have been satisfied.

(g)    Borrower is in compliance with all Legal Requirements relating to security deposits (if any) under the Leases.

(h)    No Tenant under any existing Lease has asserted in writing or otherwise any defense, set-off, offset or counterclaim with respect to its tenancy or its obligations under its Lease, and no such defense, set-off or counterclaim exists.

65

52247332;1

(i)     No Lease provides any party with the right to obtain a lien or encumbrance upon the Property superior to the lien of the Mortgage.

(j)     None of the Leases or Rents have been assigned, pledged, hypothecated or otherwise encumbered or transferred by Borrower except to the extent provided in the Loan Documents.

(k)     Each of the Leases is on the standard form of lease delivered to and approved by Lender as of the Execution Date.

(l)     There exist no offsets, setoffs, defenses or counterclaims to the payment of any portion of the Rents.

(m)     Borrower has not received notice from any Tenant challenging the validity or enforceability of any Lease.

(n)     (1) All payments due under the Leases are current and are consistent with the Rent Roll for the Property delivered to and approved by Lender, and (2) each Tenant listed on the Rent Roll is the party (i) actually paying the rent to Borrower as set forth in the corresponding Lease and (ii) physically occupying the corresponding unit, or that subleases such unit to another Person who physically occupies such unit.

(o)     There are no material breaches or defaults, or events that with notice or the passage of time, or both, would constitute a material breach or default of any Leases by Borrower or any Tenant, no Tenant is a debtor in any bankruptcy, reorganization, insolvency proceeding or other debtor-creditor proceeding, and no Tenant has demonstrated a history of payment problems which suggest financial difficulty.

(p)     There are no agreements (written or otherwise) with the Tenants other than expressly set forth in each Lease.

(q)     No Lease contains an option to purchase, right of first refusal or first offer to purchase, or any other similar provision.

(r)     No Person has any possessory interest in, or right to occupy, the Property or any part thereof except under and pursuant to a Lease.

(s)     Except as previously disclosed to Lender in writing, no brokerage commissions or finders fees are due and payable regarding any Lease.

(t)     Attached to this Agreement as Exhibit E is a true and correct copy of the Rent Roll.  All Tenants listed thereon are in place and occupying the corresponding units at the Property, or have subleases disclosed to Lender in writing prior to the Execution Date.

7.02    <u>Assignment of Leases</u>.  In order to further secure payment of the Debt and the performance of Borrower's obligations under the Loan Documents, Borrower absolutely, presently and unconditionally grants, assigns and transfers to Lender all of Borrower's right, title, interest and estate in, to and under (i) all of the Leases affecting the Property and (ii) the Rents.  Unless

66

and until an Event of Default occurs, Borrower shall have a revocable license to collect the Rents (except as otherwise provided in the Loan Documents) as and when they become due and payable. Upon the occurrence and during the continuance of an Event of Default, the license granted hereinabove shall be automatically revoked, and Lender or a receiver appointed in accordance with the Loan Documents may enter upon the Property, and collect, retain and apply the Rents toward payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. Lender shall be liable to account only for the Rents actually received by Lender pursuant to any provision of any Loan Document.

      7.03   <u>Performance of Obligations</u>.

      (a)   Borrower shall perform all of its obligations as landlord under any and all Leases. If any of the acts described in this Article which require the prior written consent of Lender are done without the written consent of Lender, at the option of Lender, they shall be of no force or effect and shall constitute an Event of Default.

      (b)   Borrower agrees to furnish Lender executed copies of all Leases and Subleases upon Lender's request. Except as set forth in Section 7.06 below, Borrower shall not, without the express written consent of Lender, (i) enter into or extend any Lease, (ii) cancel or terminate any Leases (except in the case of a default) unless Borrower has entered into new Leases covering all of the premises of the Leases being terminated or surrendered, (iii) modify or amend any Leases in any material way or reduce the rent, (iv) unless the Tenants remain liable under the Leases or unless the Lease so permits, consent to an assignment of the Tenant's interest or to a subletting of the demised premises under any Lease, (v) accept payment of advance rents in an amount in excess of one (1) month's rent, (vi) enter into any options to sell the Property, (vii) accept any Tenant security deposit in an amount greater than required by the applicable Lease, (viii) execute any assignment of the landlord interest in the Leases and Rents, or (ix) cancel, release, except upon termination of the applicable Lease, or change the terms of any Tenant security, except in accordance with the terms of the applicable Lease. Borrower shall (A) perform all its obligations as landlord under each Lease, (B) use reasonable efforts to keep the Property leased at all times to Tenants whom Borrower, reasonably and in good faith, believes are creditworthy and at rents not less than comparable existing market rates for similar properties, (C) if requested by Lender, promptly send copies to Lender of all notices of default which Borrower sends or receives with respect to any Lease, and (D) enforce in a commercially reasonable manner all of the terms, covenants and conditions contained in the Leases upon the part of each Tenant to be observed or performed, provided however, with respect to a multi-family residential property, a residential Lease may be terminated in the event of a default by the Tenant under such Lease.

      7.04   <u>Subordinated Leases</u>. Each of the Leases affecting the Property shall be absolutely subordinate to the Lien of the Mortgage and shall also contain provisions, satisfactory to Lender, to the effect that in the event of the judicial or non-judicial foreclosure of the Property, at the election of the acquiring foreclosure purchaser, the particular Lease shall not be terminated and the Tenant shall attorn to the purchaser. Each Lease shall provide that, if requested to do so, the Tenant shall agree to enter into a new Lease for the balance of the term upon the same terms and conditions as its existing Lease. If Lender requests, Borrower shall cause the Tenant under each or

67

any of such Leases to enter into subordination and attornment agreements with Lender which are reasonably satisfactory in form, scope and substance to Lender.

7.05    Leasing Commissions.  Except as previously disclosed to Lender in writing, there are no brokerage fees or commissions payable by Borrower with respect to the leasing of space at the Property ("**Leasing Commissions**") and there are no unpaid management fees payable by Borrower with respect to the management of the Property.  Borrower covenants and agrees that all contracts and agreements relating to the Property entered into by Borrower after the Execution Date requiring the payment of Leasing Commissions, management fees or other similar compensation shall (i) provide that the obligation will not be enforceable against Lender and (ii) be subordinate to the Lien of the Mortgage and shall not be payable after the occurrence of an Event of Default.  Upon Lender's request, Borrower shall provide evidence to Lender of Borrower's compliance with this Section.

7.06    Future Leases.  Borrower shall be permitted to enter into any Lease, and shall be permitted to allow any Tenant to enter into any Sublease (if permitted under a Lease), and any amendment, extension or renewal of any Lease or Sublease after the Execution Date (each such Lease, Sublease or amendment, modification or renewal, a "**Future Lease**") without Lender's prior consent or approval so long as each Future Lease shall (a) be on the standard form of lease that has been previously approved in writing by Lender, (b) provide for base and additional rental rates comparable to then-existing local market rates and terms and conditions that constitute good and prudent business practice, comply with Rent Regulations and be consistent with prevailing market terms and conditions, (c) be for a term of not more than five (5) years or less than one (1) year, (d) not require the landlord thereunder to perform any Tenant Improvements, (e) be entered into pursuant to an arms-length transaction, (f) not contain an option to purchase, right of first refusal or first offer to purchase, or any similar provision, and (g) comply with the provisions of Section 7.05 herein.  Borrower shall not enter into any Future Lease, or permit a Tenant to enter into a Future Lease, that: (x) does not comply with the foregoing, (y) whether pursuant to a single Future Lease or multiple Future Leases, (i) demises more than five percent (5%) of total rentable square feet of the Property in the aggregate to any single Person and/or any Affiliate(s) of such Person, or (ii) constitutes more than five percent (5%) of the total annual Rent in the aggregate paid by any single Person and/or any Affiliate(s) of such Person, or (z) demises any commercial space or any space for commercial use or non-residential use, without the prior written consent of Lender.  Notwithstanding anything in this Section to the contrary, Borrower shall not enter into, and shall not permit any Tenant to enter into, any Future Lease without the review and written approval of Lender if at the time of such execution there exists an Event of Default.

7.07    Security Deposits.  Borrower covenants and agrees that Borrower will (1) not commingle any security deposits of Tenants with any other assets of Borrower, and (2) deposit all cash security deposits of Tenants in a separately designated account under Borrower's or Lender's or its servicer's control and held in accordance with the terms of the applicable Lease and all applicable Laws.

52247332;1

**ARTICLE 8**
**ENVIRONMENTAL HAZARDS**

8.01    <u>Representations and Warranties</u>.  Borrower hereby (x) represents and warrants to Lender, after due inquiry and investigation, and (y) covenants and agrees with Lender, as follows:

(a)    The Property is in full compliance with all Environmental Laws;

(b)    No Hazardous Materials are located on or have been handled, generated, stored, processed or disposed of on or released or discharged from the Property (including the soil and groundwater beneath the Property) except for those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws;

(c)    The Property is not subject to any private or governmental Lien or judicial or administrative notice or action relating to Hazardous Materials;

(d)    There are no existing or closed underground storage tanks or other underground storage receptacles for Hazardous Materials on the Property;

(e)    Borrower has received no notice of, and to the best of Borrower's knowledge and belief, there exists no investigation, action, proceeding or claim by any agency, authority or unit of government or by any third party which could result in any liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of the Property nor does Borrower know of any basis for such a claim;

(f)    Borrower has received no notice that, and to the best of Borrower's knowledge and belief, there has been no claim by any party that, any use, operation or condition of the Property has caused any nuisance or any other liability or adverse condition on any other property nor does Borrower know of any basis for such a claim;

(g)    Borrower has not and is not required by any Environmental Laws to obtain any Permits or licenses to use any portion of the Improvements, Fixtures, or Equipment on the Property; and

(h)    There are no environmental investigations, studies, audits, reviews or other analysis conducted by, or in the possession of, Borrower or any of its Affiliates which have not been made available to Lender.

8.02    <u>Covenants</u>.  Borrower covenants and agrees that as long as the obligations under or pursuant to the Loan or any part thereof are outstanding:

(a)    Borrower shall keep or cause the Property to be kept free from Hazardous Materials (except Permitted Materials) and in compliance with all Environmental Laws, shall not install or use any underground storage tanks, shall expressly prohibit the use, generation, handling, storage, production, processing and disposal of Hazardous Materials by all Tenants of space in the Improvements, and, without limiting the generality of the foregoing, during the term of this Agreement, shall not install in the Improvements or permit to be installed in the Improvements asbestos or any substance containing asbestos.  In addition, Borrower (i) shall keep the Property

69

free and clear of any Liens imposed pursuant to any Environmental Law, and (ii) shall not permit or suffer any Release in violation of any applicable Environmental Laws.  Finally, if Borrower is aware that Remedial Work is required, whether as a result of governmental inquiries, governmental audits or otherwise, Borrower shall, within thirty (30) days of obtaining such knowledge, or such shorter period of time as may be required under any applicable Environmental Law, commence and thereafter diligently prosecute to completion all such Remedial Work.

(b)     Borrower shall immediately notify Lender should Borrower become aware of (i) any Release or threatened Release of Hazardous Materials at, on, under or from the Property, or other potential environmental problem or liability, with respect to the Property, (ii) any Lien or filing of Lien, action or notice affecting the Property or Borrower resulting from any violation or alleged violation of the Environmental Law, (iii) the institution of any investigation, inquiry or proceeding concerning Borrower or the Property pursuant to any Environmental Law or otherwise relating to Hazardous Materials, or (iv) the discovery of any occurrence, condition or state of facts which would render any representation or warranty contained in this Agreement incorrect in any respect if made at the time of such discovery.

(c)     Borrower shall also give prompt written notices to Lender: (i) if the Property is in violation of any Environmental Law, (ii) of the presence of Hazardous Materials on or under the Property, except for the use and storage of immaterial amounts of Hazardous Materials at the Property if such use or storage is in connection with the ordinary cleaning and maintenance of the Property and such use and storage is in compliance with all applicable Environmental Laws, (iii) any required or proposed  Remedial Work on the Property, (iv) of all claims made or threatened by any Person against Borrower or the Property relating to any loss or injury resulting from any Hazardous Material, (v) of Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law, (vi) of Borrower's receipt of any notice from any Governmental Authority or any other Person relating or pertaining to any Hazardous Materials located or Released in, on, upon, under, near or emanating from the Property, (vii) of any Governmental Authority incurring any cost or expense in connection with the assessment, containment, remediation or removal of any Hazardous Materials located or Released in, on, upon, under, near or emanating from the Property, and (viii) any actual or potential Lien on the Property pursuant to any Environmental Law.

(d)     Borrower shall, promptly and when and as required and regardless of the source of the contamination, at its own expense, take all actions as shall be necessary or advisable for the clean-up of any and all portions of the Property or other affected property, including, without limitation, all investigative, monitoring, removal, containment and remedial actions in accordance with all applicable Environmental Laws (and in all events in a manner satisfactory to Lender), and shall further pay or cause to be paid, at no expense to Lender, all clean-up, administrative and enforcement costs of applicable Governmental Authorities which may be asserted against the Property.  In the event Borrower fails to do so, Lender may take or cause to be taken, but shall have no obligation to take or cause to be taken, steps to remove, contain or remediate any Release or threatened Release of Hazardous Materials at the Property or other affected property or otherwise to have the Property brought into conformance with Environmental Laws and any cost incurred in connection therewith shall be paid by Borrower upon demand, together with interest at the Default Rate from the date incurred by Lender until repaid by

70

Borrower.  In furtherance of the foregoing, Borrower hereby grants to Lender access to the Property and an irrevocable license to remove any items deemed by Lender to be Hazardous Materials and to do all things Lender shall deem necessary to bring the Property into conformance with Environmental Laws.

(e)     Upon the request of Lender, at any time and from time to time after the occurrence of a Default under this Agreement or the Loan Documents or at such other time as Lender has reasonable grounds to believe that Hazardous Materials are or have been Released, stored or disposed of on or around the Property or that the Property may be in violation of the Environmental Laws, Borrower shall provide, at Borrower's sole expense, an environmental site assessment or environmental compliance audit of the Property prepared by a hydrogeologist or environmental engineer or other appropriate consultant approved by Lender to determine whether there has been a Release or threatened Release of Hazardous Materials at, on, or under the Property and/or from the Property onto adjoining property and further, whether the Property is in full compliance with Environmental Laws (including those governing asbestos containing materials or lead based paint).  If Borrower fails to provide such assessment or audit within thirty (30) days after such request, Lender may order the same, and Borrower hereby grants to Lender access to the Property and an irrevocable license to undertake such assessment or audit.  The cost of such assessment or audit shall be paid by Borrower upon demand therefor, together with interest at the Default Rate from the date incurred by Lender until repaid by Borrower.

(f)     Borrower agrees that if prior to the Execution Date, or if at any time hereafter, any inspection or audit reveals (or revealed, as applicable) the presence of Mold in the indoor air of the Property at concentrations exceeding ambient air levels or visible Mold on any building materials or surfaces at the Property for which the EPA Mold Guidelines recommends or requires removal thereof by remediation professionals, then, on or before thirty (30) days following (i) the Execution Date, if such inspection or audit was made prior to the Execution Date or (ii) such inspection or audit, if such inspection or audit is hereafter made, as applicable, Borrower shall, at its sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations, abatement and maintenance plan (the "**Mold O&M Plan**") to monitor, maintain and remediate any water filtration and Mold issues affecting the Property, which plan shall be prepared by an expert, and be in form, scope and substance acceptable to Lender and sufficient to cause the Property to comply with all applicable Laws and all EPA Mold Guidelines and in accordance with the Mold O&M Plan.  If a Mold O&M Plan has been prepared prior to the Execution Date, Borrower agrees to diligently and continually carry out (or cause to be carried out) the provisions thereof.  Compliance with the Mold O&M Plan shall require or be deemed to require, without limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws.  For purposes hereof, "**EPA Mold Guidelines**" means the guidelines set forth in "Mold Remediation in Schools and Commercial Buildings" prepared by the United States Environmental Protection Agency (including any amendments or supplements to such guidelines) together with any other mold remediation guidelines prepared by the United States Environmental Protection Agency and applicable to the Property.

(g)     In the event that there shall be filed a Lien against Borrower or the Property by the United States Environmental Protection Agency or any other Governmental Authority relating to the remediation, removal, clean-up or other disposition of any Hazardous Material or

to Environmental Laws, then Borrower shall, within ten (10) days from the date that Borrower is given notice that the Lien has been placed against the Property, either (i) pay the claim and remove the Lien from the Property, or (ii) furnish (A) a bond reasonably satisfactory to the title insurance company and Lender in the amount of the claim out of which the Lien arises, or (B) a cash deposit in the amount of the claim out of which the Lien arises, and shall promptly remove or arrange for the removal of the Lien.

(h)     In no event shall any Remedial Work taken at the Property result in any institutional or engineering controls, including, without limitation, capping, or a deed notice or restriction recorded against the Property or any portion thereof or other use restrictions, including, but not limited to, a classification exception area.  Any soil at the Property required under Environmental Laws to be remediated shall be remediated to the most stringent currently applicable standards or lesser standards approved in writing by any environmental agency having jurisdiction over the Property.

(i)     Borrower represents and warrants that Borrower has received from Lender a true, correct and complete copy of (x) that certain Asbestos-Containing Materials Operations & Maintenance Plan, dated February 2, 2022 prepared by Partner Engineering and Science, Inc. with respect to the Property (the "**Asbestos O&M Plan**"), and (y) that certain Lead-Based Paint Operations & Maintenance Plan, dated February 2, 2022, prepared by Partner Engineering and Science, Inc.with respect to the Property (the "**LBP O&M Plan**"), to monitor, maintain and remediate any asbestos and lead paint on the Property, which plans have been prepared by an expert, and are sufficient to cause the Property to comply with all applicable Laws.  Borrower agrees to diligently and continually carry out (or cause to be carried out) the provisions thereof. Compliance with the Asbestos O&M Plan and the LBP O&M Plan, as applicable, shall require or be deemed to require, without limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws.

8.03    Indemnity.  Borrower covenants and agrees, at Borrower's sole cost and expense, to protect, indemnify, defend (at trial and appellate levels, and with attorneys, consultants and experts acceptable to Lender), release and hold harmless each Indemnified Party from and against any and all Losses which may at any time be imposed upon, incurred by or asserted or awarded against such Indemnified Party or the Property, and arising directly or indirectly from or out of, attributable to, relating to, which may accrue out of, or which may result from:  (i) the presence, Release or threat of Release of any Hazardous Materials on, in, under, affecting or threatening to affect all or any portion of the Property or any surrounding areas, regardless of whether or not caused by or within the Control of Borrower; (ii) the past, present or future violation of any Environmental Laws relating to, affecting or threatening to affect the Property, whether or not caused by or within the Control of Borrower; (iii) the failure by Borrower to comply fully with the terms and conditions of this Agreement; (iv) the breach of any representation or warranty contained in this Agreement; (v) the failure to timely perform any Remedial Work; and/or (vi) the enforcement of this Agreement, including, without limitation, the cost of assessment, containment and/or removal of any and all Hazardous Materials on and/or from all or any portion of the Property or any surrounding areas, the cost of any actions taken in response to the presence, Release or threat of Release of any Hazardous Materials on, in, under or affecting any portion of the Property or any surrounding areas to prevent or minimize such Release or threat of Release so that it does not migrate or otherwise cause or threaten danger to present or future public health, safety, welfare

72

or the environment, and costs incurred to comply with the Environmental Laws in connection with all or any portion of the Property or surrounding areas. Lender's rights under this section shall survive payment in full of the Debt and shall be in addition to all other rights of Lender under this Agreement, the Mortgage, the Note and the other Loan Documents. Borrower's indemnification shall be made in accordance with the terms and provisions of the Indemnity Agreement.

## ARTICLE 9INDEMNIFICATION COVERING PROPERTY

9.01 <u>Indemnification</u>. In addition to, and without limitation of, any other provision of this Agreement, Borrower shall, with counsel selected by Lender, protect, indemnify and save harmless Lender and its successors and assigns, and each of their agents, employees, officers and directors, from and against all Losses imposed upon or incurred by or asserted against Lender and its assigns, or any of their agents, employees, officers or directors, by reason of (a) ownership of the Mortgage, the Property or any part thereof or any interest therein or receipt of any Rents; (b) any accident, injury to or death of any person or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, parking areas, streets or ways; (c) any use, nonuse or condition in, on or about, or possession, alteration, repair, operation, maintenance or management of, the Property or any part thereof or on the adjoining sidewalks, curbs, parking areas, streets or ways; (d) any failure on the part of Borrower to perform or comply with any of the terms of this Agreement or the other Loan Documents; (e) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (f) any claim by brokers, finders or similar Persons (except for any such Person claiming through Lender) claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof; (g) any Imposition including, without limitation any Imposition attributable to the execution, delivery, filing, or recording of any Loan Document, Lease or memorandum thereof; (h) any lien or claim arising on or against the Property or any part thereof under any Legal Requirement or any liability asserted against Lender with respect thereto; (i) the claims of any Tenant or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; or (j) any claim for commission, fees, or other compensation or reimbursement for expenses made by any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder engaged by or claiming to have dealt with or on behalf of Borrower in connection with the Loan, the Loan Documents or the transactions contemplated thereby. Notwithstanding the foregoing provisions of this Section to the contrary, Borrower shall have no obligation to indemnify Lender pursuant to this Section for liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses relative to the foregoing that result solely from Lender's willful misconduct or gross negligence. Any amounts payable to Lender by reason of the application of this Section shall constitute a part of the Debt secured by the Mortgage and other Loan Documents and shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender, as applicable, until paid. Without the prior written consent of Lender, no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action suit or proceeding).

## ARTICLE 10
## DEFAULTS

10.01   <u>Events of Default</u>.  The Debt shall become immediately due at the option of Lender, which can be exercised in Lender's sole and absolute discretion, upon any one or more of the following events (each an "**Event of Default**"):

(a)   the failure of Borrower to pay (i) any installment of principal, interest, or principal and interest or required deposits into the Reserves (other than the payment due on the Maturity Date) on the date same is due and payable or (ii) any other sum required to be paid on the Note, or any other Loan Document on the date same is due and payable;

(b)   the failure of Borrower to pay all sums due on the Maturity Date;

(c)   if any Required Insurance policy required hereunder are not kept in full force and effect, or subject to the notice provisions of Article 5 hereof, if the Required Insurance policies are not assigned and delivered to Lender as herein provided;

(d)   if Borrower assigns or attempts to assign its rights under this Agreement or any other Loan Document or any interest herein or therein, or if any Transfer occurs other than in accordance with the provisions hereof;

(e)   if any representation or warranty of any Credit Party made herein or in any other Loan Document or in any certificate, report, financial statement or other instrument or agreement furnished to Lender shall be false or misleading in any material respect;

(f)   if any Credit Party (a) is not Solvent, (b) is not paying, or is unable to, or admits in writing its inability to, pay its debts as such debts become due, or (c) makes an assignment for the benefit of creditors, petitions or applies to any tribunal for the appointment of a custodian, receiver or trustee for it or a substantial part of its assets, or (d) commences any proceeding under the Bankruptcy Code or any other Law relating to bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation whether now or hereafter in effect (each a "**Bankruptcy Law**"), or (e) has any such petition or application filed, or any such proceeding commenced, against it under the Bankruptcy Code or any other Bankruptcy Law, (1) in which an adjudication or appointment is made or order for relief is entered, or (2) which remains un-dismissed or un-stayed for a period of ninety (90) days or more, or is the subject of any proceeding under which its assets are subject to seizure, forfeiture or divestiture, or (f) by any act or omission indicates its consent to, approval of or acquiescence in any petition, application or proceeding or order for relief under the Bankruptcy Code or any other Bankruptcy Law or in any appointment of a custodian, receiver or trustee for all or any substantial part of its property under the Bankruptcy Code or any other Bankruptcy Law, or (g) suffers any such custodianship, receivership or trusteeship to continue undischarged for a period of ninety (90) days or more;

(g)   if any Credit Party fails to perform or observe any term, covenant or agreement otherwise contained in this Agreement or any other Loan Documents (other than obligations specifically referred to elsewhere in this Section 10.01 or elsewhere in this Agreement for which no grace period is to apply) on its part to be performed or observed, and such failure remains un-remedied for thirty (30) consecutive calendar days after the occurrence thereof;

74

52247332;1

(h)     if one or more judgments, decrees or orders for the payment of money is rendered against any Credit Party in an amount in excess of Twenty Five Thousand Dollars ($25,000), and such judgments, decrees or orders continue unsatisfied and in effect for a period of thirty (30) consecutive days without being vacated, discharged, satisfied, stayed or bonded pending appeal;

(i)     if the Property or any portion thereof becomes subject to (i) any Lien other than Permitted Encumbrances, or (ii) any mechanic's or materialman's lien or other Lien that is or is asserted to be superior to the lien of the Mortgage, and such Lien shall remain undischarged (by payment, bonding, or otherwise) for thirty (30) days, unless the same is contested if and to the extent permitted pursuant to the terms hereof;

(j)     except as permitted in this Agreement or the other Loan Documents, if there is any material alteration, demolition or removal of any of the Improvements without the prior written consent of Lender;

(k)     if Borrower attempts to place or does place a subordinate Lien encumbering all or any part of the Property;

(l)     if at any time and for any reason any Loan Document ceases to be in full force and effect, or is declared null and void, or the validity or enforceability of such Loan Document is contested by any party to such Loan Document, or any party to any Loan Document denies it has any further liability or obligation under such Loan Document, or any party to a Loan Document fails to perform any of its obligations under such Loan Document;

(m)     if Borrower or Controlling Party shall breach any of the representations or covenants contained in Sections 4.02(e), 4.05(t) or 4.22(b)(x) hereof;

(n)     if for any reason Borrower is unable to use all or any material part of the Property for the purposes it is being used as of the Execution Date, including as a result of (a) a failure to obtain or comply with any Permit required for the ownership or operation of the Property, (b) any change in any zoning Law, (c) the enactment, adoption or implementation of any Law, (d) a Casualty, (e) a Condemnation, or (f) the issuance of an order by any Governmental Authority;

(o)     if a Material Adverse Change occurs;

(p)     if at any time and for any reason any Property Agreement, including the Property Management Agreement, (i) ceases to be in full force and effect or is declared null and void, (ii) the validity or enforceability thereof is contested by any party thereto, (iii) any party thereto denies it has any further liabilities or obligations under such Property Agreement or the Property Management Agreement or (iv) any party to such Property Agreement fails to perform any of its material obligations under such Property Agreement, provided that in each instance that such Property Agreement is determined by Lender to be necessary for the efficient use and operation of the Property (the parties hereby agreeing that the Property Management Agreement is necessary for the efficient use and operation of the Property) and to the extent any such Property Agreement is terminated, any such agreement is not replaced by Borrower with a substitute agreement reasonably satisfactory to Lender (and with respect to the Property Management

75

Agreement, which complies with Section 4.05(s) of this Agreement) within twenty-five (25) days of such termination;

(q)     if there is the sequestration or attachment of, or levy or execution upon the Property or any part thereof, or any other property pledged to Lender by a Credit Party under any of the Loan Documents, or any material portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not relieved or dismissed within thirty (30) days after its occurrence;

(r)     if there are any changes to the terms or provisions of any of the Authority Documents after the Execution Date or any Persons party to any Authority Document fails to comply with the terms of such Authority Document;

(s)     if there is the occurrence of a default of any of the obligations as set forth or an Event of Default under and as defined in any other Loan Document by any party to such Loan Document;

(t)     in the case of a Credit Party that is not an individual, any dissolution, termination, partial or complete liquidation, merger or consolidation of any such Credit Party, or in the case of a Credit Party that is an individual, the death or legal incapacity of any such Credit Party;

(u)     if Guarantor breaches any of the financial covenants set forth in any Guaranty; or

(v)     if any of the facts or assumptions contained in any Non-Consolidation Opinion delivered in connection with or pursuant to any of the Loan Documents is or becomes untrue.

10.02   <u>Remedies</u>.

(a)     At any time that an Event of Default exists, Lender may, in addition to any other rights or remedies available to it hereunder, at law or in equity, take such action, without notice or demand, as it reasonably deems advisable to protect and enforce its rights against Borrower and in and to the Property or any one or more of them, including, but not limited to, the following actions, each of which may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting any other rights and remedies of Lender hereunder, at law or in equity:

(i)     perform, or cause the performance of, any agreement that Borrower fails to perform under this Agreement or any other Loan Document, including a failure to pay Real Property Taxes or Insurance Premiums; or

(ii)     declare all or any portion of the unpaid Debt to be immediately due and payable, and Borrower hereby waives any right to prepay any such unpaid Debt in whole or in part without payment of the Prepayment Fee and agrees to pay the Prepayment Fee; provided, however, that upon the occurrence of any of the events specified in Section 10.01(f),without any presentment, demand, protest, notice or action of

any kind (each of which hereby is expressly waived by Borrower), the entire Debt will be immediately due and payable without notice or demand or any other declaration of the amounts due and payable; or

(iii)     revoke the license to collect Rents. Upon such revocation Lender may collect and apply the Rents pursuant to the terms of any of the Loan Documents without notice and without taking possession of the Property. All Rents collected by Borrower after the revocation of such license to collect Rent shall be held by Borrower as trustee under a constructive trust for the benefit of Lender, shall be segregated from the other property or funds of Borrower and shall be delivered as soon as possible to Lender; or

(iv)     bring an action to foreclose the Mortgage and without applying for a receiver for the Rents, but subject to the rights of the Tenants under the Leases, enter into or upon the Property or any part thereof, either personally or by its agents, nominees or attorneys, and dispossess Borrower and its agents and servants therefrom, and thereupon Lender may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat, (B) make alterations, additions, renewals, replacements and improvements to or on the Property or any part thereof, (C) exercise all rights and powers of Borrower with respect to the Property or any part thereof, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict Tenants, and demand, sue for, collect and receive all earnings, revenues, rents, issues, profits and other income of the Property and every part thereof, and (D) apply the receipts from the Property or any part thereof to the payment of the Debt, after deducting therefrom all expenses (including, without limitation, reasonable attorneys' fees and disbursements) reasonably incurred in connection with the aforesaid operations and all amounts necessary to pay the Impositions, insurance and other charges in connection with the Property or any part thereof, as well as just and reasonable compensation for the services of Lender's third-party agents; and Lender, or any Person designated by Lender, may operate the Property without any liability to Borrower in connection with such operations, except to use ordinary care. All costs, expenses and liabilities incurred by Lender in managing, operating, maintaining, protecting or preserving the Property, shall constitute a demand obligation owing by Borrower to Lender and shall bear interest from date of expenditure until paid at the Default Rate; or

(v)     have an Appraisal or other valuation of the Property or any part thereof performed by an appraiser (and Borrower covenants and agrees it shall cooperate in causing any such valuation or appraisal to be performed) and any cost or expense incurred by Lender in connection therewith shall constitute a portion of the Debt and be secured by the Mortgage and shall be immediately due and payable to Lender with interest, at the Default Rate, until the date of receipt by Lender; or

(vi)     sell the Property or institute proceedings for the complete foreclosure of the Mortgage, or take such other action as may be allowed pursuant to Legal Requirements at law or in equity, for the enforcement of the Mortgage in which case the Property or any part thereof may be sold for cash or credit in one or more parcels; or

52247332;1

(vii)     with or without entry, and to the extent permitted and pursuant to the procedures provided by applicable Legal Requirements, institute proceedings for the partial foreclosure of the Mortgage, or take such other action as may be allowed pursuant to Legal Requirements, at law or in equity, for the enforcement of the Mortgage for the portion of the Debt then due and payable, subject to the Lien of the Mortgage continuing unimpaired and without loss of priority so as to secure the balance of the Debt not then due; or

(viii)     sell the Property or any part thereof and any or all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in whole or in parcels, in any order or manner, at such time and place, upon such terms and after such notice thereof as may be required or permitted by Law, at the discretion of Lender, and in the event of a sale, by foreclosure or otherwise, of less than all of the Property, the Mortgage shall continue as a Lien on the remaining portion of the Property; or

(ix)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained in the Loan Documents, or any of them; or

(x)     recover judgment on the Note or any guaranties either before, during or after (or in lieu of) any proceedings for the enforcement of the Mortgage; or

(xi)     require, at Lender's option, Borrower to pay monthly in advance to Lender, or any receiver appointed, upon notice to Borrower, the fair and reasonable rental value for the use and occupation of any portion of the Property occupied by Borrower and may require Borrower to vacate and surrender possession to Lender of the Property or to such receiver and Borrower may be evicted by summary proceedings or otherwise; or

(xii)     apply for, without notice, the appointment of a receiver of the Rents, and Lender shall be entitled to the appointment of such receiver as a matter of right, without regard to the value of the Property as security for the Debt, or the solvency or insolvency of any person then liable for the payment of the Debt; or

(xiii)     exercise all of the rights and remedies with respect to the Account Collateral available to a secured party at law or in equity, including, without limitation, the rights of a secured party  under the UCC; or

(xiv)     pursue any or all such other rights or remedies as Lender may have under applicable Law or in equity; provided, however, that the provisions of this Section shall not be construed to extend or modify any of the notice requirements or grace periods provided for hereunder or under any of the other Loan Documents.  Borrower hereby waives, to the fullest extent permitted by Legal Requirements, any defense Borrower might otherwise raise or have by the failure to make any Tenants parties

defendant to a foreclosure proceeding and to foreclose their rights in any proceeding instituted by Lender; or

(xv)    require that Borrower replace the Property Manager, in which case Borrower shall be required to replace the Property Manager with a new third party property manager acceptable to Lender in its reasonable discretion within ten (10) Business Days following Lender's demand therefor; or

(xvi)    with respect to each item of Property in which a security interest is granted pursuant to, and such security interest is perfected under, the applicable Uniform Commercial Code (the **"UCC Collateral"**), Lender may exercise in respect of any or all of the UCC Collateral all rights, remedies and powers provided for in this Agreement, by Law, in equity or otherwise available to it, including all the rights and remedies of a secured party under the applicable UCC.

(b)    Any time after an Event of Default, Lender shall have the power to sell the Property or any part thereof at public auction, in such manner, at such time and place, upon such terms and conditions, and upon such public notice as Lender may deem best for the interest of Lender, and as may be required or permitted by applicable Law, consisting of advertisement in a newspaper of general circulation in the jurisdiction and for such period as applicable Law may require and at such other times and by such other methods, if any, as may be required by Law to convey the Property in fee simple by Lender's deed with special warranty of title or assignment to and at the cost of the purchaser, who shall not be liable to see to the application of the purchase money.  The proceeds or avails of any sale made under or by virtue of this Section, together with any other sums that then may be held by Lender under this Agreement, whether under the provisions of this Section or otherwise, shall be applied as follows:

(i)    First, to the payment of the third-party costs and expenses after Event of Default incurred in connection with any such sale and to advances, fees and expenses, including, without limitation, reasonable fees and expenses of Lender's legal counsel as applicable, and of any judicial proceedings wherein the same may be made, and of all expenses, liabilities and advances reasonably made or incurred by Lender under this Agreement and/or the other Loan Documents, together with interest as provided herein on all such advances made by Lender, and all Impositions, except any Impositions or other charges subject to which the Property shall have been sold;

(ii)    Second, to the payment of the whole amount then due, owing and unpaid under the Note for principal and interest thereon, with interest on such unpaid principal at the Default Rate from the date of the occurrence of the earliest Event of Default that formed a basis for such sale until the same is paid;

(iii)    Third, to the payment of any other portion of the Debt required to be paid by Borrower pursuant to any provision of this Agreement, the Mortgage, the Note, or any of the other Loan Documents; and

(iv)    Lastly, the surplus, if any, to Borrower unless otherwise required by Legal Requirements.

79

(c)     Lender and any receiver or custodian of the Property or any part thereof shall be liable to account for only those rents, issues, proceeds and profits actually received by it.

(d)     Lender may adjourn from time to time any sale by it to be made under or by virtue of the Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales and, except as otherwise provided by any applicable provision of Legal Requirements, Lender, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(e)     Upon the completion of any sale or sales made by Lender under or by virtue of this Section, Lender, a trustee or substitute trustee, or any officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, granting, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold.  Lender is hereby irrevocably appointed the true and lawful attorney-in-fact of Borrower (coupled with an interest), in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the property and rights so sold and for that purpose Lender may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons with like power, Borrower hereby ratifying and continuing all that its said attorney-in-fact or such substitute or substitutes shall lawfully do by virtue hereof.  Nevertheless, Borrower, if so requested by Lender, shall ratify and confirm any such sale or sales by executing and delivering to Lender, or to such purchaser or purchasers all such instruments as may be advisable, in the sole judgment of Lender, for such purpose, and as may be designated in such request.  Any such sale or sales made under or by virtue of this Section, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Borrower in and to the property and rights so sold, and shall, to the fullest extent permitted under Legal Requirements, be a perpetual bar, both at law and in equity against Borrower and against any and all Persons claiming or who may claim the same, or any part thereof, from, through or under Borrower.  Borrower hereby consents to Lender seeking and obtaining a mandatory injunction compelling performance with this provision without the need to post a bond on account of such injunction and application may be made and granted ex parte.

(f)     In the event of any sale made under or by virtue of this Section (whether made under the power of sale herein granted or under or by virtue of judicial proceedings or a judgment or decree of foreclosure and sale), the entire Debt immediately thereupon shall, anything in the Loan Documents to the contrary notwithstanding, become due and payable.

(g)     Upon any sale made under or by virtue of this Section (whether made under the power of sale herein granted or under or by virtue of judicial proceedings or a judgment or decree of foreclosure and sale), Lender may bid for and acquire the Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and the costs of the action.

(h)     No recovery of any judgment by Lender and no levy of an execution under any judgment upon the Property or any part thereof or upon any other property of Borrower shall

release the Lien of the Mortgage upon the Property or any part thereof, or any Liens, rights, powers or remedies of Lender hereunder, but such Liens, rights, powers and remedies of Lender shall continue unimpaired until all amounts due under this Agreement, the Note, the Mortgage and the other Loan Documents are paid in full.

10.03   <u>Possession of the Property</u>.  Upon the occurrence of an Event of Default and the acceleration of the Debt or any portion thereof, Borrower, if an occupant of the Property or any part thereof, upon demand of Lender, shall immediately surrender possession of the Property (or the portion thereof so occupied) to Lender, and if Borrower is permitted to remain in possession, the possession shall be as a month-to-month Tenant of Lender and, on demand, Borrower shall pay to Lender monthly, in advance, a reasonable rental for the space so occupied and in default thereof Borrower may be dispossessed.  Lender shall have the right to exercise self-help to change the locks at the Property and take such other actions as Lender deems necessary or appropriate in connection with the foregoing.  The covenants herein contained may be enforced by a receiver of the Property or any part thereof.  Nothing in this Section shall be deemed to be a waiver of the provisions of this Agreement making the Transfer of the Property or any part thereof without Lender's prior written consent an Event of Default.

10.04   <u>No Cure or Waiver</u>. Neither Lender's nor any receiver's entry upon and taking possession of all or any part of the Property nor any collection of Rents, Casualty Insurance Proceeds, Condemnation Proceeds or damages, other security or proceeds of other security, or other sums, nor the application of any collected sum to any Obligations, nor the exercise of any other right or remedy by Lender or any receiver shall impair the status of the security, or cure or waive any Default or notice of Default under the Mortgage or any of the other Loan Documents, or nullify the effect of any notice of default or sale (unless all Obligations and obligations which are then due have been paid and performed and Borrower has cured all other defaults), or prejudice Lender in the exercise of any right or remedy, or be construed as an affirmation by Lender of any tenancy, lease or option or a subordination of the Lien of the Mortgage.

10.05   <u>Borrower's Actions After Default</u>.  Upon the occurrence of any Event of Default and immediately upon the commencement of any action, suit or other legal proceedings by Lender to obtain judgment for the Debt, or of any other nature in the aid of the enforcement of the Loan Documents, Borrower will (a) after receipt of notice of the institution of any such action, waive the issuance and service of process and enter its voluntary appearance in such action, suit or proceeding, (b) if required by Lender, consent to the appointment of a receiver or receivers of the Property or any part thereof and of all the earnings, revenues, rents, issues, profits and income thereof, and (c) consent to entry of a judgment of foreclosure in the form requested by Lender.

10.06   <u>Control by Lender After Default</u>. Notwithstanding the appointment of any custodian, receiver, liquidator or trustee of Borrower, or of any of its property, or of the Property or any part thereof, to the extent permitted by Legal Requirements, Lender shall be entitled to obtain possession and control of all property now and hereafter covered by the Mortgage in accordance with the terms hereof, and Borrower shall not contest any judicial order enforcing the same.

10.07   <u>Right to Cure Defaults</u>.

(a)     At any time that an Event of Default exists, Lender or its agents may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, take any action or perform any obligations of Borrower in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender and its agents are authorized to enter upon the Property or any part thereof for such purposes, or appear in, defend, or bring any action or proceedings to protect Lender's interest in the Property or any part thereof or to foreclose the Mortgage or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by Law), with interest as provided in this Section.  All such costs and expenses incurred by Lender or its agents in remedying such Event of Default or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from the date so demanded to the date of payment to Lender.  All such costs and expenses incurred by Lender or its agents together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the Mortgage, and shall be immediately due and payable to Lender within five (5) Business Days after demand.  Unless Borrower is expressly entitled to a specific time period to cure any Default hereunder, this Agreement shall not be construed to provide Borrower with any such cure period.

(b)     Borrower agrees that, if Borrower fails to perform any act or to pay any money which Borrower is required to perform or pay under the Loan Documents, Lender may (but shall have no obligation to) make the payment or perform the act at the cost and expense of Borrower and in Borrower's name or in its own name.  Borrower hereby designates Lender (or any officer or agent of Lender) as Borrower's true and lawful attorney-in-fact to make any such payments or otherwise perform Borrower's obligations hereunder and Borrower hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof.  The power of attorney is coupled with an interest and is irrevocable.

(c)     If Lender makes any payment or advance that Lender is authorized by this Agreement to make in the place and stead of Borrower (i) relating to the Impositions or tax Liens asserted against the Property, Lender may do so according to any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of the bill, statement or estimate or into the validity of any of the Impositions or the tax Liens or claims thereof; (ii) relating to any apparent or threatened adverse title, Lien, claim of lien, encumbrance, claim or charge, Lender will be the sole judge of the legality or validity of same, which shall be binding on Borrower; or (iii) relating to any other purpose authorized by this Agreement but not enumerated in this Section, Lender may do so whenever, in its judgment and discretion, the payment or advance seems necessary or desirable to protect the Property and the full security interest intended to be created by the Mortgage.  In connection with any payment or advance made pursuant to this Section, Lender has the option and is authorized, but in no event shall be obligated, to obtain a continuation report of title prepared by a title insurance company.  The payments and the advances made by Lender pursuant to this Section and the cost and expenses of said title report shall be (x) part of the Debt, (y) due and payable by Borrower on demand, together with interest at the Default Rate, and (z) secured by the Mortgage.

10.08   Recovery of Sums Required to Be Paid.  Lender shall have the right from time to time to take action to recover any sum or sums that constitute a part of the Debt as the same becomes due and payable hereunder (after the expiration of any grace period or the giving of any notice herein provided, if any), without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

10.09   Marshalling and Other Matters.  Borrower hereby waives, to the fullest extent permitted by Law, the benefit of all appraisement, valuation, stay, extension, reinstatement, redemption (both equitable and statutory) and homestead Laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Mortgage on behalf of Borrower, whether equitable or statutory and on behalf of each and every Person acquiring any interest in or title to the Property or any part thereof subsequent to the Execution Date and on behalf of all Persons to the fullest extent permitted by applicable Law.

10.10   Waivers.  To the extent permitted by Law, Borrower waives: (1) the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with any of the Loan Documents or the Obligations, (2) the benefit of all Laws now or hereafter in force regarding appraisement, valuation, stay, extension, reinstatement and redemption, (3) all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein, (4) any and all rights of redemption from sale under any order or decree of foreclosure of the Mortgage on behalf of Lender, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the Execution Date and on behalf of all Persons, (5) any notices of any nature whatsoever from Lender except with respect to matters for which the Loan Documents specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by applicable Law to give notice,  (6) the pleading of any statute of limitations as a defense to payment of the Obligations or performance of its other obligations, and (7) any defense Borrower might assert or have by reason of Lender's failure to make any Tenant of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

10.11   Tax Reduction Proceedings.  During the continuance of an Event of Default, Borrower shall be deemed to have appointed Lender as its attorney-in-fact to seek a reduction or reductions in the assessed valuation of the Property for real property tax purposes or for any other purpose and to prosecute any action or proceeding in connection therewith.  This power, being coupled with an interest, shall be irrevocable for so long as any part of the Debt remains unpaid and any Event of Default shall be continuing.

10.12   Costs of Collection.  Borrower agrees to pay all reasonable costs and expenses of collection incurred by Lender, in addition to principal, interest and late or delinquency charges (including, without limitation, reasonable attorneys' fees and disbursements) and including all reasonable costs and expenses incurred in connection with the pursuit by Lender of any of its rights or remedies referred to in this Article or its rights or remedies referred to in any of the Loan

Documents or the protection of or realization of collateral or in connection with any of Lender's collection efforts, whether or not suit on the Note, on any of the other Loan Documents or any foreclosure proceeding is filed, and all such reasonable costs and expenses shall be payable on demand, together with interest at the Default Rate thereon, and also shall be secured by the Mortgage and all other collateral at any time held by Lender as security for any or all of the Obligations.

10.13   <u>Cumulative Rights</u>.  The rights of Lender under this Agreement, the Mortgage and the other Loan Documents shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled, subject to the terms of this Agreement, to every right and remedy now or hereafter afforded by Law.

10.14   <u>General Provisions Regarding Remedies</u>.

(a)   <u>Right to Terminate Proceedings</u>.  Lender may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Agreement at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

(b)   <u>No Waiver or Release</u>.  The failure of Lender to exercise any right, remedy or option provided in the Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Loan Documents. No acceptance by Lender of any payment after the occurrence of an Event of Default and no payment by Lender of any payment or obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default.  No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower or any other Person, shall operate to release or in any manner affect the interest of Lender in the Property or the liability of Borrower to pay the Debt.  No waiver by Lender shall be effective unless it is in writing subscribed by Lender and bearing the legend "this represents a knowing and intentional waiver of Lender's rights" and then only to the extent specifically stated.

(c)   <u>No Impairment; No Releases</u>.  The interests and rights of Lender under the Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification that Lender may grant with respect to any of the Debt; (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

**ARTICLE 11**
**RESERVES**

11.01   <u>Tax and Insurance Reserve</u>.  In order to assure the payment of Impositions and Insurance Premiums as and when the same shall become due and payable, the following provisions shall apply:

52247332;1

(a)      Borrower shall establish and maintain at all times while the Debt remains outstanding a reserve (the "**Tax and Insurance Reserve**") with Lender for payment of Impositions and Insurance Premiums and as additional security for the Debt.  On the Execution Date, Borrower shall deposit into the Tax and Insurance Reserve the amount, as determined by Lender, which, when added to the monthly payments subsequently required to be deposited with Lender hereunder on account of  Impositions and Insurance Premiums, will result in there being on deposit with Lender an amount sufficient to pay the next due installment of Impositions on the Real Property at least thirty (30) days prior to the due date thereof and the next due annual Insurance Premiums with respect to the Real Property at least thirty (30) days prior to the due date thereof.  Thereafter, commencing on the First Payment Date and on each Payment Date thereafter, Borrower shall pay to Lender, in immediately available funds for deposit into the Tax and Insurance Reserve an amount equal to one-twelfth (1/12) of the Impositions and Insurance Premiums to become due during the period commencing on the first (1st) day of the first (1st) month following such Payment Date and ending twelve (12) months following such first (1st) day.  In all cases there must be paid hereunder to be deposited and held in the Tax and Insurance Reserve an amount sufficient to pay such Impositions and Insurance Premiums, at least thirty (30) days prior to the date when they are due and payable.  The amounts of such deposits with respect to Impositions and Insurance Premiums (collectively, "**Tax and Insurance Deposits**") shall be based upon Lender's estimate as to the amount of Impositions and Insurance Premiums.  Borrower shall promptly, upon the demand of Lender, make additional Tax and Insurance Deposits as Lender may from time to time require due to (i) the failure of Borrower to make Tax and Insurance Deposits in previous months, (ii) Lender's underestimation of the amounts of Impositions and/or Insurance Premiums, (iii) the particular due dates and amounts of Impositions and/or Insurance Premiums, (iv) the increase in such Impositions and/or Insurance Premiums or (v) application of funds in the Tax and Insurance Reserve pursuant to this Agreement.

(b)      Provided no Event of Default has then occurred and is continuing, Lender will, out of the funds available in the Tax and Insurance Reserve (provided such funds are sufficient for such purpose), upon the presentation to Lender by Borrower of the bills therefor, pay the Impositions and Insurance Premiums or will, upon the presentation of official receipted bills therefor, reimburse Borrower for such payments made by Borrower.  If the total funds in the Tax and Insurance Reserve shall not be sufficient to pay all of the Impositions and Insurance Premiums when the same shall become due, then Borrower shall pay to Lender on demand, for deposit into the Tax and Insurance Reserve, the amount necessary to make up the deficiency.  Lender shall be entitled to apply any funds in the Tax and Insurance Reserve to the payment of any Impositions (other than any Impositions which Borrower has notified Lender that it is contesting in accordance with the terms hereof, provided that such contest is permitted hereunder) and Insurance Premiums which have become due and have not yet been paid.

(c)      Upon the occurrence and during the continuance of an Event of Default, Lender may, at its option, without being required to do so, apply any Tax and Insurance Deposits on hand to pay Impositions and Insurance Premiums or to pay principal, interest and other amounts payable to Lender hereunder or under the other Loan Documents, all in such order and manner as Lender, in its sole discretion, may elect.

(d)      Borrower shall be responsible for ensuring the receipt by Lender, at least thirty (30) days prior to the respective due date for payment thereof, of all bills, invoices and

85

statements for all Impositions and Insurance Premiums to be paid from the Tax and Insurance Reserve.  Lender shall be absolutely entitled to rely on any statements of any Governmental Authority with respect to Impositions and any statement of Borrower's insurance carrier or its agent with respect to Insurance Premiums.

(e)  No provision of this Agreement or any other Loan Document shall be construed as creating in any party other than Borrower and Lender any rights in and to the Tax and Insurance Deposits or any rights to have the Tax and Insurance Deposits applied to payment of Impositions and Insurance Premiums.  Lender shall have no obligation or duty to any third party to collect Tax and Insurance Deposits.

11.02   <u>Intentionally Omitted</u>.

11.03   <u>Renovation Reserve</u>.

(a)  As additional security for the Debt, Borrower shall establish a renovation reserve (the "**Renovation Reserve**") with Lender.  Borrower may request in writing (a "**Renovation Reserve Advance Request**") that Lender make one or more additional advances to Borrower (each, a "**Renovation Reserve Advance**") and Lender shall make each such Renovation Reserve Advance to Borrower (with all such Renovation Reserve Advances being deposited by Lender into the Renovation Reserve to be applied as set forth in this Section 11.03), provided that all of the conditions set forth below have been satisfied with respect to each such Renovation Reserve Advance, and each such Renovation Reserve Advance deposited by Lender into the Renovation Reserve shall be and constitute part of the Loan.  The conditions to any Renovation Reserve Advance shall be as follows: (x) no Event of Default then exists; (y) if requested by Lender, Borrower shall deliver to Lender a date-down or similar endorsement to the title insurance policy insuring the Lien of the Mortgage with respect to any such Renovation Reserve Advance in form and substance acceptable to Lender; and (z) Borrower shall be deemed to have re-stated each of the representations and warranties contained in this Agreement as of the date of any such Renovation Reserve Advance.  The maximum aggregate amount of all Renovation Reserve Advances made hereunder shall be $1,500,000.00 (the "**Renovation Reserve Maximum Advance Amount**").  Funds then advanced into the Renovation Reserve as a Renovation Reserve Advance pursuant to a Renovation Reserve Advance Request shall then be disbursed to Borrower in accordance with this Section 11.03 to reimburse Borrower for costs paid by Borrower for certain capital renovations of the Property (the "**Renovations**") in accordance with customary construction lending practice and a renovation budget which has been approved by Lender and attached hereto as Exhibit F (the "**Renovations Budget**").  Notwithstanding the periodic funding of Renovation Reserve Advances into the Renovation Reserve pursuant to Renovation Reserve Advance Requests, if as of February 18, 2023 (the "**Renovation Reserve Full Funding Date**"), any portion of the Renovation Reserve Maximum Advance Amount remains available to be disbursed pursuant to the terms and conditions of this Section 11.03, then (A) the entirety of such remaining amount shall be disbursed by Lender into the Renovation Reserve so long as no Event of Default is then continuing; and (B) if requested by Lender, Borrower shall deliver to Lender a date-down or similar endorsement to the title insurance policy insuring the Lien of the Mortgage with respect to any such Renovation Reserve Advance in form and substance acceptable to Lender.  Any Renovation Reserve Advance made on or after the Renovation Reserve Full Funding Date shall not be disbursed to Borrower until such time that Borrower has satisfied all of the conditions

86

set forth below with respect to each request for reimbursement from the Renovation Reserve.  If an Event of Default shall then exist as a result of Borrower's failure to perform or pay for any Renovations, then, in addition to all of Lender's rights and remedies under this Agreement, Lender shall have the right to advance a portion or all of the unadvanced Renovation Reserve Maximum Advance Amount and use such funds to complete or pay for such Renovations (but Lender shall not be obligated to do so).  Prior to any disbursement to be made to Borrower as set forth below, Borrower shall provide to Lender any and all general contracts, subcontracts, construction contracts, labor or material contracts or other instruments or agreements entered into with respect to the completion of the Renovations (the "**Renovation Contracts**") for Lender's review.  Any such Renovation Contracts shall be arm's length, commercially reasonable and otherwise on customary and fair terms. Borrower shall cause each Renovation included in the Renovations Budget to be completed, performed, remediated and corrected in accordance with the Renovations Budget to the satisfaction of Lender and as necessary to bring the Property into compliance with all applicable Laws on or before the applicable dates set forth in the Renovations Budget, as such time periods may be extended by Lender in its sole discretion.  Borrower shall be permitted to reallocate funds to and from individual line items as set forth in the Renovations Budget of up to ten percent (10%) (individually or in the aggregate when taking into account any prior reallocations) of the original amount of such line item that funds were reallocated to or reallocated from without Lender's approval, provided that Borrower provides prior written notice to Lender, except that Borrower shall not be permitted to reallocate funds (i) from and to any line items identified as "immediate repairs" and/or life safety items or (ii) from any line items to the general conditions line item and/or the line item for profit and fees to the general contractor, construction manager, property manager, or other  party entitled to a fee.  Reallocations of funds in an amount greater than ten percent (10%) (individually or in the aggregate when taking into account any prior reallocations) of the original amount of any line item to or from any other line item in the Renovations Budget shall be subject to Lender's prior written approval, which approval shall not be unreasonably withheld. Notwithstanding the foregoing, Borrower shall not be permitted to reallocate funds from the contingency line item, the general conditions line item and/or the line item for profit and fees to the general contractor, construction manager, property manager, or other party entitled to a fee in the Renovations Budget, to any other line item that would cause the aggregate amount disbursed from such line item (taking into account all prior reallocations from such line item), expressed as a percentage of the initial amount of such line item, to be greater than the percentage of completion of the Renovation set forth in such line item, each and all as determined by Lender in its sole discretion.  So long as no Event of Default has occurred and is continuing, Lender shall, to the extent funds are available for such purpose in the Renovation Reserve, disburse to Borrower the amount paid by Borrower in completing, performing, remediating and/or correcting the Renovations after: (a) the receipt by Lender, in the form attached hereto as Exhibit G, of: (1) a written request from Borrower for disbursement of funds from the Renovation Reserve and (2) a certification by Borrower that the applicable Renovation has been completed in accordance with the terms of this Agreement, (b) delivery to Lender of invoices, receipts, cancelled checks, or other evidence satisfactory to Lender verifying the costs of the Renovation to be reimbursed, (c) if required in Lender's sole but reasonable discretion, the delivery to Lender of a certification from an inspecting architect, engineer or other consultant reasonably acceptable to Lender describing the completed Renovation work, verifying the completion of such Renovation work and the value of the completed work and, if applicable, certifying that the Property is, as a result of such Renovation work, in compliance with all applicable Laws relating

52247332;1

to the Renovation so performed, (d) delivery to Lender of title insurance continuation statements, affidavits, lien waivers or other evidence reasonably satisfactory to Lender showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law Liens and are furnishing or have furnished materials or labor to the Property have been paid all amounts due for such labor and materials furnished to the Property, including a date-down endorsement to the title insurance policy (1) to cover the amount and date of the disbursement, (2) insuring that the Mortgage continues to be a first priority lien on the Property subject only to the Permitted Encumbrances and (3) insuring against mechanic's lien claims for work performed prior to the date of such endorsement, and (e) for disbursement requests in excess of $10,000.00, delivery to Lender of a new certificate of occupancy for the portion of the Improvements covered by such Renovations, if said new certificate of occupancy is required by applicable Law, or a certification by Borrower that no new certificate of occupancy is required. Lender shall not be required to disburse funds from the Renovation Reserve more frequently than once in any thirty (30) day period or in less than $10,000 increments.  In making any payment from the Renovation Reserve, Lender shall be entitled to rely on such request from Borrower without any inquiry into the accuracy, validity or contestability of any such amount.  Lender may require an inspection of the Property, at Borrower's expense, by a third-party engineer selected by Lender, prior to making a disbursement from the Renovation Reserve in order to verify compliance with the requirements of this Section 11.03. The costs of the work performed by such engineer shall be paid from the Renovation Reserve.  In the event that the amount of funds on deposit in the Renovation Reserve are inadequate to pay the costs of the Renovations, then Borrower shall pay to Lender on demand, for deposit into the Renovation Reserve, the amount necessary to make up such deficiency.  Upon the occurrence and during the continuance of (i) an Event of Default or (ii) a Material Business Change, Lender may, but shall not be obligated to, apply at any time the balance then remaining in the Renovation Reserve against the Debt in whatever order Lender shall subjectively determine, provided that no such application of the Renovation Reserve shall be deemed to cure any Event of Default.  Upon full completion of the Renovations in accordance with the Renovations Budget, the balance of the funds remaining in the Renovation Reserve shall, at Lender's election, either be (i) applied by Lender to reduce the principal balance of the Loan or (ii) transferred to the Additional Collateral Account and held by Lender as additional collateral for the Loan. Notwithstanding anything to the contrary set forth herein, Lender shall in no event be obligated to fund payment of or reimbursement for the cost of deposits under any contracts engaging any construction contractors or any general contractor (if any).

(b)     The Loan shall be deemed to be "Renovation Out of Balance" if at any time on or prior to the Maturity Date, Lender determines, in its sole discretion, that the funds remaining in the Renovation Reserve are not or will not be sufficient to (i) complete the Renovations in accordance with this Section and the Renovations Budget, (ii) pay interest on the Loan through completion of the Renovations, (iii) pay all costs and expenses set forth in the Renovations Budget, and such additional amounts as Lender, in its sole but reasonable discretion, deems necessary to complete the Renovations as set forth in the Renovations Budget, (iv) pay all liabilities associated with the Renovations and (v) perform all obligations of Borrower under the Loan Documents associated with the Renovations.  In determining whether the Loan is Renovation Out of Balance, only funds being held in the Renovation Reserve will be considered.  In the event that Lender determines that the Loan is Renovation Out of Balance, then within ten (10) days after being notified in writing by Lender that the Loan is Renovation Out of Balance and that a certain amount is required to be deposited in order to remediate the fact that the Loan is Renovation Out of Balance

88

(the "**Renovation Out of Balance Amount**"), Borrower shall pay to Lender, for deposit into the Renovation Reserve, funds equal to the Renovation Out of Balance Amount.  Failure to pay the Renovation Out of Balance Amount to Lender within such timeframe and as otherwise set forth herein shall constitute an Event of Default.  So long as the Loan is Renovation Out of Balance, Lender shall have no obligation to make any disbursements from the Renovation Reserve.

11.04   <u>Replacement Reserve</u>.  As additional security for the Debt, Borrower shall establish a repair and/or replacement reserve (the "**Replacement Reserve**") with Lender.  The Replacement Reserve shall be used to reimburse Borrower for the costs and expenses incurred by Borrower in connection with the performance of ongoing capital repair work at the Property (collectively, the "**Work**").  Borrower shall not be required to deposit any funds into the Replacement Reserve on the Execution Date. Commencing on the March 1, 2023 and continuing on each Payment Date thereafter, Borrower shall pay to Lender, concurrently with and in addition to the monthly interest payment due under the Note and until the Debt is fully paid and performed, in immediately available funds for deposit into the Replacement Reserve an amount equal to $7,023.00 per month (the "**Replacement Deposit**").  So long as no Event of Default has occurred and is continuing, all sums in the Replacement Reserve shall be held by Lender in the Replacement Reserve to reimburse Borrower for the costs and expenses of the Work.  So long as no Event of Default has occurred and is continuing, Lender shall, to the extent funds are available for such purpose in the Replacement Reserve, disburse to Borrower the amount paid by Borrower in performing such Work after (a) the receipt by Lender, in the form attached hereto as Exhibit H, of: (1) a written request from Borrower for disbursement of funds from the Replacement Reserve and (2) a certification by Borrower that the applicable item of Work has been completed in accordance with the terms of this Agreement; (b) the delivery to Lender of invoices, receipts or other evidence satisfactory to Lender, verifying the cost of the Work to be reimbursed; (c) the delivery to Lender of title continuation statements, affidavits, lien waivers or other evidence reasonably satisfactory to Lender showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law Liens and are furnishing or have furnished materials or labor to the Property have been paid all amounts due for labor and materials furnished to the Property; (d) if required in Lender's sole but reasonable discretion, the delivery to Lender of a certification from an inspecting architect or other third party acceptable to Lender describing the completed Work and verifying the completion of the Work and the value of the completed Work; and (e) for disbursement requests in excess of $10,000.00, the delivery to Lender of a new certificate of occupancy for the portion of the Improvements covered by such Work, if said new certificate of occupancy is required by applicable Law, or a certification by Borrower that no new certificate of occupancy is required.  Lender shall not be required to disburse funds from the Replacement Reserve more frequently than once in any thirty (30) day period or in less than $10,000 increments.  In making any payment from the Replacement Reserve, Lender shall be entitled to rely on such request from Borrower without any inquiry into the accuracy, validity or contestability of any such amount.  Lender may require an inspection of the Property, at Borrower's expense, by a third-party engineer selected by Lender, prior to making a disbursement from the Replacement Reserve in order to verify compliance with the requirements of this Section. Lender may, at Borrower's expense, make or cause to be made during the term of the Loan an annual inspection of the Property to determine the need, as determined by Lender, in its reasonable judgment, for further Work at the Property.  In addition to the foregoing, Lender may reassess its estimate of the amount required to be maintained in the Replacement Reserve from time to time, and, following such reassessment, may increase the amount of the monthly Replacement Deposit

89

upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to maintain the proper maintenance and operation of the Property.  In the event that such inspection reveals that further Work at the Property is required, Lender shall provide Borrower with a written description of the required Work and Borrower shall complete such Work to the reasonable satisfaction of Lender within ninety (90) days after the receipt of such description from Lender, or such later date as may be approved by Lender in its sole discretion. In the event that the amount on deposit in the Replacement Reserve is inadequate to pay the cost of the Work, then Borrower shall pay to Lender on demand, for deposit into the Replacement Reserve, the amount necessary to make up the deficiency.  Upon the occurrence and during the continuance of (i) an Event of Default or (ii) a Material Business Change, Lender may, but shall not be obligated to, apply at any time the balance then remaining in the Replacement Reserve against the Debt in whatever order Lender shall subjectively determine, provided that no such application of the Replacement Reserve shall be deemed to cure any Event of Default. Notwithstanding anything to the contrary set forth herein, Lender shall in no event be obligated to fund payment of or reimbursement for the cost of deposits under any contracts engaging any construction contractors or any general contractor (if any).

11.05   **Interest Reserve.**  Notwithstanding the foregoing or anything to the contrary set forth herein, if at any time during the term of the Loan (including, but not limited to, the first Business Day of each calendar quarter during any calendar year), the Debt Service Coverage Ratio, as determined by Lender in its sole discretion, shall be less than 1.10 to 1.00, based upon a trailing three (3) month basis for Gross Income from Operations (annualized) and based upon a trailing twelve (12) month basis for normalized Operating Expenses (annualized), Borrower shall establish and maintain at all times while the Debt remains outstanding an interest reserve (the "**Interest Reserve**") with Lender, and within ten (10) days after demand therefor, Borrower shall deposit into the Interest Reserve an amount equal to three (3) months' worth of interest on the Loan at the then Applicable Interest Rate as calculated by Lender in its sole discretion.  In the event that Borrower shall fail to make (i) any monthly payment of interest on the Loan required to be paid hereunder (the "**Monthly Payment**") when due or (ii) any portion of the Monthly Payment when due, and provided that no Event of Default has occurred and is continuing, then Lender may, in its discretion, advance funds from the Interest Reserve to itself in the amount of the difference (the "**Shortfall**") between the Monthly Payment and the amount remitted by Borrower to Lender for the payment of such Monthly Payment (the "**Actual Borrower Payment**").  The purpose of the Interest Reserve is to supplement shortfalls in Gross Income from Operations to make payment of all Monthly Payments in full when due.  If a Shortfall exists, then concurrently with its remittance of the Actual Borrower Payment, Borrower shall provide to Lender in writing a request for disbursement of the Shortfall along with a certification that Gross Income from Operations, during the month immediately preceding the applicable Payment Date, was not sufficient to make the full Monthly Payment.  Further, (i) Lender may, in its sole and absolute discretion, also disburse funds from the Interest Reserve into the Tax and Insurance Reserve in the amounts required to pay any Impositions and Insurance Premiums required hereunder, and (ii) upon written request from Borrower therefor, Lender may, in its sole and absolute discretion, disburse funds from the Interest Reserve into any other Reserve (other than the Tax and Insurance Reserve) an amount necessary to pay for certain costs to be paid out of such Reserve.  After each disbursement by Lender from the Interest Reserve which causes the balance of the Interest Reserve to be less than one (1) full Monthly Payment, as determined by Lender, Borrower shall, within ten (10) days after demand therefor, pay to Lender for deposit into the Interest Reserve the amount required to bring the total

90

amount of funds on deposit in the Interest Reserve  to three (3) full Monthly Payments, as determined by Lender.  Borrower further agrees that if Borrower fails to make any such payment for deposit into the Interest Reserve within such ten (10) day period, the Interest Reserve may be replenished by Guarantor and/or Lender at any time thereafter. Upon the occurrence and during the continuance of (i) an Event of Default or (ii) a Material Business Change, Lender may, but shall not be obligated to, apply at any time the balance then remaining in the Interest Reserve against the Debt in whatever order Lender shall subjectively determine, provided that no such application of the Interest Reserve shall be deemed to cure any Event of Default.   Nothing contained herein, including, without limitation, the existence of the Interest Reserve, shall release Borrower of any obligation to make payments under this Agreement, the Note or the other Loan Documents strictly in accordance with the terms hereof or thereof.

11.06   General Provisions Regarding Reserves.

(a)     As additional security for the payment and performance by Borrower of all duties, responsibilities and obligations under the Note and the other Loan Documents, Borrower hereby unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Lender, and hereby grants to Lender a security interest in the (i) Additional Collateral Account (if any), Tax and Insurance Reserve, the Renovation Reserve, the Replacement Reserve and the Interest Reserve (collectively, the "**Reserves**"), (ii) the accounts into which the Reserves have been deposited, (iii) all insurance of said accounts, (iv) all accounts, contract rights and general intangibles or other rights and interests pertaining thereto, (v) all sums now or hereafter therein or represented thereby, (vi) all replacements, substitutions or proceeds thereof, (vii) all instruments and documents now or hereafter evidencing the Reserves or such accounts, (viii) all powers, options, rights, privileges and immunities pertaining to the Reserves (including the right to make withdrawals therefrom), and (ix) all proceeds of the foregoing. Borrower hereby authorizes and consents to the account or accounts into which the Reserves have been deposited being held in Lender's name or the name of any entity servicing the Loan for Lender and hereby acknowledges and agrees that Lender, or at Lender's election, such servicing agent, shall have exclusive control over said accounts.  Notice of the assignment and security interest granted to Lender herein may be delivered by Lender at any time to the financial institution wherein the Reserves have been established, and Lender, or such servicing entity, shall have possession of all passbooks or other evidences of such accounts.  Borrower hereby assumes all risk of loss with respect to amounts on deposit in the Reserves.   Borrower hereby knowingly, voluntarily and intentionally stipulates, acknowledges and agrees that the advancement of the funds from the Reserves as set forth herein is at Borrower's direction and is not the exercise by Lender of any right of set-off or other remedy upon a Default.  Borrower hereby waives all right to withdraw funds from the Reserves.  If (i) an Event of Default or (ii) a Material Business Change shall occur, then Lender may, without notice or demand on Borrower, at its option: (A) withdraw any or all of the funds (including, without limitation, interest) then remaining in any or all of the Reserves and apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including, but not limited to, attorneys' fees, costs and expenses) to the Debt in such manner or as Lender shall deem appropriate in its sole discretion, and the excess, if any, shall be paid to Borrower, (B) exercise any and all rights and remedies of a secured party under any applicable UCC, and/or (C) exercise any other remedies available at law or in equity.  No such use or application of the funds contained in the Reserves shall be deemed to cure any Default hereunder or under the other Loan Documents.  All amounts deposited with Lender pursuant to this Article

may be commingled with general funds of Lender and no interest with respect thereto shall be paid to or otherwise credited to Borrower.

(b)     Borrower understands and agrees that, notwithstanding the establishment of the Reserves as herein required, all of the proceeds of the Note have been, and shall be considered, fully disbursed and shall bear interest and be payable on the terms provided in the Loan Documents subject to Section 2.01 hereof.

(c)     Upon full payment of the Debt, the balance of the Reserves then in Lender's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

(d)     The Reserves are solely for the protection of Lender and entail no responsibility on Lender's part except as specifically set forth herein.

## ARTICLE 12
## CASH MANAGEMENT PROVISIONS

12.01   Collection Account.

(a)     Upon the occurrence of an Event of Default, Borrower shall within ten (10) days following Lender's request therefor, enter into the Account Agreement with Lender and the Bank in the form provided by Lender. Pursuant to the Account Agreement, Borrower shall establish with Bank an interest-bearing collection account (the "**Collection Account**").  The Collection Account and the funds deposited therein and securities and other assets credited thereto shall serve as additional security for the Loan, and Borrower hereby grants to Lender a security interest in the Collection Account and a security interest in the funds deposited therein and securities and other assets credited thereto.  Borrower agrees that, prior to the payment in full of the Debt, the terms and conditions of the Account Agreement shall not be amended or modified without the prior written consent of Lender (which consent Lender may grant or withhold in its sole discretion).  In recognition of Lender's security interest in the funds deposited into the Collection Account, Borrower shall identify the Collection Account with the name of Lender, as secured party.  The Collection Account shall be named as follows: "Woodside Meadows Apts Owner LLC f/b/o Arbor Realty SR, Inc., as secured party Collection Account".  Following Borrower's execution of the Account Agreement, Borrower shall deliver the same to Property Manager.

(b)     Borrower agrees that the Collection Account shall be maintained (i) as a "deposit account" (as such term is defined in Section 9-102(a)(29) of the UCC), (ii) in such a manner that Lender shall have "control" (within the meaning of Section 9-104(a)(2) of the UCC) over the Collection Account and (iii)  such that neither Borrower nor Property Manager shall have any right of withdrawal from the Collection Account and, except as provided herein or in the Account Agreement, no Account Collateral shall be released to Borrower or Property Manager from the Collection Account.  Without limiting Borrower's obligations under the immediately preceding sentence, Borrower shall only establish and maintain the Collection Account with a financial institution that has executed an agreement substantially in the form of the Account Agreement or in such other form acceptable to Lender in its sole discretion.

92

(c)     The Collection Account shall be subject to such applicable Laws, and such applicable regulations of the Board of Governors of the Federal Reserve System and of any other banking or governmental authority, as may now or hereafter be in effect.  Income and interest (after deducting therefrom losses, if any, incurred in the investment of any funds in such accounts for any prior period) accruing on the Collection Account or any investments held in such accounts shall be distributed as if such amounts were deposits into the Collection Account.

(d)     Borrower agrees that Borrower shall be the beneficial owner of the Collection Account for federal income tax purposes and all items of income, gain, expense and loss recognized in the Collection Account shall be reported to the United States Internal Revenue Service and all state and local taxing authorities under its name and taxpayer identification number.

(e)     Following the Execution Date, Borrower shall not establish any deposit account or securities account with any financial institution unless prior thereto Lender, Borrower and such financial institution shall have entered into an Account Agreement with such financial institution, in form and substance satisfactory to Lender (provided, however, that the foregoing shall not prohibit Borrower or Property Manager from utilizing one or more separate accounts for the disbursement or retention of funds of Borrower not generated by the Property (e.g., capital contributions and net proceeds of the Loan) and funds that have been transferred to Borrower's Operating Account from the Collection Account pursuant to Sections 12.04 and 12.05).

(f)     Lender shall have the right to replace Bank with any other Approved Bank, which will promptly execute and deliver to Lender an Account Agreement (and Borrower shall reasonably cooperate with Lender in connection with such transfer) in the event that (a) the Bank fails, in any material respect, to comply with the terms of the Account Agreement, (b) the Bank named herein is no longer the Bank, (c) any successor Bank is no longer an Approved Bank or (d) Lender believes, in good faith, the relationship with Bank is causing undue administrative burdens (as compared with other banks providing similar services under loans originated by Lender).

12.02   <u>Security Deposit Account</u>.  Borrower shall cause Property Manager to collect all security deposits from Tenants under Leases, which shall be held by Property Manager, as agent for Borrower, in accordance with applicable Law and in a segregated demand deposit bank account at such commercial or savings bank or banks as may be reasonably satisfactory to Lender (the "**Security Deposit Account**").  Borrower shall notify Lender of any security deposits held as letters of credit and, upon Lender's request, such letters of credit shall be promptly delivered and collaterally assigned to Lender.  Borrower shall have no right to withdraw funds from the Security Deposit Account; provided that, so long as no Event of Default is continuing, Borrower may withdraw funds from the Security Deposit Account to refund or apply security deposits as required by or in accordance with the Leases or by applicable Legal Requirements and, provided further, that if an Event of Default is continuing, Borrower may request, and Lender shall approve, the withdrawal of funds from the Security Deposit Account for the sole purpose of returning security deposits to Tenants (other than Affiliates of Borrower) who are entitled to return of such security deposits under their respective Leases (provided such Leases comply with the provisions of this Agreement).

12.03   <u>Payments into Collection Account</u>.

(a)     Following the occurrence of an Event of Default, all cash, checks, drafts, credit card receivables and other instruments for the payment of Rents shall be deposited into the Collection Account.

(b)     Following the occurrence of an Event of Default, Borrower shall, and shall cause Property Manager to, deposit all revenue derived from the Property and received by Borrower or Property Manager, as the case may be, into the Collection Account on a daily basis. Following the occurrence of an Event of Default, Borrower shall instruct Property Manager to immediately deposit on a daily basis (A) all revenue derived from the Property collected by Property Manager pursuant to the Property Management Agreement (or otherwise) into the Collection Account and (B) all funds otherwise payable to Borrower by Property Manager pursuant to the Property Management Agreement (or otherwise in connection with the Property) into the Collection Account.

(c)     Upon the occurrence of an Event of Default, at Lender's request, Borrower shall cause a notice substantially in the form of Exhibit I attached hereto (a "**Tenant Notice Letter**"), to be delivered to each Tenant under an existing Lease, notifying such Tenant to send directly to the Bank promptly when due all payments, whether in the form of checks, cash, drafts, money orders or any other type of payment whatsoever of rent or any other item payable to Borrower as landlord or otherwise or payable to Property Manager on behalf of Borrower.  Copies of such Tenant Notice Letters, together with evidence of mailing, shall be delivered by Borrower to Lender or its designee simultaneously therewith.  If Borrower shall enter into any Future Lease after the occurrence of an Event of Default, Borrower shall immediately cause a Tenant Notice Letter to be delivered to the Tenant thereunder and shall deliver a copy of such Tenant Notice Letter, together with evidence of mailing, to Lender or its designee within ten (10) days after the effective date of such Future Lease.

(d)     Borrower hereby agrees that if any amounts which are required to be deposited in the Collection Account are received by Borrower, Property Manager or any of their respective Affiliates, such amounts shall be deposited in the Collection Account within two (2) Business Days of receipt thereof, or after the occurrence of an Event of Default immediately.  Until so deposited, any such amounts held by Borrower or Property Manager or any of their respective Affiliates shall be deemed to be Account Collateral and shall be held in trust by it for the benefit, and as the property, of Lender and shall not be commingled with any other funds or property of Borrower or Property Manager or any of their respective Affiliates.

12.04  <u>Disbursements from Collection Account</u>. Bank shall, without verification from Borrower or any other party, transfer, on each Business Day, all collected and available funds as determined by Bank's then current funds availability schedule received in the Collection Account to an account established by Lender (the "**Central Account**") with a bank selected by Lender. Lender (or Lender's servicer) alone shall have the power of withdrawal from, and sole dominion and control over, the Central Account.  Borrower acknowledges that it shall not have any right of withdrawal with respect to the Central Account or the amounts at any time appearing to the credit

52247332;1

of the Central Account.  Funds on deposit in the Central Account shall be disbursed by Lender in accordance with Sections 12.05.

12.05   <u>Disbursements from Central Account</u>.  Upon the occurrence of an Event of Default, without additional notice from Lender to Borrower, Lender may, in addition to and not in limitation of Lender's other rights, apply all funds in the Central Account as Lender shall determine in its sole and absolute discretion to pay the Debt and/or operating expenses and/or capital expenditures for the Property as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce Lender's rights and remedies hereunder with respect to any Account Collateral or to preserve the value of the Account Collateral.

12.06   <u>Security Interest</u>.

(a)   To secure the full and punctual payment and performance of the Debt, Borrower hereby collaterally assigns, grants a security interest in and pledges to Lender, to the extent not prohibited by applicable Law, a first priority continuing security interest in and to the Account Collateral, whether now owned or existing or hereafter acquired or arising and regardless of where located. In addition to the rights and remedies herein set forth, Lender shall have all of the rights and remedies with respect to the Account Collateral available to a secured party at law or in equity, including, without limitation, the rights of a secured party under the UCC, as if such rights and remedies were fully set forth herein.  This Agreement shall constitute a security agreement for purposes of the UCC and other applicable Law.

(b)   This Agreement shall create a continuing security interest in the Account Collateral and shall remain in full force and effect until payment in full of the Debt.  Upon payment in full of the Debt, this security interest shall automatically terminate without further notice from any party and Borrower shall be entitled to the return, upon its request, of such of the Account Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof and Lender shall execute such instruments and documents as may be reasonably requested by Borrower to evidence such termination and the release of the Account Collateral.

(c)   Beyond the exercise of reasonable care in the custody thereof, Lender shall have no duty as to any Account Collateral in its possession or control as agent therefor or bailee thereof or any income thereon or the preservation of rights against any person or otherwise with respect thereto.  Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Account Collateral in its possession if the Account Collateral is accorded treatment substantially equal to that which Lender accords its own property, it being understood that Lender shall not be liable or responsible for any loss or damage to any of the Account Collateral, or for any diminution in value thereof, by reason of the act or omission of Lender, its Affiliates, agents, employees or bailees, except to the extent that such loss or damage results from Lender's gross negligence or willful misconduct.  In no event shall Lender be liable either directly or indirectly for losses or delays resulting from any event which may be the basis of Force Majeure, computer malfunctions, interruption of communication facilities, labor difficulties or other causes beyond Lender's reasonable control or for indirect, special or consequential damages. Notwithstanding the foregoing, Borrower acknowledges and agrees that (i) Lender does not have custody of the Account Collateral, (ii) Bank has custody of the Account Collateral, (iii) the Bank

95

was chosen by Borrower and (iv) Lender has no obligation or duty to supervise the Bank or to see to the safe custody of the Account Collateral.

(d)     Lender shall be responsible for the performance only of such duties with respect to the Account Collateral as are specifically set forth in this Article and no other duty shall be implied from any provision hereof.  Lender shall not be under any obligation or duty to perform any act with respect to the Account Collateral which would cause it to incur any expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own monies.  Borrower shall indemnify and hold Lender, its employees and officers harmless from and against any loss, cost or damage (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Lender in connection with the transactions contemplated hereby with respect to the Account Collateral except as such may be caused by the gross negligence or willful misconduct of Lender, its employees, officers or agents.

(e)     Lender shall be protected in acting upon any written notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper, document or signature believed by it in good faith to be genuine, and, in so acting, it may be assumed that any person purporting to give any of the foregoing in connection with the provisions hereof has been duly authorized to do so.  Lender may consult with counsel, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder and in good faith in accordance therewith.

(f)     Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, with full power of substitution, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the Account Collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower could or might do or which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for herein and to accomplish the purposes of this Agreement.  The foregoing powers of attorney are irrevocable and coupled with an interest.

(g)     Borrower hereby expressly waives, to the fullest extent permitted by Law, presentment, demand, protest or any notice of any kind in connection with this Agreement or the Account Collateral.  Borrower acknowledges and agrees that ten (10) Business Days' prior written notice of the time and place of any public sale of the Account Collateral or any other intended disposition thereof shall be reasonable and sufficient notice to Borrower within the meaning of the UCC.

(h)     Borrower agrees that it will not (i) sell or otherwise dispose of any of the Account Collateral or (ii) create or permit to exist any Lien upon or with respect to all or any of the Account Collateral, except for the Lien granted to Lender, under this Agreement.

## ARTICLE 13
## MISCELLANEOUS

13.01  <u>Further Assurances</u>.    Borrower shall, without expense to Lender, execute, authorize, acknowledge and deliver all further acts, deeds, conveyances, mortgages, deeds of trust,

52247332;1

assignments, security agreements, and financing statements as Lender shall from time to time reasonably require, to (1) assure, convey, assign, transfer and confirm unto Lender the Property and rights conveyed or assigned by this Agreement or which Borrower may become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or any of the other Loan Documents, or for filing, refiling, registering, reregistering, recording or rerecording the Mortgage or (2) make Benchmark Replacement Conforming Changes. If Borrower fails to comply with the terms of this Section, Lender may, at Borrower's expense, perform Borrower's obligations for and in the name of Borrower, and Borrower hereby irrevocably appoints Lender as its attorney in fact to do so. The appointment of Lender as attorney-in-fact is coupled with an interest. Borrower consents to the entry of a mandatory injunction without Lender needing to post a bond, as Lender deems necessary to enforce Lender's rights hereunder.

13.02    Participation and Sale of Loan.

(a)    Lender may (at no cost to Borrower except as set forth in Sections 13.02(c) through (e)) sell, transfer or assign its entire interest or one or more participation interests in the Debt and the Loan Documents, at any time and from time to time, including, without limitation, its rights and obligations as servicer of the Debt, and may issue mortgage pass-through certificates or other securities evidencing a beneficial interest in the Debt in a rated or unrated public offering or private placement, including depositing the Loan Documents with a trust that may issue securities (the "**Securities**"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities (collectively, the "**Investor**"), any prospective Investor or any Rating Agency rating or assigning value to such Securities, all documents and information which Lender now has or may hereafter acquire relating to the Debt, Borrower, Guarantor and the Property, whether furnished by Borrower or otherwise, as Lender determines necessary or desirable.

(b)    Borrower acknowledges that  Lender may release or disclose to potential purchasers or transferees of the Debt, or potential participants in the Debt, originals or copies of the Loan Documents, title information, engineering reports, financial statements, operating statements, appraisals, leases, rent rolls, and all other materials, documents and information in Lender's possession or which Lender is entitled to receive under the Loan Documents, with respect to the Debt, Borrower, Guarantor or the Property.

(c)    Borrower covenants and agrees that in the event the Loan is to be included as an asset of a Securitization, Borrower shall (x) at no material out-of-pocket cost or expense to Borrower, gather any information reasonably required by the Rating Agencies in connection with such a Securitization, (y) at Lender's request, meet with representatives of the Rating Agencies to discuss the business and operations of the Property, and (z) cooperate with the reasonable requests of each Rating Agency and Lender in connection with all of the foregoing as well as in connection with all other matters relating to the Loan, Borrower, Guarantor and/or the Property and the preparation of any offering documents with respect thereto, including, without limitation, entering into any amendments or modifications to this Agreement or to any other Loan Document which may be requested by Lender to conform to Rating Agency or market standards for a Securitization provided that no such modification shall modify (i) the interest rate payable under the Note, (ii) the Maturity Date, (iii) the amortization of principal under the Note, (iv) any other material economic

97

term of the Loan, or (v) any provision, the effect of which would materially increase Borrower's obligations or materially decrease Borrower's rights under the Loan Documents (including, without limitation, Section 13.26 hereof). Borrower acknowledges that the information provided by Borrower to Lender may be incorporated into the offering documents for a Securitization. Lender and each Rating Agency shall be entitled to rely on the information supplied by Borrower, Guarantor or any of their respective Affiliates or their respective representatives and Borrower indemnifies and holds harmless Lender and each Rating Agency, their Affiliates and each Person who controls such Persons within the meaning of Section 15 of the Securities Act of 1933, as the same may be amended from time to time, or Section 20 of the Securities Exchange Act of 1934, as the same may be amended from time to time, for, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, known or unknown, contingent or otherwise (but excluding consequential damages of Lender), whether incurred or imposed within or outside the judicial process, including, without limitation, reasonable attorneys' fees and disbursements that arise out of or are based upon any untrue statement of any material fact contained in such information or arise out of or are based upon the omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading.

(d)     In the event the Loan is included as an asset of a Securitization by Lender or any of its Affiliates, Borrower shall, within fourteen (14) Business Days after Lender's written request therefor, deliver opinions in form and substance and delivered by counsel reasonably acceptable to Lender and the Rating Agencies, as may be reasonably required by Lender and/or the Rating Agency in connection with such Securitization.  Borrower's failure to deliver the opinions required hereby within such fourteen (14) Business Day period shall constitute an "Event of Default" hereunder.

(e)     Borrower covenants and agrees that, upon Lender's written request therefor in connection with a Securitization, Borrower shall, at Borrower's sole cost and expense, promptly deliver audited financial statements and related documentation prepared by an independent certified public accountant that satisfy securities Laws and requirements for use in a public registration statement (which may include up to three (3) years of historical audited financial statements).

(f)     Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time, at Lender's sole cost and expense, to require Borrower to restructure the Loan into additional multiple notes (which may include component notes and/or senior and junior notes), to re-allocate principal among component notes and/or senior and junior notes and/or to create participation interests in the Loan; provided that (i) the total principal amounts of the Loan (including any component notes) shall equal the total principal amount of the Loan immediately prior to the restructuring, (ii) except in the case of the occurrence of an Event of Default or a default beyond all notice and cure periods, the weighted average interest rate of the component notes shall, in the aggregate, equal to the Applicable Interest Rate, (iii) except in the case of the occurrence of an Event of Default and/or a default beyond all notice and cure periods, the aggregate debt service payments on the component notes shall equal the aggregate debt service payments which would have been payable under the Loan had the restructuring not occurred, (iv) the stated maturity of the component notes shall be the same as the

98

Note, (v) the amortization of principal under the component notes shall be the same as the Note, (vi) all other material economic term of the Loan shall remain the same as set forth in the Loan Documents, and (vii) no provision, the effect of which would materially increase Borrower's obligations or materially decrease Borrower's rights under the Loan Documents, shall be required.

13.03   Replacement of Note.  Upon notice to Borrower of the loss, theft, destruction or mutilation of the Note, Borrower will execute and deliver, in lieu of the original Note, a replacement note, identical in form and substance to such Note and dated as of the Execution Date. Upon the execution and delivery of the replacement note, all references in any of the Loan Documents to the original Note shall refer to the replacement note.

13.04   Contest of Certain Claims.  Notwithstanding the provisions of Section 4.06 and Section 4.09, Borrower shall not be in default for failure to pay or discharge Impositions or mechanic's or materialman's lien asserted against the Property or for failure to comply with any Legal Requirement if, and so long as, (a) Borrower shall have notified Lender of same within ten (10) Business Days of obtaining knowledge thereof, (b) Borrower shall diligently and in good faith contest the same by appropriate legal proceedings which shall operate to prevent the enforcement or collection of the same and the sale of the Property or any part thereof, to satisfy the same, (c) unless funds are otherwise reserved, Borrower shall, upon five (5) Business Days' notice, furnish to Lender a cash deposit, or an indemnity bond satisfactory to Lender with a surety reasonably satisfactory to Lender, in the amount of the Impositions or mechanic's or materialman's lien claim or penalties or fines relating to the failure to comply with any Legal Requirement, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, to assure payment of the matters under contest and to prevent any sale or forfeiture of the Property or any part thereof, (d) Borrower shall timely upon final determination thereof pay the amount of any such Imposition, claim, fine or penalty so determined, together with all costs, interest and penalties which may be payable in connection therewith, (e) the failure to pay the Impositions or mechanic's or materialman's lien claim does not constitute a default under any other deed of trust, mortgage or security interest covering or affecting any part of the Property, and (f) notwithstanding the foregoing, Borrower shall immediately upon request of Lender pay (and if Borrower shall fail so to do, Lender may, but shall not be required to, pay or cause to be discharged or bonded against) any such Impositions or claim notwithstanding such contest, if in the reasonable opinion of Lender, the Property or any part thereof or interest therein may be in danger of being sold, forfeited, foreclosed, terminated, canceled or lost.  Lender may pay over any such cash deposit or part thereof to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established.

13.05   Notices.

(a)   All notices, demands and requests given or required to be given by, pursuant to, or relating to, this Agreement shall be in writing.

(b)   All notices shall be deemed to have been properly given if hand delivered or if mailed by United States registered or certified mail, with return receipt requested, postage prepaid, or by United States Express Mail or other comparable overnight courier service to the parties at the addresses set forth below (or at such other addresses as shall be given in writing by any party to the others):

99

If to Lender:

Arbor Realty SR, Inc.
333 Earle Ovington Boulevard, Suite 900
Uniondale, New York 11553
Attention:  William Connolly, Esq.

with a copy to:
McDermott Will & Emery LLP
2049 Century Park East, Suite 3200
Los Angeles, California 90067
Attention: Mal E. Serure, Esq.


If to Borrower:
Woodside Meadows Apts Owner LLC
c/o EVU Residential LLC
100 Franklin Sq. Drive, Suite 402
Somerset New Jersey 0887
Attention: Berel Farkas

with a copy to:
Tepper Law PLLC
19 Squadron Blvd., Suite 2
New City, New York 10956
Attention: Nisson Tepper, Esq.

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or two (2) Business Days after mailing; or in the case of overnight courier service, on the Business Day after the same was sent.  A party receiving a notice which does not comply with the technical requirements for notice under this Section may elect to waive any deficiencies and treat the notice as having been properly given.

    13.06   Estoppel Certificate.  Within ten (10) days after a request by Lender, Borrower shall furnish Lender with a statement, duly acknowledged and certified, setting forth (a) the amount of the original principal amount of the Note and the then-current unpaid principal amount of the Note, (b) the rate of interest of the Note, (c) the date payments of interest and/or principal were last paid, (d) any offsets or defenses to the payment of the Debt and, if any are alleged, the nature thereof, (e) that this Agreement, the Note and the other Loan Documents have not been modified or if modified, giving particulars of such modification, (f) that there has not occurred and is then continuing any Default, Event of Default or any event or circumstance that, with the giving of notice or the passage of time, or both, would constitute a Default or Event of Default hereunder, or if such Default, Event of Default, event or circumstance exists, the nature thereof, the period of time it has existed, and the action being taken to remedy such Default, Event of Default, event or circumstance, and (g) any other matters as Lender may reasonably request.  If Borrower does not furnish an estoppel certificate within such ten (10) day period, Borrower appoints Lender as its attorney-in-fact to execute and deliver the certificate on its behalf, which power of attorney shall

52247332;1

be coupled with an interest and shall be irrevocable.  Borrower hereby consents to Lender seeking and obtaining a mandatory injunction compelling performance of this Section 13.06 without the need to post a bond on account of such injunction, and such application may be made and granted ex parte.

13.07   <u>Sole Discretion of Lender</u>.  Whenever Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Lender and shall be final and conclusive, except as may be otherwise specifically provided herein.

13.08   <u>Waiver of Notice</u>.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

13.09   <u>Remedies of Borrower</u>.  In the event that a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case where by Law or under this Agreement, the Note or the Loan Documents, it has an obligation to act reasonably or promptly, Lender shall not be liable for any punitive, direct, consequential or incidental damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  Borrower covenants and agrees that in no event shall Lender be liable for consequential damages and, to the fullest extent permitted by Law, Borrower expressly irrevocably waives all existing and future claims that it may have against Lender for consequential damages.

13.10   <u>Actions and Proceedings</u>.  Lender has the right (but not the obligation) to appear in and defend any action or proceeding brought with respect to the Property in its own name or, if required by Legal Requirements or, if in Lender's reasonable judgment, it is necessary, in the name and on behalf of Borrower, which Lender believes will adversely affect the Property or the Mortgage and to bring any action or proceedings, in its name or in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

13.11   <u>Subrogation</u>.  Lender shall be subrogated to the Lien of any and all encumbrances against the Property paid out of the proceeds of the Loan and to all of the rights of the recipient of such payment.

13.12   <u>Applicable Law</u>.  THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED

IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

13.13   <u>Waiver of Counterclaim and Trial By Jury</u>.   BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT TO ASSERT A COUNTERCLAIM, OTHER THAN A COMPULSORY COUNTERCLAIM, IN ANY ACTION OR PROCEEDING BROUGHT AGAINST IT BY LENDER OR ITS AGENTS, AND KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN RESPECT OF ANY ACTION OR PROCEEDING BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, THE NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF BORROWER, GUARANTOR OR LENDER RELATING TO THE DEBT AND THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT.  BORROWER'S AGREEMENT TO THE PROVISIONS OF THIS SECTION IS A MATERIAL INDUCEMENT FOR LENDER MAKING THE LOAN.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THESE WAIVERS BY BORROWER.

13.14   <u>Consent to Jurisdiction</u>.   ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NASSAU COUNTY, NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER AGREES THAT SERVICE OF PROCESS UPON BORROWER AT THE ADDRESS FOR BORROWER SET FORTH HEREIN AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGE IN THE ADDRESS FOR BORROWER SET FORTH HEREIN, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE AN AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE AN AUTHORIZED AGENT IF BORROWER CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK.  NOTHING CONTAINED HEREIN SHALL

AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION.

13.15   <u>Successors and Assigns</u>.  The Loan is made subject to the terms and conditions of this Agreement and the other Loan Documents, and Lender's business policies and procedures. This Agreement applies to Lender and Borrower, and their successors and assigns.  Borrower is not permitted to assign any of its duties or obligations under this Agreement or any other Loan Document.

13.16   <u>Severability</u>.  If any provision of this Agreement should be held unenforceable or void, then that provision shall be separated from the remaining provisions and shall not affect the validity of this Agreement except that if the unenforceable or void provision relates to the payment of any monetary sum, then, Lender may, at its option, declare the Debt immediately due and payable.

13.17   <u>Captions</u>.   The captions are inserted only as a matter of convenience and for reference, and are not intended to define, limit, or describe the scope or intent of any provisions of this Agreement.

13.18   <u>Time of the Essence</u>.  TIME SHALL BE OF THE ESSENCE WITH RESPECT TO ALL OF BORROWER'S OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

13.19   <u>No Oral Change</u>.  This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act on the part of Borrower or Lender, but only by an agreement in writing signed by all parties.

13.20   <u>Entire Agreement</u>.  This Agreement and the other Loan Documents constitute the entire agreement between Borrower, Lender and Guarantor with respect to the subject matter hereof and all understandings, oral representations and agreements heretofore or simultaneously had among the parties are merged in, and are contained in, such documents and instruments. Borrower and Guarantor acknowledge and agree that they are not relying on any representations, statements or information received from Lender in connection with the execution of this Agreement and the making of the Loan, and that Borrower and Guarantor were represented by counsel, they are sophisticated parties that engaged in an arms-length negotiation with Lender and entered into this Agreement freely and voluntarily without any fraud or duress imposed by any party, including Lender or its principals.

13.21   <u>Fees and Expenses</u>.  If Lender becomes a party (by intervention or otherwise) to any action or proceeding affecting, directly or indirectly, Borrower, the Property or the title thereto or Lender's interest under this Agreement or the other Loan Documents, or employs an attorney to collect any of the Debt or to enforce performance of the obligations, covenants and agreements of the Loan Documents, Borrower shall reimburse Lender for all expenses, costs, charges and legal fees incurred by Lender (including, without limitation, the fees and expenses of experts and consultants), whether or not suit is commenced, within ten (10) days after demand therefor, together with interest at the Applicable Interest Rate from the date incurred until paid by Borrower.

103

In addition, upon the repayment in full of all obligations under the Loan Documents, Borrower agrees to pay all fees and expenses, including filing, recording and legal fees incurred in connection with the termination or satisfaction of any and all filings or recordings.

13.22   Waiver of Bankruptcy Stay.  Borrower agrees that, in the event that Borrower shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the Bankruptcy Code, (ii) file any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or Law relating to bankruptcy or insolvency, or (iii) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, Lender shall thereupon be entitled and Borrower irrevocably consents to immediate and unconditional relief from any automatic stay imposed by Section 362 of the Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies otherwise available to Lender as provided for herein, in the Note, other Loan Documents delivered in connection herewith and as otherwise provided by Law, and Borrower irrevocably waives any right to object to such relief and will not contest any motion by Lender seeking relief from the automatic stay and Borrower will cooperate with Lender, in any manner requested by Lender, in its efforts to obtain relief from any such stay or other prohibition.

13.23   No Joint Venture; No Third-Party Beneficiaries.  Borrower and Lender intend that the relationships created hereunder and under each of the other Loan Documents are solely those of borrower and lender.  Nothing herein or in any of the other Loan Documents is intended to create, nor shall it be construed as creating anything but a debtor-creditor relationship between Borrower, on the one hand, and Lender, on the other hand, nor shall they be deemed to confer on anyone other than Lender, and its successors and assigns, any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.

13.24   Joint and Several Obligations.  If "Borrower" consists of more than one (1) party, each shall be jointly and severally liable to perform the obligations of Borrower under the Loan Documents.

13.25   Duplicate Originals; Counterparts.  This Agreement and each of the other Loan Documents may be executed in any number of duplicate originals, and each duplicate original shall be deemed to be an original.  This Agreement and each of the other Loan Documents (and each duplicate original) also may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed agreement even though all signatures do not appear on the same document.

13.26   Exculpation.

(a)      Notwithstanding anything to the contrary contained in this Agreement or in any of the other Loan Documents, except as specifically provided in Sections 13.26(c) and 13.26(d) below or otherwise in this Section 13.26 or in any of the Guaranties, Borrower, Guarantor, any direct or indirect member, shareholder, partner, principal, Affiliate, employee, officer, director, agent or representative of Borrower or Guarantor (each, a "**Related Party**") shall not have any personal liability for (i) the payment of any sum of money which is or may be payable under this Agreement, the Note, or any other Loan Document, including, but not limited to, the

repayment of the Debt, or (ii) the performance or discharge of any covenants, obligations or undertakings of Borrower hereunder or under any Loan Document and no monetary or deficiency judgment shall be sought or enforced against Borrower or any Related Party with respect thereto; provided, however, a judgment may be sought against Borrower or any Related Party to enforce the rights of Lender in, to, or against the Property, including the Rents, and all other collateral granted as security under any Loan Document and Lender shall have full recourse to and the right to proceed against the Property and such other collateral.

        (b)    Notwithstanding the foregoing, nothing contained herein shall (i) impair the validity of the Debt or in any way affect or impair the Lien of the Mortgage, or the right of Lender to enforce any and all rights and remedies under and by virtue of this Agreement, the Mortgage or any other Loan Document (limited, however, as expressly provided otherwise above), including, without limitation, naming Borrower as a party defendant in any foreclosure action, (ii) limit Lender from pursuing or seeking to enforce the rights of Lender against any third parties, including Guarantor and any other guarantor, indemnitor or surety under any guaranty or indemnity delivered in connection with the Note or otherwise in connection with the Loan, or (iii) constitute a waiver, release or impairment of any Obligation, (iv) impair the right of Lender to obtain the appointment of a receiver, or (v) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property.

        (c)    Additionally, the provisions of this Section 13.26 shall not relieve Borrower or Guarantor from any personal liability for, and Borrower (as well as Guarantor, to the extent provided in the Guaranties) shall be fully and personally liable for, any and all losses (including, without limitation, (i) loss of principal, interest and fees under any and all Loan Documents, and (ii) any reduction in value of the Property, or any other collateral securing the Loan, or the loss of any such collateral or Lender's security interest therein), costs and expenses incurred by Lender (or any Indemnified Party) in respect of or as a result of any or all claims, suits, liabilities (including strict liabilities), actions, demands, proceedings, obligations, debts, damages (including punitive and consequential damages), trials, fines, penalties, charges, injury to a person, property or natural resource, fees, judgments, accounts, orders, adjudications, awards, Liens, injunctive relief, causes of action or amounts paid in settlement of whatever kind or nature, including reasonable attorneys' fees and consultants' fees and disbursements and other cost of defense or otherwise related thereto (collectively, "**Losses**") by reason of or in connection with (i) any willful misconduct, breach of trust, or failure to disclose a material fact by or on behalf of Borrower, Guarantor or any Related Party in connection with the making of the Loan or execution and delivery of any of the Loan Documents, including, by reason of any claim under the United States Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), (ii) the misapplication, misappropriation or conversion by or on behalf of Borrower, Guarantor or any Related Party of (a) any Casualty Insurance Proceeds with respect to the Property, (b) any Condemnation Proceeds with respect to the Property, (c) any Rents and security deposits, (d) any Rents paid more than one (1) month in advance, or (e) any other funds due to Lender under the Loan Documents, (iii) following the occurrence of an Event of Default, the failure of Borrower or any Related Party or Guarantor to direct or pay Rents received by Borrower or such Related Party or Guarantor to the Collection Account or the Security Deposit Account, (iv) the misapplication, misappropriation or conversion by or on behalf of Borrower, Guarantor or any Related Party of monies held in or paid out from any account

105

(including any reserve or escrow) maintained under the Loan Documents, (v) any and all Tenant security deposits held by Borrower not being properly applied, returned to Tenants when due or delivered to Lender, any receiver or any Person purchasing the Property at a foreclosure sale upon the taking of possession of the Property by Lender, such receiver or other Person as required under the Loan Documents, (vi) the wrongful removal, disposal or destruction of any property constituting the Property or any damage to the Property caused by the willful misconduct or gross negligence of Borrower, Guarantor or any Related Party or any intentional waste of the Property by Borrower, Guarantor or any Related Party, (vii) any legal requirement (including RICO) mandating the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by Borrower, Guarantor or any Related Party in connection therewith, (viii) any material misrepresentation, miscertification, omission or breach of warranty by Borrower or a Guarantor or any Related Party or any other Person with respect to any representation, warranty or certification contained in any Loan Document or in any document, certificate or report provided under, pursuant to or in connection therewith, including, without limitation, the Certificate re: "Recycled" Single-Purpose Entity dated as of the date hereof by Borrower in favor of Lender, or otherwise to induce Lender to make the Loan, or any advance thereof, or to release monies from any account held by Lender (including any reserve or escrow) or to take other action with respect to collateral for the Loan, (ix) (a) any damage or destruction of the Property or any part thereof due to fire or other casualty to the extent (i) the cost to complete the Restoration (as such amount is determined by Lender's Casualty Consultant) exceeds the amount of the available Casualty Insurance Proceeds and/or (ii) not covered by insurance but only to the extent the same would have been covered by insurance if Borrower had obtained and maintained the Required Insurance coverage required hereunder, (b) Borrower's failure to obtain and maintain the Required Insurance, or (c) following a Casualty or Condemnation, the inability to rebuild, replace or restore the Improvements in compliance with all Legal Requirements (i) to the same size, area, characteristics, use and density (including, without limitation, with the same number of units and parking spaces) that existed as of the Execution Date and (ii) in a manner that does not materially and adversely affect the value of the Property from the state it was in prior to the Casualty or Condemnation, (x) the enforcement of any of Lender's rights or remedies hereunder or under each and every Loan Document or in any bankruptcy or similar proceeding which may be brought by or against Borrower, Guarantor or any Controlling Party; (xi) the placement of any involuntary Lien on the Property, (xii) the failure to pay any Impositions or any real property transfer taxes, provided, however, that with respect to Impositions (but not transfer taxes), there shall be no liability under this clause (l) to the extent that, (a) funds to pay such Impositions were, at the time in question, available in the Tax and Insurance Reserve and allocated to the payment of Impositions, and Lender failed to pay (or make such funds available to pay, whether in full or in part) such Impositions, unless Borrower or any of its Affiliates have taken any action to impede Lender's ability to disburse, or prevent Lender from disbursing, funds from the applicable Reserve, or (b) there is insufficient cash flow from the operation of the Property to pay such Impositions; (xiii) gross negligence, willful misconduct or criminal acts by Borrower, Guarantor or any Related Party, (xiv) any failure by Borrower to pay the fees and expenses of Lender required pursuant to the terms of any of the Loan Documents, (xv) the breach of any representation, warranty, covenant or indemnification provision contained in Article 8 hereof, the Indemnity Agreement or in any other Loan Documents concerning Environmental Laws or Hazardous Materials, and/or (xvi) the exercise of any right or remedy under any federal, state or local forfeiture Laws resulting in the loss or impairment of any security interest granted under any

106

Loan Document, or the priority thereof, against the assets subject to such security interest as a result of the acts or intentional omissions of Borrower or any Related Party or Guarantor (any and all such amounts due under clauses (i) through (xvi) of this Section 13.26(c), collectively, the "**Loss Amounts**").

(d)     Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (ii) Borrower and Guarantor shall be liable for the full amount of the Debt in the event that (A) the first full monthly payment of interest on the Note is not paid when due, (B) (i) Borrower fails to obtain Lender's prior written consent to any subordinate financing encumbering the Property or any mezzanine or preferred equity financing encumbering the equity interests of direct or indirect owners of Borrower and/or Borrower incurs any indebtedness or obligations in violation of the terms of the Loan Documents; or (ii) the placement of any voluntary Lien on the Property, (C) a breach of any of the terms and covenants contained in Section 4.08 hereof, (D) any failure to comply with, or  a breach of any of the provisions of, Sections 4.02(e), 4.05(t), 4.22(b)(x) or 10.02(a)(xv) hereof, (E) Borrower, Guarantor or any Controlling Party commences, or consents to, joins in or otherwise acquiesces in (i) a voluntary case or proceeding under the Bankruptcy Code or any Bankruptcy Law, (ii) any other case or proceeding to adjudicate Borrower, Guarantor or any Controlling Party a bankrupt Person or an insolvent Person or (iii) the appointment of a custodian, receiver, trustee or examiner for Borrower, Guarantor, any Controlling Party or any portion of the Property, (F) an involuntary case or proceeding under the Bankruptcy Code or any Bankruptcy Law is commenced against Borrower, Guarantor or any Controlling Party, or any other case or proceeding seeking to adjudicate Borrower, Guarantor or any Controlling Party a bankrupt Person or an insolvent Person is commenced (unless, in each case, such case or proceeding is commenced by Lender), unless such case or proceeding is discharged, stayed or dismissed within sixty (60) days thereafter, (G) Borrower, Guarantor, or any Related Party contests, asserts a defense or interferes with Lender's enforcement of its rights and remedies hereunder or under any of the other Loan Documents, (H) the Mortgage is deemed to be a fraudulent conveyance by a court of competent jurisdiction, (I) Borrower or any Related Party is substantively consolidated with any other Person, unless such consolidation was involuntary and not consented to by Borrower, Guarantor or any Controlling Party and is discharged, stayed or dismissed within sixty (60) days thereafter, (J) (i) an involuntary case or proceeding under the Bankruptcy Code or any Bankruptcy Law is commenced against Borrower, Guarantor or Controlling Party, or any other case or proceeding seeking to adjudicate Borrower, Guarantor or Controlling Party a bankrupt Person or an insolvent Person is commenced by any other Person in which Borrower, Guarantor or any Related Party colludes with or otherwise assist such Person or (ii) Borrower, Guarantor or any Related Party solicits or causes to be solicited petitioning creditors for an involuntary case or proceeding under the Bankruptcy Code or any Bankruptcy Law against Borrower, Guarantor or Controlling Party, or any other case or proceeding seeking to adjudicate Borrower, Guarantor or Controlling Party a bankrupt or an insolvent Person, (K) Borrower, Guarantor or Controlling Party makes an assignment for the benefit of creditors or admits that it is Insolvent or that it is unable to pay its debts as they become due, (L) Guarantor fails, within ten (10) days after written demand is made by Lender that such payment is to be made, to (i) pay to Lender all Loss Amounts, (ii) pay to Lender the required Renovation Out of Balance Amount and/or any Rebalance Prepayment as and when required or (iii) make any payment to

107

Lender or any other party that is due by reason of, under and pursuant to any of the Guaranties, (M) any fraud by Borrower, Guarantor, Related Party or any Person with respect to any representation, warranty, covenant or certification contained in any Loan Document or in any document, certificate, report, application or supporting documentation provided under, pursuant to or in connection therewith, or otherwise to induce Lender to make the Loan, or any advance thereof, to release monies from any account held by Lender (including any reserve or escrow), to grant consent pursuant to any Loan Document, or to take other action with respect to collateral for the Loan, or in connection with any ongoing financial or other reporting required by any of the Loan Documents, (N) Guarantor fails to maintain either the minimum Net Worth or minimum Liquidity as set forth in the Guaranties or in any other Loan Document, and/or (O) following the occurrence of an Event of Default, Borrower fails, within ten (10) days after written demand by Lender, to (i) establish the Collection Account with the Bank and commence depositing funds therein pursuant to Article 12 hereof and (ii) enter into the Account Agreement with Lender and the Bank, pursuant to and in accordance with Section 12.01 hereof.

(e)     Nothing contained herein is intended to limit the obligations and personal liability of any guarantor or any indemnitor under any indemnity agreement or guaranty, including, without limitation, the Guaranties, executed by Borrower, Guarantor or any other Person for the benefit of Lender.

13.27   <u>Conflict; Construction of Documents; Reliance</u>.   In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.   The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.   Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan, without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender.   Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.   Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

13.28   <u>Set-Off</u>.   In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or un-matured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower; provided however,

Lender may only exercise such right during the continuance of an Event of Default.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, Lender and Borrower hereby sign, seal and deliver this Loan Agreement.

LENDER:

**ARBOR REALTY SR, INC.,**
a Maryland corporation

By: _____
    Name: Valerie Rubin
    Title:   Authorized Signatory

BORROWER:

**WOODSIDE MEADOWS APTS OWNER LLC,**
a Delaware limited liability company

By: _____

Name: Berel Farkas
Title:  Authorized Signatory

EXHIBIT A

Legal Description

Land situated in the City of Lansing, County of Eaton, and State of Michigan, described as:

PARCEL 1:
Lots 136 and 137 of GLENBURNE NO. 2, according to the plat thereof recorded in Liber 6 of Plats, Page 27, Eaton County Records.

PARCEL 2:
Lot 135 of GLENBURNE NO. 2, according to the plat thereof recorded in Liber 6 of Plats, Page 27, Eaton County Records, ALSO Lots 225, 226, 227 of GLENBURNE NO. 4, according to the plat thereof recorded in Liber 7 of Plats, Page 4, Eaton County Records.

EXHIBIT B

Initial Budget

[SEE ATTACHED]

## Proforma: Sycamore Townhomes FKA Woodside Meadows

| | units | 338 | T3 Rev Ann/ T12 Exp | Proforma at Closing | Proforma Year 1 | Proforma Year 2 | Proforma Year 3 |
|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | |
| Gross Potential Rent | | | $3,599,384 | $3,599,384 | $4,530,028 | $5,424,024 | $5,586,745 |
| Loss to Lease | | | ($15,392) | ($15,392) | ($22,650) | ($27,120) | ($27,934) |
| % of GPR | | | 0.43% | 0.43% | 0.50% | 0.50% | 0.50% |
| Vacancy | | | ($662,461) | ($179,969) | ($226,501) | ($271,201) | ($279,337) |
| % of GPR | | | 18.40% | 5.00% | 5.00% | 5.00% | 5.00% |
| Concessions | | | ($31,800) | ($31,800) | ($45,300) | ($54,240) | ($55,867) |
| % of GPR | | | 0.88% | 0.88% | 1.00% | 1.00% | 1.00% |
| Bad Debt | | | ($1,255) | ($1,255) | ($45,300) | ($54,240) | ($55,867) |
| % of GPR | | | 0.03% | 0.03% | 1.00% | 1.00% | 1.00% |
| Model/ Employee Staff Units | | | ($22,600) | ($22,600) | ($33,975) | ($40,680) | ($41,901) |
| % of GPR | | | 0.63% | 0.63% | 0.75% | 0.75% | 0.75% |
| Down Units/ Other Non-Rev Units | | | $0 | $0 | ($67,950) | ($81,360) | ($83,801) |
| % of GPR | | | 0.00% | 0.00% | 1.50% | 1.50% | 1.50% |
| Utilities Income | | | $93,883 | $93,883 | $95,760 | $97,676 | $99,629 |
| Other Income | | | $285,434 | $285,434 | $291,142 | $296,965 | $302,905 |
| **NET REVENUE** | | | **$3,245,192** | **$3,727,683** | **$4,475,253** | **$5,289,823** | **$5,444,571** |
| | | | | | | | |
| **OPERATING EXPENSES:** | | | | | | | |
| General & Administrative | | | $74,124 | $74,124 | $75,606 | $77,119 | $78,661 |
| Contract Services | | | $81,531 | $81,531 | $83,162 | $84,825 | $86,522 |
| Advertising & Marketing | | | $37,631 | $37,631 | $38,384 | $39,152 | $39,935 |
| Payroll | | | $252,032 | $252,032 | $257,073 | $262,215 | $267,459 |
| Electric | | | $47,797 | $47,797 | $48,752 | $49,728 | $50,722 |
| Water & Sewer | | | $361,525 | $361,525 | $368,755 | $376,130 | $383,653 |
| Cable/Internet/Phone | | | $2,687 | $2,687 | $2,741 | $2,796 | $2,852 |
| Utility Other | | | $0 | $0 | $0 | $0 | $0 |
| Utility Billing Services | | | $2,265 | $2,265 | $2,310 | $2,356 | $2,403 |
| Gas | | | $32,839 | $32,839 | $33,496 | $34,166 | $34,849 |
| Repairs & Maintenance | | | $59,004 | $59,004 | $60,184 | $61,388 | $62,616 |
| Make Ready | | | $4,090 | $4,090 | $4,172 | $4,256 | $4,341 |

| | | | | | |
|---|---|---|---|---|---|
| Management Fees | $86,648 | $111,831 | $134,258 | $158,695 | $163,337 |
| Professional fees | $12,665 | $12,665 | $12,919 | $13,177 | $13,440 |
| Real Estate Taxes | $201,000 | $201,000 | $205,020 | $209,120 | $213,303 |
| Insurance | $59,474 | $59,474 | $60,664 | $61,877 | $63,114 |
| **TOTAL OPERATING EXPENSES:** | **$1,315,314** | **$1,340,496** | **$1,387,496** | **$1,436,998** | **$1,467,207** |
| | | | | | |
| **NOI:** | **$1,929,878** | **$2,387,188** | **$3,087,757** | **$3,852,825** | **$3,977,365** |

EXHIBIT C

Intentionally Omitted

EXHIBIT D

Intentionally Omitted

EXHIBIT E

RENT ROLL


[SEE ATTACHED]

**Rent Roll AM**
Sycamore Townhomes
Feb 2022

## Unit Details

| Bldg-Unit | Unit Type | SQFT | Unit Status | Resident | Move-In | Lease Start | Lease End | Expected Move-Out | Market Rent | Scheduled Charges | Balance | Deposit Held |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3901BW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Sauceda, Placidc | 10/2/2020 | 11/1/2021 | | | 1,160.00 | 1,225.00 | 13,413.92 | 1,125.00 |
| 3903BW | WSM1x1 (6441a | 620.00 | Occupied No | Pennington, Cam | 8/1/1999 | 10/1/2021 | 9/30/2022 | | 720.00 | 672.00 | 758.31 | 200.00 |
| 3905BW | WSM1x1 (6441a | 620.00 | Occupied No | Juarez, Jose | 12/16/2020 | 2/1/2022 | | | 720.00 | 836.00 | 886.00 | 0.00 |
| 3907BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Ward, Bennie | 7/14/2020 | 9/9/2021 | 9/30/2022 | | 790.00 | 882.00 | 1,947.46 | 800.00 |
| 3909BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Triantaflos, Jame | 6/10/2016 | 6/1/2021 | 6/30/2022 | | 790.00 | 805.00 | 896.41 | 199.00 |
| 3911BW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Mukamana, Fran | 11/1/2021 | 11/1/2021 | 10/31/2022 | | 960.00 | 960.00 | 1,583.90 | 860.00 |
| 3913BW | WSM2x1 (6442a | 900.00 | Vacant Rente | -- Vacant -- | | | | | 760.00 | 0.00 | | 0.00 |
| 3915BW | WSM1x1 (6441a | 620.00 | Occupied No | Robinson, Ronny | 1/3/2022 | 1/3/2022 | 1/31/2023 | | 720.00 | 720.00 | 623.50 | 400.00 |
| 3917BW | WSM1x1 (6441a | 620.00 | Occupied No | Moore, Candi (Cε | 7/1/2016 | 10/8/2021 | 10/31/2022 | | 720.00 | 775.00 | (350.52) | 882.50 |
| 3919BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Smith, Heather | 6/12/2020 | 7/1/2021 | 7/31/2022 | | 790.00 | 785.00 | 0.00 | 350.00 |
| 3921BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Phillips, Deshun ( | 5/8/2020 | 6/1/2021 | 6/30/2022 | | 790.00 | 795.00 | 14,092.09 | 350.00 |
| 3923BW | WSM2x1 (6442a | 900.00 | Occupied No | Al-Hadje, Abdel-/ | 1/30/2021 | 2/1/2022 | | | 760.00 | 860.00 | 153.41 | 350.00 |
| 3925BW | WSM2x1 (6442a | 900.00 | Occupied No | Turner, Anita | 3/30/2007 | 6/1/2021 | 6/30/2022 | | 760.00 | 675.00 | (138.70) | 575.00 |
| 3927BW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Sams, Jecarla | 2/7/2017 | 5/1/2021 | 4/15/2022 | | 960.00 | 810.00 | 901.41 | 730.00 |
| 3929BW | WSM2x1.5 - Ren | 950.00 | Occupied No | Nappier, Melvin | 7/12/2021 | 7/12/2021 | 7/31/2022 | | 990.00 | 990.00 | 2,149.46 | 500.00 |
| 3931BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Bridgeman, Deac | 1/30/2020 | 2/1/2021 | | | 790.00 | 750.00 | 5,550.16 | 150.00 |
| 3933BW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Fields Taylor, Ev: | 8/23/2021 | 8/23/2021 | 8/31/2022 | | 960.00 | 960.00 | (6.95) | 860.00 |
| 3935BW | WSM2x1 (6442a | 900.00 | Occupied No | Stedman, Caprio | 1/31/2014 | 4/1/2021 | 3/15/2022 | | 760.00 | 740.00 | 0.00 | 350.00 |
| 3937BW | WSM2x1 (6442a | 900.00 | Occupied No | Melgarejo, Oscar | 8/3/2018 | 8/1/2021 | | | 760.00 | 814.00 | 7,948.36 | 250.00 |
| 3939BW | WSM2x1 (6442a | 900.00 | Occupied No | Morse, Abrina | 9/27/2019 | 11/1/2021 | | | 760.00 | 845.50 | 1,453.41 | 0.00 |
| 3941BW | WSM2x1 (6442a | 900.00 | Occupied No | Sharaf, Mohame | 10/22/2020 | 11/1/2021 | 10/31/2022 | | 760.00 | 808.50 | 0.00 | 100.00 |
| 3943BW | WSM2x1 (6442a | 900.00 | Occupied No | Kadani, Sharif | 2/10/2021 | 2/1/2021 | 2/28/2022 | | 760.00 | 760.00 | 903.90 | 350.00 |
| 3945BW | WSM2x1 (6442a | 900.00 | Occupied No | Ward, Jacquelyn | 6/26/2020 | 7/1/2021 | 7/31/2022 | | 760.00 | 750.00 | (935.97) | 750.00 |
| 3947BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Neil, Amadieo | 3/5/2018 | 6/1/2021 | 6/30/2022 | | 790.00 | 680.00 | 3,333.47 | 670.00 |
| 3949BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Beard, Val | 1/24/1997 | 9/1/2021 | 8/31/2022 | | 790.00 | 687.75 | (311.31) | 129.00 |
| 3951BW | WSM1x1 (6441a | 620.00 | Occupied No | Torres, Alba | 3/1/2021 | 3/1/2021 | 3/31/2022 | | 720.00 | 720.00 | 177.71 | 250.00 |
| 3953BW | WSM1x1 - Renov | 620.00 | Occupied No | Flagg, Nona | 1/12/2021 | 2/1/2022 | 1/31/2023 | | 920.00 | 913.00 | 2,256.72 | 250.00 |
| 3955BW | WSM2x1 (6442a | 900.00 | Occupied No | Robins, Tiffany | 10/28/2016 | 12/1/2021 | | | 760.00 | 890.00 | 4,235.41 | 605.00 |
| 3957BW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Hammons, Tiffan | 2/14/2020 | 3/1/2021 | 2/15/2022 | | 960.00 | 1,210.00 | 1,268.43 | 380.00 |
| 3959BW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Flores, Isaac | 1/4/2021 | 2/1/2022 | 1/31/2023 | | 1,160.00 | 1,150.00 | 0.00 | 450.00 |
| 3961BW | WSM1x1 (6441a | 620.00 | Occupied No | West, Kailon | 9/19/2009 | 6/1/2021 | 6/30/2022 | | 720.00 | 650.00 | 7,872.98 | 250.00 |
| 3963BW | WSM1x1 (6441a | 620.00 | Occupied No | Nzoyihera, Remn | 10/22/2021 | 10/22/2021 | 10/31/2022 | | 720.00 | 720.00 | 1,662.61 | 720.00 |
| 3965BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Eubanks, John | 12/1/2020 | 1/1/2022 | | | 790.00 | 805.00 | 2,171.19 | 525.00 |
| 3967BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Murchison, Jocel | 5/22/2020 | 6/1/2021 | 6/30/2022 | | 790.00 | 795.00 | 3,660.08 | 875.00 |
| 3969BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Garcia, Maria | 4/1/2016 | 5/1/2021 | 4/15/2022 | | 790.00 | 740.00 | (808.67) | 635.00 |
| 3971BW | WSM2x1.5 (6442 | 950.00 | Vacant Unren | -- Vacant -- | | | | | 790.00 | 0.00 | | 0.00 |
| 3973BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Mayes, Stephani | 5/17/2021 | 5/17/2021 | 5/31/2022 | | 790.00 | 632.00 | 3,513.58 | 350.00 |
| 3975BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Ledesma, John | 5/21/2016 | 9/9/2021 | 9/30/2022 | | 790.00 | 798.00 | 0.00 | 250.00 |
| 3977BW | WSM2x1 (6442a | 900.00 | Vacant Unren | -- Vacant -- | | | | | 760.00 | 0.00 | | 0.00 |
| 3979BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Bryant, Jaime | 5/1/2020 | 6/1/2021 | 6/30/2022 | | 760.00 | 810.00 | 8,256.81 | 725.00 |
| 3981BW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Musa, Isack | 6/25/2021 | 6/25/2021 | 6/30/2022 | | 1,160.00 | 1,160.00 | 0.00 | 500.00 |
| 3983BW | WSM2x1.5 - Ren | 950.00 | Occupied No | Graham, Catrina | 11/5/2021 | 11/5/2021 | 11/30/2022 | | 990.00 | 990.00 | 1,656.13 | 400.00 |
| 3985BW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Nshizirungu, Safi | 8/5/2019 | 1/19/2022 | 1/31/2023 | | 790.00 | 777.00 | 846.23 | 725.00 |
| 3987BW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Davis, Moses | 12/15/2021 | 12/15/2021 | 12/31/2022 | | 1,160.00 | 1,160.00 | 2,156.25 | 960.00 |
| 4000BW | WSM2x1 (6442a | 900.00 | Occupied No | Irvine, Sylvia | 11/2/2002 | 12/16/2021 | | | 760.00 | 845.50 | 878.78 | 400.00 |
| 4001BW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Muhire, Innocent | 10/8/2020 | 11/1/2021 | | | 1,160.00 | 1,306.25 | 4,441.94 | 450.00 |
| 4002BW | WSM2x1.5 - Ren | 950.00 | Occupied No | Iraguna, Peter | 8/2/2021 | 8/2/2021 | 8/31/2022 | | 990.00 | 990.00 | 1,031.41 | 500.00 |
| 4003BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Kuykendall, Julie | 11/20/2021 | 11/20/2021 | 11/30/2022 | | 790.00 | 790.00 | 0.00 | 400.00 |
| 4004BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Talley, Tashari | 10/7/2020 | 11/1/2021 | 10/31/2022 | | 790.00 | 820.00 | (1,336.10) | 800.00 |
| 4005BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Ordiway, Angelic | 10/9/2017 | 9/9/2021 | 9/30/2022 | | 790.00 | 735.00 | 378.65 | 640.00 |
| 4006BW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Warren, Felicia | 10/22/2018 | 1/1/2022 | | | 960.00 | 1,095.00 | 895.00 | 215.27 |
| 4007BW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Elam, Karmica | 7/7/2021 | 7/1/2021 | 6/30/2022 | | 1,160.00 | 1,160.00 | 727.60 | 500.00 |
| 4008BW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Crump, Connie | 11/2/2021 | 11/2/2021 | 11/30/2022 | | 960.00 | 960.00 | 2,472.23 | 1,160.00 |
| 4009BW | WSM3x1.5 (6443 | 1,120.00 | Vacant Unren | -- Vacant -- | | | | | 960.00 | 0.00 | | 0.00 |
| 4010BW | WSM2x1 (6442a | 900.00 | Occupied No | Tajik, Shahabuldi | 11/19/2021 | 11/19/2021 | 11/30/2022 | | 760.00 | 750.00 | (625.45) | 650.00 |
| 4011BW | WSM2x1.5 (6442 | 950.00 | Vacant Unren | -- Vacant -- | | | | | 790.00 | 0.00 | | 0.00 |
| 4012BW | WSM1x1 (6441a | 620.00 | Occupied No | Smaller, Israel Jr | 10/29/2021 | 10/29/2021 | 11/30/2022 | | 720.00 | 720.00 | 891.41 | 620.00 |
| 4013BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Perez-Hernandez | 1/29/2016 | 6/1/2021 | 6/30/2022 | | 790.00 | 740.00 | 2,432.56 | 635.00 |
| 4014BW | WSM1x1 - Renov | 620.00 | Occupied No | Thomas, Taryn | 6/30/2021 | 6/30/2021 | 6/30/2022 | | 920.00 | 920.00 | (855.56) | 500.00 |
| 4015BW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Nyirabanditsi, Eli: | 10/1/2021 | 10/1/2021 | 9/30/2022 | | 960.00 | 960.00 | 1,062.55 | 860.00 |
| 4016BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Martin, Celara | 4/12/2019 | 11/1/2021 | | | 790.00 | 770.00 | 191.41 | 670.00 |
| 4017BW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Croft, Christophe | 3/31/2021 | 3/31/2021 | 3/31/2022 | | 1,160.00 | 1,110.00 | 1,608.15 | 450.00 |
| 4018BW | WSM2x1.5 (6442 | 950.00 | Occupied No | McDonald, Yaniq | 10/16/2019 | 12/1/2021 | 11/30/2022 | | 790.00 | 765.00 | 0.00 | 450.00 |
| 4019BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Withers, Brenda | 12/14/2018 | 1/1/2022 | | | 790.00 | 1,720.00 | 247.00 | 570.00 |
| 4020BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Mcneal, Lateja | 9/10/2020 | 10/1/2021 | | | 790.00 | 940.00 | 12,450.54 | 800.00 |
| 4021BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Jones, Breana | 3/23/2020 | 4/1/2021 | 3/31/2022 | | 790.00 | 800.00 | 0.00 | 350.00 |
| 4022BW | WSM2x1.5 - Ren | 950.00 | Occupied No | Haynes, Briana | 11/15/2021 | 11/15/2021 | 11/30/2022 | | 990.00 | 990.00 | 1,186.35 | 990.00 |
| 4023BW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Lewis, Shamarra | 10/31/2017 | 12/1/2021 | 11/30/2022 | | 960.00 | 1,810.00 | 2,735.00 | 0.00 |
| 4024BW | WSM2x1.5 - Ren | 950.00 | Occupied No | Canady, Cheyenr | 6/1/2021 | 5/26/2021 | 5/31/2022 | | 990.00 | 965.00 | (1,266.00) | 0.00 |
| 4025BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Jackson, Ashari | 12/6/2019 | 9/1/2021 | 8/31/2022 | | 790.00 | 829.50 | 2,770.07 | 0.00 |
| 4026BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Hunter, Jamere | 4/9/2019 | 2/1/2022 | 2/28/2022 | | 790.00 | 805.00 | 748.57 | 0.00 |
| 4027BW | WSM2x1 (6442a | 900.00 | Occupied No | Habimana, Innoc | 5/29/2020 | 6/1/2021 | 6/30/2022 | | 760.00 | 760.00 | 0.00 | 350.00 |
| 4028BW | WSM2x1.5 - Ren | 950.00 | Occupied No | Clerk, Lola | 5/3/2021 | 5/3/2021 | 5/31/2022 | | 990.00 | 940.00 | 915.06 | 350.00 |
| 4029BW | WSM2x1.5 (6442 | 950.00 | Occupied No | Sayedi, Ahmad | 12/28/2021 | 12/28/2021 | 12/31/2022 | | 790.00 | 750.00 | 0.00 | 750.00 |

Rent Roll AMC

| Unit | Type | Rent | Status | | Resident | Move-in | Lease Start | Lease End | Extra | Market | Actual | Balance | Deposit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4030BW | WSM2x1.5 (6442 | 950.00 | Occupied | No | Dillon, Lynn | 10/26/2018 | 11/1/2021 | 10/31/2022 | | 790.00 | 787.50 | 0.00 | 335.00 |
| 4031BW | WSM2x1.5 (6442 | 950.00 | Occupied | No | Singh, Nirmal | 8/26/2016 | 10/1/2021 | | | 790.00 | 785.00 | 5,050.26 | 635.00 |
| 4032GWB | WSM3x1.5 - Ren | 1,120.00 | Occupied | No | Pickott, Savanna | 4/1/2021 | 4/1/2021 | 4/30/2022 | | 1,160.00 | 1,110.00 | 1,290.60 | 450.00 |
| 4033WB | WSM3x1.5 (6443 | 1,120.00 | Occupied | No | Van Etten, Micha | 1/1/2016 | 1/1/2022 | 12/31/2022 | | 960.00 | 725.00 | 1,186.00 | 450.00 |
| 4034GWB | WSM2x1 (6442a | 900.00 | Occupied | No | Henry, Diamond | 3/29/2020 | 4/1/2021 | | | 760.00 | 750.00 | 7,206.82 | 350.00 |
| 4035WB | WSM1x1 (6441a | 620.00 | Occupied | No | Mountain, Regina | 2/11/2019 | 4/1/2020 | | | 720.00 | 605.00 | (56.12) | 440.00 |
| 4036GWB | WSM1x1 (6441a | 620.00 | Occupied | No | Eller, Samantha | 3/1/2019 | 5/1/2021 | 4/15/2022 | | 720.00 | 725.00 | 0.00 | 199.00 |
| 4037WB | WSM1x1 (6441a | 620.00 | Occupied | No | Barnett, Nartarsh | 1/17/2020 | 1/1/2022 | | | 720.00 | 871.75 | 8,054.67 | 0.00 |
| 4038GWB | WSM1x1 (6441a | 620.00 | Occupied | No | Thomas, London | 10/31/2019 | 12/1/2021 | | | 720.00 | 840.00 | 282.79 | 0.00 |
| 4039WB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Davis, Clinton | 10/9/2008 | 12/20/2021 | 12/31/2022 | | 790.00 | 740.00 | 1,126.41 | 200.00 |
| 4040GWB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Olson, Christa (C | 8/6/2021 | 8/31/2022 | | | 990.00 | 990.00 | (912.58) | 400.00 |
| 4041WB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Romero, Adrian F | 12/20/2021 | 12/20/2021 | 12/31/2022 | | 790.00 | 790.00 | 707.84 | 760.00 |
| 4042GWB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Hamdan, Jennah | 5/7/2021 | 5/7/2021 | 5/31/2022 | | 990.00 | 965.00 | 9,779.35 | 350.00 |
| 4043WB | WSM2x1 (6442a | 900.00 | Occupied | No | Geter, Kenyarta | 2/15/2020 | 3/1/2021 | 2/28/2022 | | 760.00 | 785.00 | 851.41 | 380.00 |
| 4044GWB | WSM3x1.5 (6443 | 1,120.00 | Occupied | No | Jones, Britany | 11/15/2016 | 2/1/2022 | | | 960.00 | 992.00 | 6,427.02 | 725.00 |
| 4045WB | WSM2x1 (6442a | 900.00 | Vacant | Unren | -- Vacant -- | | | | | 760.00 | 0.00 | | |
| 4046GWB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Harris, Brittany | 8/12/2016 | 9/1/2021 | 8/31/2022 | | 990.00 | 890.00 | 1,519.75 | 635.00 |
| 4047WB | WSM1x1 (6441a | 900.00 | Vacant | Unren | -- Vacant -- | | | | | 720.00 | 0.00 | | |
| 4048GWB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Artis, Dazsha | 5/1/2021 | 5/1/2021 | 5/31/2022 | | 990.00 | 965.00 | 980.24 | 350.00 |
| 4049WB | WSM2x1 (6442a | 900.00 | Vacant | Unren | -- Vacant -- | | | | | 760.00 | 0.00 | | |
| 4050GWB | WSM3x1.5 - Ren | 1,120.00 | Occupied | No | Her, Maria | 4/1/2021 | 4/1/2021 | 4/30/2022 | | 1,160.00 | 1,110.00 | 1,255.90 | 450.00 |
| 4051WB | WSM2x1 (6442a | 900.00 | Occupied | No | Mutabesha, Kelly | 8/27/2018 | 6/1/2021 | 6/30/2022 | | 760.00 | 700.00 | 821.32 | 640.00 |
| 4052GWB | WSM2x1 - Reno | 900.00 | Occupied | No | Jones, Andrea | 5/24/2021 | 5/24/2021 | 5/31/2022 | | 960.00 | 960.00 | (2,071.64) | 350.00 |
| 4053WB | WSM2x1 - Reno | 900.00 | Occupied | No | Bile, Yohan | 10/9/2020 | 11/1/2021 | | | 960.00 | 1,050.25 | 5,628.53 | 905.00 |
| 4054GWB | WSM2x1 - Reno | 900.00 | Occupied | No | Blocker, Malik | 4/1/2021 | 4/1/2021 | 4/30/2022 | | 960.00 | 935.00 | 11,838.73 | 450.00 |
| 4055WB | WSM2x1 (6442a | 900.00 | Occupied | No | Dickinson, Luke | 12/15/2018 | 1/1/2022 | | | 760.00 | 790.00 | 3,128.41 | 640.00 |
| 4056GWB | WSM3x1.5 - Ren | 1,120.00 | Occupied | No | Harrington, Dane | 11/5/2021 | 11/5/2021 | 5/31/2023 | | 1,160.00 | 1,160.00 | 1,005.33 | 1,060.00 |
| 4057WB | WSM2x1 (6442a | 900.00 | Occupied | No | Lucero, Brittany | 11/19/2021 | 11/19/2021 | 2/28/2022 | | 960.00 | 960.00 | 2,512.39 | 960.00 |
| 4058GWB | WSM2x1 - Reno | 900.00 | Occupied | No | Roberts, Juaneisl | 10/1/2021 | 10/1/2021 | 9/30/2022 | | 960.00 | 960.00 | 1,055.90 | 400.00 |
| 4059WB | WSM3x1.5 (6443 | 1,120.00 | Occupied | No | Passaway, Jacqu | 7/14/2017 | 9/1/2021 | 8/31/2022 | | 960.00 | 824.25 | (742.60) | 730.00 |
| 4060GWB | WSM1x1 (6441a | 620.00 | Occupied | Unren | -- Vacant -- | | | | | 720.00 | 0.00 | | |
| 4061WB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Hoskins, Delandr | 10/2/2019 | 11/1/2021 | 10/31/2022 | | 790.00 | 777.00 | 818.41 | 0.00 |
| 4062GWB | WSM1x1 (6441a | 620.00 | Occupied | No | Rodriguez, Salen | 7/6/2020 | 8/4/2021 | 8/31/2022 | | 720.00 | 724.50 | 2,580.80 | 690.00 |
| 4063WB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Murphy, Nicholas | 1/17/2020 | 5/1/2021 | | | 790.00 | 925.00 | 901.70 | 0.00 |
| 4064GWB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Halstead, Mark | 10/4/2019 | 12/1/2021 | | | 790.00 | 982.00 | 9,168.90 | 0.00 |
| 4065GWB | WSM3x1.5 (6443 | 1,120.00 | Notice Unren | | Robinson, Edrina | 8/14/2018 | 3/1/2021 | 2/15/2022 | 2/28/2022 | 960.00 | 1,095.00 | 2,566.69 | 250.00 |
| 4066GWB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Williams, April | 7/1/2019 | 8/1/2021 | | | 790.00 | 890.00 | 5,599.00 | 813.00 |
| 4068GWB | WSM3x1.5 - Ren | 1,120.00 | Occupied | No | Washington, Mor | 12/19/2019 | 1/1/2022 | | | 960.00 | 1,191.00 | 7,197.54 | 0.00 |
| 4070GWB | WSM2x1 (6442a | 900.00 | Occupied | No | Lundquist, Lauri | 4/6/2007 | 9/9/2021 | 9/30/2022 | | 760.00 | 687.75 | (16.35) | 250.00 |
| 4072GWB | WSM1x1 (6441a | 620.00 | Vacant | Unren | -- Vacant -- | | | | | 720.00 | 0.00 | | |
| 4074GWB | WSM1x1 (6441a | 620.00 | Occupied | No | Smith, Roosevelt | 5/3/2012 | 8/4/2021 | 8/31/2022 | | 720.00 | 667.01 | 38.56 | 585.00 |
| 4076GWB | WSM2x1.5 (6442 | 950.00 | Vacant | Unren | -- Vacant -- | | | | | 790.00 | 0.00 | | |
| 4078GWB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Maybin, Jasmine | 4/12/2021 | 4/12/2021 | 4/30/2022 | | 990.00 | 940.00 | (248.18) | 450.00 |
| 4080GWB | WSM3x1.5 - Ren | 1,120.00 | Occupied | No | Mena, Alina | 7/22/2021 | 7/22/2021 | 7/31/2022 | | 1,160.00 | 1,160.00 | 0.00 | 1,160.00 |
| 4082GWB | WSM2x1 - Reno | 900.00 | Occupied | No | Horton, Talisha | 3/31/2021 | 3/31/2021 | 3/31/2022 | | 960.00 | 910.00 | 144.05 | 350.00 |
| 4084GWB | WSM1x1 (6441a | 620.00 | Occupied | No | Alber, Bridgette | 12/13/2019 | 1/1/2022 | | | 720.00 | 1,576.00 | 4,437.00 | 0.00 |
| 4086GWB | WSM1x1 - Reno | 620.00 | Occupied | No | Bristow-Young, C | 2/19/2021 | 2/19/2021 | 2/28/2022 | | 920.00 | 870.00 | 1,835.90 | 870.00 |
| 4088GWB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Robles, Jasmine | 10/2/2020 | 11/1/2021 | 10/31/2022 | | 790.00 | 840.00 | 1,716.76 | 800.00 |
| 4090GWB | WSM2x1.5 (6442 | 950.00 | Vacant | Unren | -- Vacant -- | | | | | 790.00 | 0.00 | | |
| 4100GWB | WSM2x1 (6442a | 900.00 | Occupied | No | Kelly, Amanda | 12/19/2014 | 10/1/2021 | 9/30/2022 | | 760.00 | 619.50 | 1,777.99 | 450.00 |
| 4102GWB | WSM2x1 - Reno | 900.00 | Occupied | No | McCray, Ernest | 1/1/2021 | 2/1/2022 | | | 960.00 | 1,010.00 | 244.06 | 910.00 |
| 4104GWB | WSM2x1.5 - Ren | 1,120.00 | Occupied | No | Jackson, Tonerea | 7/9/2021 | 7/9/2021 | 7/31/2022 | | 1,160.00 | 1,160.00 | (2,171.64) | 500.00 |
| 4106GWB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Clayborn, Delvon | 3/8/2021 | 3/8/2021 | 3/31/2022 | | 990.00 | 950.00 | 862.74 | 1,050.00 |
| 4108GWB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Incorporated, Int | 5/1/2020 | 1/1/2022 | 12/31/2022 | | 790.00 | 840.00 | 0.00 | 1,312.50 |
| 4110GWB | WSM3x1.5 (6443 | 1,120.00 | Occupied | No | Pringle, Keiannia | 3/1/2020 | 4/1/2021 | 3/31/2022 | | 960.00 | 965.00 | (330.05) | 380.00 |
| 4112GWB | WSM3x1.5 (6443 | 1,120.00 | Vacant | Unren | -- Vacant -- | | | | | 960.00 | 0.00 | | |
| 4114GWB | WSM2x1 - Reno | 900.00 | Occupied | No | Khamis, Ayoub | 9/17/2020 | 10/1/2021 | 9/30/2022 | | 960.00 | 950.25 | 0.00 | 350.00 |
| 4116GWB | WSM1x1 (6441a | 620.00 | Occupied | No | Tanner, Melinda | 3/13/2020 | 4/1/2021 | 3/15/2022 | | 720.00 | 750.00 | 245.00 | 250.00 |
| 4118GWB | WSM1x1 (6441a | 620.00 | Occupied | No | Clement, Jeffrey | 11/4/2019 | 12/1/2021 | | | 720.00 | 845.00 | 2,697.59 | 0.00 |
| 4120GWB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Clark, Madison | 7/6/2021 | 7/6/2021 | 7/31/2022 | | 990.00 | 990.00 | 0.00 | 500.00 |
| 4122GWB | WSM2x1.5 (6442 | 950.00 | Vacant | Rente | -- Vacant -- | | | | | 790.00 | 0.00 | | |
| 4124GWB | WSM3x1.5 (6443 | 1,120.00 | Vacant | Rente | -- Vacant -- | | | | | 960.00 | 0.00 | | |
| 4126GWB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Cobb, Karli | 12/1/2021 | 12/1/2021 | 11/30/2022 | | 990.00 | 990.00 | (1,178.06) | 500.00 |
| 4128GWB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Love, LouElla | 10/7/2011 | 1/16/2022 | 1/31/2023 | | 790.00 | 861.00 | 1,035.74 | 300.00 |
| 4130GWB | WSM3x1.5 (6443 | 1,120.00 | Occupied | No | Woods, Aleia | 11/7/2019 | 1/16/2022 | | | 960.00 | 945.00 | 2,039.11 | 0.00 |
| 4132GWB | WSM2x1 (6442a | 900.00 | Occupied | No | Chaffee, Crystal | 12/29/2018 | 1/1/2022 | 12/31/2022 | | 760.00 | 897.00 | 1,042.90 | 0.00 |
| 4134GWB | WSM2x1 - Reno | 900.00 | Occupied | No | Hendley, Ashley | 7/23/2021 | 7/23/2021 | 7/31/2022 | | 960.00 | 960.00 | (1,649.05) | 960.00 |
| 4136WB | WSM3x1.5 (6443 | 1,120.00 | Occupied | No | Greer, Bernard | 2/19/2021 | 2/19/2021 | 2/28/2022 | | 960.00 | 975.00 | 1,066.41 | 975.00 |
| 4138WB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Fowler, Cody | 5/15/2021 | 5/15/2021 | 5/31/2022 | | 960.00 | 935.00 | 0.00 | 0.00 |
| 4140WB | WSM1x1 - Reno | 620.00 | Occupied | No | Serrato, Xzavier | 12/14/2020 | 1/1/2022 | | | 920.00 | 995.00 | 2,273.90 | 350.00 |
| 4142WB | WSM1x1 (6441a | 620.00 | Occupied | No | Wesson, Scott | 1/18/2019 | 6/1/2021 | 6/30/2022 | | 720.00 | 670.00 | 453.68 | 0.00 |
| 4144WB | WSM2x1.5 (6442 | 950.00 | Vacant | Unren | -- Vacant -- | | | | | 790.00 | 0.00 | | |
| 4146WB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Radiger, Joseph | 8/23/2021 | 8/23/2021 | 8/31/2022 | | 990.00 | 990.00 | 0.00 | 400.00 |
| 4148WB | WSM3x1.5 (6443 | 1,120.00 | Occupied | No | Uribe-Hernandez | 8/25/2017 | 12/20/2021 | 12/31/2022 | | 960.00 | 855.00 | 146.66 | 199.00 |
| 4150WB | WSM2x1 (6442a | 900.00 | Occupied | No | Gonzalez, Angeli | 1/18/2019 | 2/1/2021 | 2/15/2022 | | 760.00 | 700.00 | (5,714.66) | 0.00 |
| 4152WB | WSM1x1 (6441a | 620.00 | Excluded | -Dc | -- Vacant -- | | | | | 720.00 | 0.00 | | |
| 4154WB | WSM1x1 (6441a | 620.00 | Vacant | Unren | -- Vacant -- | | | | | 720.00 | 0.00 | | |
| 4156WB | WSM2x1.5 - Ren | 950.00 | Occupied | No | Sims, Jzaelyn | 5/24/2021 | 5/24/2021 | 5/31/2022 | | 990.00 | 990.00 | 1,027.06 | 350.00 |
| 4158WB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Caldwell, Luchris | 10/31/2005 | 11/1/2019 | | | 790.00 | 790.00 | (888.00) | 350.00 |
| 4160WB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Buckner, Regina | 5/29/2013 | 7/1/2021 | 7/31/2022 | | 790.00 | 790.00 | 1,767.00 | 250.00 |
| 4162WB | WSM2x1.5 (6442 | 950.00 | Occupied | No | Joy, Candice | 11/5/2021 | 11/5/2021 | 11/30/2022 | | 790.00 | 790.00 | 2,937.08 | 790.00 |
| 4164WB | WSM1x1 - Reno | 620.00 | Occupied | No | Uwange, Patrick | 11/19/2021 | 11/19/2021 | 11/30/2022 | | 920.00 | 650.00 | 678.82 | 550.00 |

*Rent Roll 2.9 generated 02/07/2022 at 10:20am EST*

Rent Roll AMP

| Unit | Floor Plan | Rent | Status | Tenant | Move In | Lease Start | Lease End | | Market | Actual | Balance | Deposit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4166WB | WSM1x1 (6441a | 620.00 | Occupied No | Scott III, Calvin | 7/10/2014 | 5/1/2022 | 4/15/2022 | | 720.00 | 665.00 | 7,159.14 | 499.00 |
| 4168WB | WSM2x1 - Renov | 900.00 | Occupied No | Gilis, Brad | 5/14/2021 | 5/14/2021 | 5/31/2022 | | 960.00 | 935.00 | 5,150.67 | 350.00 |
| 4170WB | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Coreus, James | 7/13/2018 | 6/1/2021 | 6/30/2022 | | 960.00 | 785.00 | 4,603.11 | 250.00 |
| 4408SW | WSM3x1.5 (6443 | 1,120.00 | Vacant Unren | -- Vacant -- | | | | | 960.00 | 0.00 | | |
| 4409CB | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Worden, Diane | 2/1/2021 | 2/1/2021 | 2/28/2022 | | 960.00 | 975.00 | 0.00 | 550.00 |
| 4410SW | WSM2x1.5 - Ren | 950.00 | Occupied No | Harris, Chelsea | 10/7/2021 | 10/7/2021 | 10/31/2022 | | 990.00 | 990.00 | (2.20) | 400.00 |
| 4411CB | WSM2x1.5 (6442 | 950.00 | Occupied No | Washington-Colli | 10/10/2018 | 12/1/2021 | 11/30/2022 | | 790.00 | 829.00 | (165.00) | 16.60 |
| 4411SW | WSM2x1.5 - Ren | 950.00 | Vacant Rente | -- Vacant -- | | | | | 990.00 | 0.00 | | |
| 4412GSW | WSM2x1 (6442a | 900.00 | Occupied No | Wilondja, Dewilo | 12/19/2018 | 1/1/2022 | | | 760.00 | 815.00 | (49.10) | 640.00 |
| 4413CB | WSM2x1.5 (6442 | 950.00 | Occupied No | Morton, Carolyn | 10/1/2021 | 10/1/2021 | 9/30/2022 | | 990.00 | 790.00 | 986.21 | 500.00 |
| 4413GSW | WSM3x1.5 - Ren | 950.00 | Vacant Unren | -- Vacant -- | | | | | 990.00 | 0.00 | | |
| 4414GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Incorporated, Inte | 5/12/2020 | 1/1/2022 | 12/31/2022 | | 790.00 | 840.00 | 0.00 | 1,312.50 |
| 4415CB | WSM3x1.5 (6443 | 1,120.00 | Notice Unrent | Rogers, Delaney | 1/22/2021 | 1/22/2021 | 1/31/2022 | 1/31/2022 | 960.00 | 0.00 | 129.57 | 550.00 |
| 4415GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Patterson, Eileen | 10/2/2019 | 12/1/2021 | | | 960.00 | 1,135.00 | 710.90 | 0.00 |
| 4416GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Lilly, Kemesha | 1/27/2020 | 2/1/2022 | | | 790.00 | 965.00 | 2,163.40 | 0.00 |
| 4417CB | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Allen, Tamie | 8/1/2021 | 9/1/2021 | 8/31/2022 | | 1,160.00 | 696.00 | 1,440.61 | 500.00 |
| 4417GSW | WSM1x1 (6441a | 620.00 | Occupied No | Mcabee, Renita | 10/18/2019 | 12/2/2021 | 12/31/2022 | | 720.00 | 775.00 | 554.00 | 0.00 |
| 4418GSW | WSM1x1 (6441a | 620.00 | Occupied No | Gordon, Surena | 9/12/2019 | 9/28/2021 | 9/30/2022 | | 720.00 | 814.00 | 5,303.53 | 0.00 |
| 4419CB | WSM2x1.5 - Ren | 950.00 | Vacant Unren | -- Vacant -- | | | | | 790.00 | 0.00 | | |
| 4419GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Sigler, Corinne | 8/1/2018 | 9/1/2021 | | | 960.00 | 955.00 | 2,495.26 | 250.00 |
| 4420GSW | WSM2x1 (6442a | 900.00 | Occupied No | Harris, Joyce | 10/18/2019 | 11/1/2021 | | | 760.00 | 954.44 | 3,258.29 | 0.00 |
| 4421CB | WSM2x1.5 (6442 | 950.00 | Occupied No | Manns, Latosha | 6/28/2016 | 9/27/2021 | 9/30/2022 | | 790.00 | 612.00 | 1,347.00 | 635.00 |
| 4421GSW | WSM2x1 (6442a | 900.00 | Occupied No | Harris, Mildred | 4/24/2019 | 6/1/2021 | 6/30/2022 | | 760.00 | 690.00 | 1,699.80 | 500.00 |
| 4422GSW | WSM2x1 (6442a | 900.00 | Occupied No | Stephens, Lavett | 5/2/2012 | 7/1/2021 | 7/31/2022 | | 760.00 | 659.00 | 855.00 | 300.00 |
| 4423CB | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Abdallah, Halouw | 9/25/2020 | 10/1/2021 | 9/30/2022 | | 960.00 | 1,023.75 | 0.00 | 975.00 |
| 4423GSW | WSM2x1 (6442a | 900.00 | Occupied No | Pierre, Melky | 7/21/2018 | 12/20/2021 | 12/31/2022 | | 760.00 | 687.00 | 1,603.42 | 250.00 |
| 4424GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Hall, Jasman | 12/19/2019 | 1/1/2022 | | | 960.00 | 1,045.00 | 1,911.31 | 0.00 |
| 4425CB | WSM2x1 (6442a | 900.00 | Occupied No | White, Billie | 10/13/2017 | 12/20/2021 | 12/31/2022 | | 760.00 | 790.00 | 7,217.16 | 199.00 |
| 4425GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Kako, Nezamudd | 11/19/2021 | 11/19/2021 | 11/30/2022 | | 960.00 | 800.00 | 129.60 | 700.00 |
| 4426GSW | WSM1x1 (6441a | 620.00 | Occupied No | Dillard, Michael | 7/19/2008 | 8/1/2021 | 7/31/2022 | | 720.00 | 666.75 | (99.64) | 250.00 |
| 4427CB | WSM2x1 - Renov | 900.00 | Occupied No | Pompey, Mikeish | 9/1/2021 | 9/1/2021 | 8/31/2022 | | 960.00 | 960.00 | 5,482.68 | 400.00 |
| 4427GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | Weierbach, Alexa | 3/1/2020 | 4/1/2021 | 3/31/2022 | | 790.00 | 890.00 | (21.00) | 350.00 |
| 4428GSW | WSM2x1 (6442a | 900.00 | Vacant Unren | -- Vacant -- | | | | | 760.00 | 0.00 | | |
| 4429CB | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Moore, Samora | 9/21/2018 | 1/1/2021 | | | 960.00 | 1,095.00 | 4,983.50 | 250.00 |
| 4429GSW | WSM2x1 - Renov | 900.00 | Occupied No | Gould, Taylur | 8/25/2021 | 8/25/2021 | 8/31/2022 | | 960.00 | 960.00 | 0.00 | 400.00 |
| 4430GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | Mavoungou, Iren | 8/2/2021 | 8/2/2021 | 8/31/2022 | | 990.00 | 990.00 | 1,085.90 | 400.00 |
| 4431CB | WSM2x1.5 - Ren | 950.00 | Occupied No | Pompey, Mikera | 8/6/2021 | 8/6/2021 | 8/31/2022 | | 990.00 | 990.00 | 3,921.82 | 990.00 |
| 4431GSW | WSM2x1 (6442a | 900.00 | Occupied No | Black, Ashlee | 12/20/2019 | 1/1/2022 | | | 760.00 | 980.75 | 5,288.04 | 0.00 |
| 4432GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | McKinney, Genei | 7/21/2018 | 9/1/2021 | 8/31/2022 | | 790.00 | 861.00 | (769.34) | 400.00 |
| 4433CB | WSM2x1.5 - Ren | 950.00 | Occupied No | Kyle, Robert | 11/8/2016 | 6/1/2021 | 6/30/2022 | | 790.00 | 730.00 | (0.59) | 199.00 |
| 4433GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Babakarkhiel, Za | 11/19/2021 | 11/19/2021 | 11/30/2022 | | 1,160.00 | 800.00 | (49.78) | 700.00 |
| 4434GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Ali, Rashonda | 2/3/2020 | 3/1/2021 | 2/15/2022 | | 960.00 | 1,235.00 | 3,326.33 | 0.00 |
| 4435CB | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Costa, Vincent | 5/21/2021 | 5/14/2022 | 5/31/2022 | | 1,160.00 | 1,160.00 | 4,865.06 | 0.00 |
| 4435GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Williams, Tiffany | 7/30/2021 | 7/30/2021 | 7/31/2022 | | 1,160.00 | 1,160.00 | 2,164.00 | 0.00 |
| 4436GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Incorporated, Inte | 5/1/2020 | 1/1/2022 | 12/31/2022 | | 790.00 | 840.00 | 0.00 | 1,312.50 |
| 4437CB | WSM3x1.5 - Ren | 950.00 | Occupied No | Muhinja, Bonane | 5/23/2021 | 5/23/2021 | 5/31/2022 | | 990.00 | 965.00 | 0.00 | 350.00 |
| 4437GSW | WSM3x1.5 - Ren | 950.00 | Occupied No | Jones, Isaac | 3/22/2021 | 3/22/2021 | 3/31/2022 | | 990.00 | 940.00 | 0.00 | 350.00 |
| 4438GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Stinson, Tierra | 10/22/2021 | 10/8/2021 | 10/31/2022 | | 990.00 | 990.00 | 1,262.95 | 500.00 |
| 4439CB | WSM2x1.5 (6442 | 950.00 | Occupied No | Ruiz, Marisol | 3/17/2017 | 6/1/2021 | 6/30/2022 | | 790.00 | 725.00 | 912.62 | 639.32 |
| 4439GSW | WSM3x1.5 - Ren | 950.00 | Notice Unrent | Kelly, Tyrone | 1/18/2021 | 1/18/2021 | 1/31/2022 | 1/31/2022 | 990.00 | 0.00 | (2,873.69) | 100.00 |
| 4440GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Jimenez, Danielle | 10/15/2020 | 11/1/2021 | 10/31/2022 | | 960.00 | 1,023.75 | (716.87) | 450.00 |
| 4441CB | WSM1x1 (6441a | 620.00 | Occupied No | Sharper, Arthie | 2/19/2018 | 6/1/2021 | 6/30/2022 | | 720.00 | 700.00 | 171.31 | 100.00 |
| 4441GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Janetzke, Dustan | 5/27/2021 | 5/27/2021 | 5/31/2022 | | 790.00 | 965.00 | 0.00 | 350.00 |
| 4442GSW | WSM2x1 - Renov | 900.00 | Occupied No | Mobley, Aletta | 8/14/2021 | 8/27/2021 | 8/31/2022 | | 960.00 | 960.00 | 1,255.30 | 960.00 |
| 4443CB | WSM1x1 (6441a | 620.00 | Occupied No | Langan, Marylan | 2/26/1998 | 7/1/2021 | 7/31/2022 | | 720.00 | 720.00 | 4,329.00 | 0.00 |
| 4443GSW | WSM2x1 - Renov | 900.00 | Occupied No | Godette, Autumn | 8/13/2021 | 8/13/2021 | 8/31/2022 | | 960.00 | 960.00 | 2,151.96 | 400.00 |
| 4444GSW | WSM2x1 (6442a | 900.00 | Occupied No | Tamayo-orta, Kel | 7/20/2020 | 8/1/2021 | 7/31/2022 | | 760.00 | 798.00 | 1,328.60 | 760.00 |
| 4445CB | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Vanheerde, Bryc | 4/27/2021 | 4/27/2021 | 5/31/2022 | | 1,160.00 | 1,135.00 | 7,545.31 | 450.00 |
| 4445GSW | WSM1x1 (6441a | 620.00 | Vacant Unren | -- Vacant -- | | | | | 720.00 | 0.00 | | |
| 4446GSW | WSM1x1 (6441a | 620.00 | Occupied No | Triplett, Shaqwan | 7/22/2020 | 9/10/2021 | 9/30/2022 | | 720.00 | 760.73 | 1,649.96 | 690.00 |
| 4447CB | WSM2x1.5 (6442 | 950.00 | Occupied No | Haymon, Donna | 2/1/2017 | 6/1/2021 | 6/30/2022 | | 790.00 | 790.00 | 840.00 | 535.00 |
| 4447GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Kunkel, Rhiannor | 5/18/2021 | 5/18/2021 | 5/31/2022 | | 1,160.00 | 1,110.00 | 0.00 | 450.00 |
| 4448GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Porter, Sawanda | 6/1/2019 | 8/9/2021 | 8/31/2022 | | 960.00 | 1,195.00 | 5,958.60 | 0.00 |
| 4449CB | WSM2x1.5 (6442 | 950.00 | Occupied No | Bonilla, Roxanne | 7/2/2018 | 1/1/2022 | 12/31/2022 | | 790.00 | 808.00 | (802.59) | 250.00 |
| 4449GSW | WSM2x1.5 (6442 | 950.00 | Vacant Rente | -- Vacant -- | | | | | 790.00 | 0.00 | | |
| 4450GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Urias, Ana | 4/12/2019 | 6/1/2021 | 6/30/2022 | | 790.00 | 730.00 | 10,043.95 | 0.00 |
| 4451CB | WSM2x1.5 - Ren | 950.00 | Occupied No | Shafman, Martha | 6/22/2021 | 6/22/2021 | 6/30/2022 | | 990.00 | 990.00 | 1,094.06 | 250.00 |
| 4451GSW | WSM3x1.5 - Ren | 950.00 | Occupied No | Fields, Quantrill | 3/22/2021 | 3/22/2021 | 3/31/2022 | | 790.00 | 790.00 | 1,696.31 | 350.00 |
| 4452GSW | WSM2x1.5 - Ren | 950.00 | Vacant Unren | -- Vacant -- | | | | | 790.00 | 0.00 | | |
| 4453CB | WSM2x1.5 (6442 | 950.00 | Occupied No | Lee, Han Soo | 8/1/2020 | 9/1/2021 | | | 790.00 | 840.00 | 0.00 | 800.00 |
| 4453GSW | WSM2x1 (6442a | 900.00 | Vacant Unren | -- Vacant -- | | | | | 760.00 | 0.00 | | |
| 4454GSW | WSM2x1 (6442a | 900.00 | Occupied No | Brown, Larry | 7/29/2016 | 9/9/2021 | 9/30/2022 | | 760.00 | 890.00 | 814.00 | 741.00 |
| 4455CB | WSM2x1.5 - Ren | 950.00 | Occupied No | Anderson, Jerem | 5/28/2021 | 5/28/2021 | 5/31/2022 | | 990.00 | 965.00 | 1,042.56 | 350.00 |
| 4455GSW | WSM1x1 (6441a | 620.00 | Occupied No | Wade, Melissa | 1/8/2018 | 6/1/2021 | 6/30/2022 | | 720.00 | 625.00 | 0.00 | 685.71 |
| 4456GSW | WSM2x1 - Renov | 900.00 | Vacant Unren | -- Vacant -- | | | | | 960.00 | 0.00 | | |
| 4457CB | WSM2x1.5 (6442 | 950.00 | Occupied No | Aro, Miguel | 10/1/2021 | 10/6/2021 | 10/31/2022 | | 790.00 | 790.00 | 382.73 | 790.00 |
| 4457GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Gayles, Shakira | 1/28/2020 | 2/1/2021 | | | 960.00 | 1,520.00 | (10,895.84) | 0.00 |
| 4458GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Lopez, Edgar | 6/29/2021 | 6/29/2021 | 6/30/2022 | | 1,160.00 | 790.00 | 0.00 | 600.00 |
| 4459GSW | WSM2x1.5 (6442 | 950.00 | Excluded -Do | -- Vacant -- | | | | | 790.00 | 0.00 | | |
| 4460GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Polk, Janetta | 12/14/2021 | 12/14/2021 | 12/31/2022 | | 990.00 | 990.00 | 1,494.42 | 990.00 |
| 4461GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Gitare, Carmene | 10/23/2021 | 10/23/2021 | 10/31/2022 | | 790.00 | 790.00 | 1,467.78 | 500.00 |
| 4462GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | Bernard, Alicia (L | 10/10/2019 | 12/1/2021 | 11/30/2022 | | 990.00 | 792.00 | 1,606.90 | 0.00 |

Rent Roll AW

| Unit | Type | Rent | Status | | Tenant | Move-in | Lease Start | Lease End | | Market | Actual | Balance | Deposit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4463GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | | Muse, Stella | 7/2/2021 | 7/2/2021 | 7/31/2022 | | 1,160 | 1,160.00 | 5,456.28 | 0.00 |
| 4464GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | | Perry, Bonnie | 5/7/2021 | 5/7/2021 | 5/31/2022 | | 1,160 | 1,135.00 | 2,781.89 | 450.00 |
| 4478GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | | Allen, Autica | 3/17/2021 | 3/17/2021 | 3/31/2022 | | 1,160 | 1,110.00 | 2,889.80 | 450.00 |
| 4480GSW | WSM1x1 - Renov | 620.00 | Occupied No | | Matin, Abdul | 11/17/2021 | 11/17/2021 | 11/30/2022 | | 920 | 700.00 | (108.90) | 600.00 |
| 4482GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Matthew, Michae | 8/31/2018 | 10/1/2021 | | | 760 | 790.00 | 1,743.75 | 350.00 |
| 4484GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Vanvalkenburg, E | 6/17/2021 | 6/16/2021 | 6/15/2022 | | 990 | 990.00 | 74.74 | 350.00 |
| 4486GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Cummins, Camm | 11/22/2019 | 1/1/2022 | | | 790 | 985.00 | 1,840.90 | 0.00 |
| 4488GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Bideri, Fred | 6/28/2021 | 6/28/2021 | 6/30/2022 | | 990 | 990.00 | 227.03 | 500.00 |
| 4490GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Dick, Kodi | 7/15/2021 | 7/15/2021 | 7/31/2022 | | 790 | 990.00 | 0.00 | 450.00 |
| 4492GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Chandler, Dolore | 7/1/2000 | 7/1/2021 | 7/31/2022 | | 960 | 960.00 | 1,137.00 | 300.00 |
| 4494GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Morse, Detra | 12/1/2021 | 12/1/2021 | 11/30/2022 | | 990 | 1,015.00 | 393.36 | 550.00 |
| 4496GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Clay, Bruce | 1/7/2022 | 1/7/2022 | 1/31/2023 | | 990 | 990.00 | 878.39 | 990.00 |
| 4500GSW | WSM3x1.5 - Ren | 1,120.00 | Excluded -De -- | | Vacant -- | | | | | 1,160 | 0.00 | | 0.00 |
| 4501GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | | Nieto-sanchez, T. | 8/6/2021 | 8/6/2021 | 8/31/2022 | | 1,160 | 1,160.00 | 0.00 | 500.00 |
| 4502GSW | WSM1x1 (6441a | 620.00 | Occupied No | | Allawai, Dewa | 10/29/2021 | 10/29/2021 | 11/30/2022 | | 720 | 720.00 | 860.58 | 720.00 |
| 4503GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Jackson, Quanta | 9/20/2021 | 9/20/2021 | 9/30/2022 | | 990 | 990.00 | 2,250.72 | 400.00 |
| 4504GSW | WSM2x1 (6442a | | Occupied No | | Vacant Unren -- | | | | | 760 | 0.00 | | 0.00 |
| 4505GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Trainor, Johnatha | 2/12/2021 | 2/12/2021 | 2/28/2022 | | 760 | 760.00 | (843.69) | 760.00 |
| 4506GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Brown, Gloria | 2/1/2008 | 3/1/2021 | 2/15/2022 | | 790 | 890.00 | 588.43 | 610.00 |
| 4507GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Moise, Marie | 9/13/2021 | 9/13/2021 | 9/30/2022 | | 990 | 1,015.00 | 1,499.42 | 1,090.00 |
| 4508GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Vacant Unren -- | | | | | 790 | 0.00 | | 0.00 |
| 4509GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Guido, Ruby | 11/1/2019 | 1/1/2022 | | | 790 | 1,845.00 | 1,716.00 | 0.00 |
| 4510GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Vacant -- | | | | | 760 | 0.00 | | 0.00 |
| 4511GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Vacant Unren -- | | | | | 960 | 0.00 | | 0.00 |
| 4512GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Thurman, Tahna | 12/24/2015 | 4/1/2021 | | | 760 | 930.00 | 5,153.00 | 250.00 |
| 4513GSW | WSM1x1 - Renov | 620.00 | Occupied No | | Baha Duri, Nasse | 11/19/2021 | 11/19/2021 | 11/30/2022 | | 920 | 700.00 | (226.57) | 600.00 |
| 4514GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Thomas, William | 7/27/2010 | 9/27/2021 | 9/30/2022 | | 790 | 882.00 | 0.00 | 450.00 |
| 4515GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Robinson, Timoth | 5/3/2019 | 8/1/2021 | 7/31/2022 | | 760 | 890.00 | 940.00 | 0.00 |
| 4516GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Howard, Deeldra | 1/3/2020 | 1/1/2022 | | | 790 | 890.00 | 1,638.00 | 0.00 |
| 4517GSW | WSM2x1 - Renov | 900.00 | Occupied No | | Cole, Symari | 7/7/2021 | 7/7/2021 | 7/31/2022 | | 960 | 985.00 | 4,564.99 | 700.00 |
| 4518GSW | WSM1x1 - Renov | 620.00 | Occupied No | | Ceja-Cruz, Jose | 8/1/2021 | 8/1/2021 | 7/31/2022 | | 920 | 920.00 | 3,083.02 | 920.00 |
| 4519GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Riley, Patricia | 11/30/2013 | 5/1/2021 | 4/15/2022 | | 960 | 825.00 | 970.76 | 99.00 |
| 4520GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Kamae, Jodi | 8/31/2018 | 7/1/2021 | 7/31/2022 | | 960 | 1,195.00 | 4,880.46 | 250.00 |
| 4521GSW | WSM1x1 (6441a | 620.00 | Occupied No | | Mccarthy, Scott | 9/28/2019 | 11/1/2021 | | | 720 | 824.50 | 4,131.40 | 0.00 |
| 4522GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Esther, Nyiramba | 11/1/2018 | 11/1/2021 | 10/31/2022 | | 960 | 855.75 | 1,006.90 | 0.00 |
| 4523GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Johnson, Collinte | 1/3/2014 | 6/1/2021 | 6/30/2022 | | 790 | 910.00 | 335.00 | 200.00 |
| 4524GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Lewis, Billy | 9/7/2012 | 6/1/2021 | 6/30/2022 | | 790 | 685.00 | (1,616.53) | 645.00 |
| 4525GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Myers, Tammi | 3/5/2021 | 3/5/2021 | 3/31/2022 | | 790 | 790.00 | 1,111.13 | 350.00 |
| 4526GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Vacant Unren -- | | | | | 790 | 0.00 | | 0.00 |
| 4527GSW | WSM2x1 - Renov | 900.00 | Occupied No | | Sims, Ki'Laih | 3/5/2021 | 3/5/2021 | 3/31/2022 | | 960 | 910.00 | 1,484.74 | 350.00 |
| 4528GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Shade, Dale | 4/30/2006 | 6/1/2021 | 6/30/2022 | | 960 | 830.00 | 0.00 | 200.00 |
| 4529GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Strong, Timothy | 1/8/2021 | 2/1/2022 | | | 760 | 860.00 | 995.74 | 350.00 |
| 4530GSW | WSM1x1 - Renov | 620.00 | Occupied No | | Vacant -- | | | | | 920 | 0.00 | | 0.00 |
| 4531GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | | Yates, Nicholas | 10/1/2021 | 10/1/2021 | 9/30/2022 | | 1,160 | 1,160.00 | 4,460.67 | 1,060.00 |
| 4532GSW | WSM2x1 (6442a | 900.00 | Notice Unrent | | Caston, Tondalay | 4/25/2014 | 6/1/2021 | 6/30/2022 | 1/31/2022 | 760 | 0.00 | 1,776.00 | 625.00 |
| 4533GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Mroczka, Taylor | 1/28/2022 | 1/28/2022 | 1/31/2023 | | 990 | 990.00 | 0.00 | 500.00 |
| 4534GSW | WSM2x1.5 (6442 | 950.00 | Notice Unrent | | Spivey, Tamara | 12/4/2019 | 1/1/2022 | 1/21/2022 | 1/21/2022 | 790 | 0.00 | 2,075.74 | 1,125.00 |
| 4535GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Cooper, Jmesha | 3/19/2021 | 3/19/2021 | 3/31/2022 | | 760 | 760.00 | 1,025.24 | 350.00 |
| 4536GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Peatross, Loomis | 3/27/2020 | 4/1/2021 | 3/31/2022 | | 790 | 825.00 | 2,024.17 | 350.00 |
| 4537GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Scott, Shaunqual | 9/10/2020 | 10/1/2021 | 9/30/2022 | | 760 | 798.00 | 980.11 | 350.00 |
| 4538GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Kelly, Tyrail | 3/1/2021 | 3/1/2021 | 3/31/2022 | | 760 | 760.00 | (996.05) | 0.00 |
| 4539GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | | Cardona, Vincent | 10/27/2021 | 10/27/2021 | 10/31/2022 | | 1,160 | 1,160.00 | 0.00 | 400.00 |
| 4540GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Vacant Unren -- | | | | | 960 | 0.00 | | 0.00 |
| 4541GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Thurman, Tamec | 12/19/2019 | 1/24/2022 | 1/31/2023 | | 960 | 1,195.00 | (2,492.39) | 0.00 |
| 4542GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Hicks, Ebony | 11/5/2021 | 11/5/2021 | 11/30/2022 | | 990 | 990.00 | 1,138.36 | 990.00 |
| 4543GSW | WSM2x1.5 (6442 | | Occupied No | | Vacant Unren -- | | | | | 790 | 0.00 | | 0.00 |
| 4544GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Starnes, Alicia | 1/21/2019 | 6/1/2021 | 6/30/2022 | | 790 | 730.00 | 3,844.74 | 0.00 |
| 4545GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | | Reat, Nyamer | 5/3/2021 | 5/3/2021 | 5/31/2022 | | 1,160 | 1,135.00 | 1,339.47 | 450.00 |
| 4546GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Snaden, Latanya | 11/8/2019 | 1/1/2022 | | | 960 | 1,195.00 | 7,064.00 | 0.00 |
| 4547GSW | WSM1x1 (6441a | 620.00 | Occupied No | | Pruitt, Michael | 4/26/2016 | 7/1/2021 | 7/31/2022 | | 720 | 775.00 | 2,414.70 | 605.00 |
| 4548GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Akins, Theresa | 12/3/2011 | 1/1/2022 | | | 790 | 1,880.00 | 4,434.43 | 90.00 |
| 4549GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Reynolds, Theres | 9/27/2013 | 1/1/2022 | 12/31/2022 | | 790 | 829.00 | 1,124.90 | 575.00 |
| 4550GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Black, Chelsea | 3/18/2021 | 3/18/2021 | 3/31/2022 | | 790 | 790.00 | 1,090.55 | 350.00 |
| 4551GSW | WSM2x1.5 (6442 | 950.00 | Excluded -Mi -- | | Vacant -- | | | | | 790 | 0.00 | | 0.00 |
| 4552GSW | WSM2x1 (6442a | 900.00 | Notice Unrent | | Runyon, Gerald | 1/24/2020 | 2/1/2022 | 2/6/2022 | 2/6/2022 | 760 | 915.00 | 276.07 | 0.00 |
| 4553GSW | WSM2x1 - Renov | 900.00 | Occupied No | | Daniels, Tailere | 3/5/2021 | 3/5/2021 | 3/31/2022 | | 960 | 910.00 | 1,055.24 | 350.00 |
| 4554GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Burns, Mariah | 1/30/2020 | 1/16/2022 | 1/31/2023 | | 760 | 950.00 | (135.88) | 0.00 |
| 4555GSW | WSM2x1 (6442a | | Occupied No | | Vacant Rente -- | | | | | 760 | 0.00 | | 0.00 |
| 4556GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Fundunburks, Tyi | 10/27/2021 | 10/27/2021 | 10/31/2022 | | 990 | 990.00 | 1,662.02 | 890.00 |
| 4557GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Goedert, Melissa | 10/26/2018 | 1/1/2022 | 12/31/2022 | | 790 | 890.00 | 1,185.35 | 335.00 |
| 4558GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Vacant Unren -- | | | | | 790 | 0.00 | | 0.00 |
| 4559GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Young, Trajuan | 9/24/2021 | 9/24/2021 | 9/30/2022 | | 990 | 990.00 | 3,832.95 | 400.00 |
| 4560GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Vacant Unren -- | | | | | 960 | 0.00 | | 0.00 |
| 4561GSW | WSM2x1 (6442a | 900.00 | Occupied No | | Cabell, Anita | 8/6/2018 | 6/1/2021 | 6/30/2022 | | 760 | 700.00 | 562.74 | 250.00 |
| 4562GSW | WSM1x1 (6441a | 620.00 | Occupied No | | Killinger, Jordan | 11/13/2020 | 12/1/2021 | 11/30/2022 | | 720 | 756.00 | 0.00 | 350.00 |
| 4563GSW | WSM1x1 (6441a | 620.00 | Occupied No | | Brown, James | 10/31/2019 | 11/1/2021 | 10/31/2022 | | 720 | 775.00 | 78.00 | 0.00 |
| 4564GSW | WSM2x1 - Renov | 900.00 | Occupied No | | Ceja Cruz, Jose | 8/13/2021 | 8/13/2021 | 8/31/2022 | | 960 | 960.00 | 6,788.96 | 990.00 |
| 4565GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Rogers, Keyona | 11/1/2019 | 12/1/2020 | | | 960 | 1,050.00 | 3,963.58 | 0.00 |
| 4566GSW | WSM3x1.5 - Ren | 1,120.00 | Occupied No | | Perez-Rosas, An | 8/3/2021 | 8/3/2021 | 8/31/2022 | | 1,160 | 1,160.00 | (991.55) | 1,160.00 |
| 4568GSW | WSM2x1.5 (6442 | 950.00 | Occupied No | | Swamp, Bethany | 12/5/2015 | 12/1/2021 | | | 790 | 900.00 | 1,236.38 | 400.00 |
| 4570GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | | Williams III, Greg | 9/17/2021 | 9/17/2021 | 9/30/2022 | | 990 | 990.00 | 2,799.88 | 400.00 |
| 4572GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | | Al-Shimary, Mary | 5/31/2018 | 10/12/2021 | 10/31/2022 | | 960 | 835.00 | 0.00 | 250.00 |

*Rent Roll 2.9 generated 02/07/2022 at 10:20am EST*

Rent Roll AW

| Unit | Unit Type | Market Rent | Unit Status | Resident | Move-In | Lease Start | Lease End | Market Rent | Scheduled | Balance | Deposit Held |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4574GSW | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Lenoir, John | 12/6/2019 | 8/1/2020 | | 960.00 | 1,075.00 | 372.56 | 0.00 |
| 4576GSW | WSM3x1.5 (6442 | 950.00 | Occupied No | Smith, Mercideiz | 6/10/2019 | 8/1/2020 | | 790.00 | 822.00 | (778.47) | 0.00 |
| 4578GSW | WSM2x1 (6442a | 900.00 | Occupied No | Jackson, Donte | 1/8/2021 | 2/1/2022 | | 760.00 | 860.00 | 6,692.08 | 350.00 |
| 4580GSW | WSM2x1.5 (6442 | 950.00 | Vacant Unren | -- Vacant -- | | | | 790.00 | 0.00 | | 0.00 |
| 4582GSW | WSM1x1 (6441a | 620.00 | Excluded -Do | -- Vacant -- | | | | 720.00 | 0.00 | | 0.00 |
| 4584GSW | WSM1x1 (6441a | 620.00 | Vacant Unren | -- Vacant -- | | | | 720.00 | 0.00 | | 0.00 |
| 4586GSW | WSM2x1.5 (6442 | 950.00 | Excluded -Do | -- Vacant -- | | | | 790.00 | 0.00 | | 0.00 |
| 4588GSW | WSM2x1.5 - Ren | 950.00 | Occupied No | Salehi Zada, Abu | 11/19/2021 | 11/19/2021 | 11/30/2022 | 990.00 | 750.00 | 252.55 | 650.00 |
| 4801RC | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Martin, Jaisha | 11/13/2020 | 12/1/2021 | | 960.00 | 1,075.00 | 3,964.10 | 975.00 |
| 4803RC | WSM3x1.5 - Ren | 950.00 | Occupied No | Jones, Lashane | 7/1/2021 | 7/1/2021 | 6/30/2022 | 990.00 | 990.00 | 506.35 | 500.00 |
| 4805RC | WSM2x1.5 (6442 | 950.00 | Occupied No | Alston Jefferies, | 8/8/2019 | 9/1/2020 | | 790.00 | 725.00 | 5,766.41 | 625.00 |
| 4807RC | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Parwani, Abdulla | 12/28/2021 | 12/28/2021 | 12/31/2022 | 960.00 | 800.00 | 0.00 | 800.00 |
| 4809RC | WSM3x1.5 (6443 | 1,120.00 | Occupied No | Riggins, Takiliya | 2/7/2020 | 3/1/2021 | 3/15/2022 | 960.00 | 1,040.00 | 2,228.00 | 0.00 |
| 4811RC | WSM2x1 (6442a | 900.00 | Vacant Unren | -- Vacant -- | | | | 760.00 | 0.00 | | 0.00 |
| 4813RC | WSM1x1 - Renov | 620.00 | Occupied No | Loveless, Rachel | 11/1/2021 | 11/1/2021 | 10/31/2022 | 920.00 | 736.00 | 755.27 | 500.00 |
| 4815RC | WSM1x1 (6441a | 620.00 | Occupied No | James, Johnny | 10/16/2019 | 12/20/2021 | 12/31/2022 | 720.00 | 687.00 | 372.57 | 0.00 |
| 4817RC | WSM2x1.5 (6442 | 950.00 | Occupied No | Lofton, Clifford | 6/3/2016 | 1/1/2022 | | 790.00 | 855.00 | (157.50) | 635.00 |
| 4819RC | WSM2x1.5 - Ren | 950.00 | Occupied No | Harrison, Casey | 1/24/2022 | 1/24/2022 | 1/31/2023 | 990.00 | 990.00 | (4.20) | 400.00 |
| 4821RC | WSM2x1 - Renov | 900.00 | Vacant Unren | -- Vacant -- | | | | 960.00 | 0.00 | | 0.00 |
| 4823RC | WSM2x1 - Renov | 900.00 | Occupied No | Weakly, Celeste | 10/15/2021 | 10/15/2021 | 10/31/2022 | 960.00 | 960.00 | (955.94) | 400.00 |
| 4825RC | WSM3x1.5 - Ren | 1,120.00 | Occupied No | Burks, Kira | 5/7/2021 | 5/7/2021 | 5/31/2022 | 1,160.00 | 1,110.00 | 0.00 | 450.00 |
| 4827RC | WSM2x1.5 (6442 | 950.00 | Occupied No | Gantt, April | 10/5/2020 | 1/1/2022 | 12/31/2022 | 790.00 | 824.00 | 0.00 | 350.00 |
| 4829RC | WSM2x1.5 (6442 | 950.00 | Occupied No | Fontal, Josue | 10/31/2018 | 1/1/2022 | 12/31/2022 | 790.00 | 813.00 | 1,017.41 | 335.00 |
| 4831RC | WSM2x1.5 (6443 | 1,120.00 | Occupied No | Gunter, Chelsea | 9/28/2021 | 9/24/2021 | 9/30/2022 | 960.00 | 960.00 | 426.25 | 960.00 |
| | **Sycamore Townhomes Total:** | **320,430.00** | | | | | | **300,410.00** | **264,599.18** | **477,141.69** | **128,376.90** |

### Status Summary

| Description | Unit Count | Percent |
|---|---|---|
| Occupied N | 290 | 85.80% |
| Notice Unre | 6 | 1.78% |
| **Occupied Units** | **296** | **87.57%** |
| Vacant Rent | 1 | 0.30% |
| Vacant Rent | 5 | 1.48% |
| Vacant Unre | 3 | 0.89% |
| Vacant Unre | 33 | 9.76% |
| **Total Vacant Units** | **42** | **12.43%** |
| **Total Rentable Units** | **338** | **100.00%** |
| Excluded - Do | 5 | 1.45% |
| Excluded - Mo | 1 | 0.29% |
| **Total Excluded Units** | **6** | **100.00%** |
| **Total Units** | **344** | **100.00%** |

### Charge Code Summary

| Charge Code | Scheduled |
|---|---|
| **Ledger: Resident** | |
| Concession R | (184.00) |
| Employee Re | (622.00) |
| Insurance No | 450.00 |
| Monthly Pet R | 250.00 |
| Monthly Rent | 208,565.24 |
| Month to Mon | 4,200.00 |
| Month to Mon | 19,057.94 |
| Storage Fee | 25.00 |
| **Resident Total:** | **231,742.18** |
| **Ledger: Section 8** | |
| Section 8 | 32,857.00 |
| **Section 8 Total:** | **32,857.00** |
| **Total:** | **264,599.18** |

### Average Charges by Unit Type Summary

| Unit Type | Rentable Units | Occupied Units | Market Rent | Scheduled Charges |
|---|---|---|---|---|
| WSM1x1 - Renov | 10 | 9 | 920.00 | 822.67 |
| WSM1x1 (6441a | 38 | 32 | 720.00 | 760.98 |
| WSM2x1 - Renov | 21 | 19 | 960.00 | 956.34 |
| WSM2x1 (6442a | 54 | 44 | 763.70 | 782.61 |
| WSM2x1.5 - Ren | 41 | 39 | 990.00 | 951.67 |
| WSM2x1.5 (6442 | 95 | 81 | 794.08 | 839.52 |
| WSM3x1.5 - Ren | 28 | 28 | 1,160.00 | 1,111.15 |
| WSM3x1.5 (6443 | 51 | 44 | 960.00 | 1,000.24 |
| **Average:** | **338** | **296** | **873.28** | **893.92** |

### Future Resident Details

| Bldg-Unit | Unit Type | SQFT | Unit Status | Resident | Move-In | Lease Start | Lease End | Market Rent | Scheduled Charges | Balance | Deposit Held |
|---|---|---|---|---|---|---|---|---|---|---|---|

Selected report filters returned no data

EXHIBIT F

RENOVATIONS BUDGET

[SEE ATTACHED]

**Woodside Meadows/Sycamore Townhomes**

**Capex Budget**

**Unit Renovations**

| Item | Price Per Unit | Total Units | Total | Timing |
|---|---|---|---|---|
| Unit Upgrades to Include: | $ 7,500.00 | 100 | $ 750,000.00 | Average of 8 Units Per Month for a total of 100 Units in Year 1 |
| *Kithen Cabinets and Countertops* | *$2,500* | | | |
| *New Vinyl Flooring* | *$1,500* | | | |
| *Bathroom Vanities and Fixtures* | *$1,250* | | | |
| *Stainless Steel Appliances* | *$1,500* | | | |
| *LED Lighting* | *$750* | | | |

**Totals Unit Renovations**      **$ 750,000.00**

**Common Area Renovations**

| Item | Total | Timing |
|---|---|---|
| Brand New Heated Pool | $ 250,000.00 | 6-12 Months |
| Pool Furniture | $ 50,000.00 | 6-12 Months |
| Exterior Lighting Improvements | $ 50,000.00 | 3-6 Months |
| Roofing Repairs as Needed | $ 150,000.00 | 12-18 Months |
| Parking Lot Repairs as Needed | $ 25,000.00 | 12-18 Months |
| Outdoor Kitchen and Fire Pit | $ 75,000.00 | 6-12 Months |
| Deferred Maintenance as Needed | $ 150,000.00 | 12-18 Months |

**Totals Common Area Renovations**      **$ 750,000.00**

**Total Capex Budget**      **$ 1,500,000.00**

*Note - Per unit cost is based on average as unit conditions vary and not all upgrades may be neceessary on every unit

EXHIBIT G
**REQUEST FOR DISBURSEMENT FROM RENOVATIONS RESERVE**

Pursuant to Section 11.03 of that certain Loan Agreement (the "Loan Agreement") dated as of ____, 20__ between _____ ("Borrower") and Arbor _____ ("Lender"), Borrower hereby requests that Lender disburse to Borrower the amount of $_____ (the "Requested Funds") in connection with certain Renovations performed at the property located at _____(the "Property") (as further identified and defined in the Loan Agreement).  In connection with such request, attached are the following items required to be submitted by Borrower to Lender: (i) Borrower's Certificate of Renovations, as set forth below, (ii) all invoices, receipts or other evidence (that shall be satisfactory to Lender) verifying the costs of such Renovations, (iii) all affidavits, lien waivers or other evidence (that shall be reasonably satisfactory to Lender) showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the Property have been paid all amounts due for labor and materials furnished to the Property, (iv) for disbursement requests in excess of $10,000.00, a new certificate of occupancy for the portion of the Improvements covered by such Renovations, if said new certificate of occupancy is required by Law.

Borrower understands that Lender reserves the right, in its sole but reasonable discretion, to require a certification from an inspecting architect or other third party acceptable to Lender describing the completed Renovations items, verifying the completion of the Renovations items and the value of the completed Renovations items.

In addition, Borrower further represents and certifies to Lender as follows:

1. Those certain Renovations at the Property, as represented in the attached request have been completed in full.
2. The amount of the Requested Funds has been paid in full for the Renovations to all vendors, contractors, subcontractors, materialmen, laborers and other parties who may claim a lien against the Property (each a "Vendor" or, collectively, "Vendors").
3. All Vendors have accepted such payments in full as settlement of all claims in connection with this draw request that would entitle such Vendor to claim a lien against the Property, and no Vendor shall have any lien against the Property as a result of such Renovations.
4. The work associated with the Renovations, or the portion thereof for which such Requested Funds are being requested, has been completed in a good and workmanlike manner.
5. All Renovations are in compliance with all applicable Laws, ordinances, rules and regulations of any governmental authority, agency or instrumentally having jurisdiction over the Property.
6. If no new certificate of occupancy is required ADD – No new certificate of occupancy is required as a result of the Renovations performed pursuant to the disbursement request.

BORROWER:
[Name]
By: _____
      Name:
      Title:

[Exhibit G]

EXHIBIT H
**REQUEST FOR DISBURSEMENT FROM REPLACEMENT RESERVE**

Pursuant to Section 11.04 of that certain Loan Agreement (the "Loan Agreement") dated as of _____ 20__ between _____ ("Borrower") and Arbor _____ ("Lender"), Borrower hereby requests that Lender disburse to Borrower the amount of $_____ in connection with certain Work (as defined in the Loan Agreement) performed at _____(the "Property").  In connection with such request, attached are the following items required to be submitted by Borrower to Lender: (i) Borrower's Certificate of Replacements, (ii) all invoices, receipts or other evidence (that shall be satisfactory to Lender) verifying the costs of such Work, (iii) all affidavits, lien waivers or other evidence (that shall be reasonably satisfactory to Lender) showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the Property have been paid all amounts due for labor and materials furnished to the Property, and (iv) for disbursement requests in excess of $10,000.00, a new certificate of occupancy for the portion of the Improvements covered by such Work, if said new certificate of occupancy is required by Law.

Borrower understands that Lender reserves the right, in its sole but reasonable discretion, to require a certification from an inspecting architect or other third party acceptable to Lender describing the completed Work, verifying the completion of the Work and the value of the completed Work.

In addition, Borrower further represents and certifies to Lender as follows:

1. Those certain replacements (the "Work") at the Property, as represented in the attached request, have been completed in full.
2. The amount of $_____ (the "Funds") has been paid in full for the Work to all vendors, contractors, subcontractors, materialmen, laborers  and other parties who may claim a lien against the Property ("Vendors").
3. All Vendors have accepted such payments in full as settlement of all claims in connection with this draw request that would entitle such Vendor to claim a lien against the Property, and no Vendor shall have any lien against the Property as a result of such Work.
4. The work associated with the Work has been completed in a good and workmanlike manner.
5. All Work is in compliance with all applicable Laws, ordinances, rules and regulations of any governmental authority, agency or instrumentally having jurisdiction over the Property.
6. If no new certificate of occupancy is required ADD – No new certificate of occupancy is required as a result of the Work performed pursuant to the disbursement request.

BORROWER:

[Name]
By: _____
        Name:
        Title:

[Exhibit H]

EXHIBIT I

<u>FORM OF TENANT NOTICE LETTER</u>

_____, 20_____

**[Addressee]**

    Re:    Payment Direction Letter for the property known as [_____] and located at [_____] (the "**Property**")

Dear _____:

    [_____], a [_____] ("**Borrower**"), the owner of the Property, has mortgaged the Property to Arbor _____, a _____ (together with its successors and assigns, "**Lender**") and has agreed that all rents due for the Property will be paid directly to a bank selected by Borrower and approved by Lender.  Therefore, from and after the date hereof, all rent to be paid by you under the Lease between Borrower and you (the "**Lease**") should be sent directly by wire transfer to the following address:

| | |
|---|---|
| Bank: | [_____] |
| ABA No.: | [_____] |
| Account No.: | [_____] |
| Account Name: | [_____] fbo Arbor _____ Clearing Account |

    All checks should be made out to "[_____]".

    These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent ("**Servicer**"), or pursuant to a joint written instruction from Borrower and Lender or Servicer.  Until you receive written instructions from Lender or Servicer, continue to send all rent payments due under the Lease as directed above.  All rent payments must be delivered no later than the day on which such amounts are due under the Lease.

    If you have any questions concerning this letter, please contact _____ of Borrower at _____ . We appreciate your cooperation in this matter.

                [_____]

                By:_____

                Name:

                Title:

[Exhibit I]

[EXHIBIT I]

FORM OF PAYMENT DIRECTION LETTER

_____, 20_____

**[Addressee]**

Re:    Payment Direction Letter for the property known as [_____] and located at [_____] (the "**Property**")

Dear _____:

    [_____], a [_____] ("**Borrower**"), the owner of the Property, has mortgaged the Property to Arbor _____, a _____ (together with its successors and assigns, "**Lender**") and has agreed that all rents due for the Property will be paid directly to a bank selected by Borrower and approved by Lender.  Therefore, from and after the date hereof, all payments due to Borrower [Manager] under that certain **[REFERENCE AGREEMENT]** (the "**Agreement**") between Borrower [Manager] and you, should be sent directly by wire transfer to the following address:

| | |
|---|---|
| Bank: | [_____] |
| ABA No.: | [_____] |
| Account No.: | [_____] |
| Account Name: | [_____] fbo Arbor _____ Clearing Account |

All checks should be made out to "[_____]".

    These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent ("**Servicer**"), or pursuant to a joint written instruction from Borrower and Lender or Servicer.  Until you receive written instructions from Lender or Servicer, continue to send all rent payments due under the Lease as directed above.  All rent payments must be delivered no later than the day on which such amounts are due under the Lease.

    If you have any questions concerning this letter, please contact _____ of Borrower at _____ . We appreciate your cooperation in this matter.

[_____]

By:_____

           Name:

           Title: ]

1

SCHEDULE A
Organizational Chart

[SEE ATTACHED]

52247332;1

# Sycamore Homes Apartments
# Organizational Chart



*No foreign investors with direct or indirect ownership in Borrower, greater than 10%
** No single investor owns a direct or indirect ownership in Borrower, greater than 20%