UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF LANSING,

      Plaintiff,

v.

                                    Case No. 1:24-cv-590

WOODSIDE MEADOWS APTS OWNER
LLC,

                                      HON. JANE M. BECKERING

      Defendant,

and

ARBOR REALTY PARTICIPATION,
LLC,

      Intervenor-Defendant.

_____/

**OPINION AND ORDER**

Pending before the Court in this removed, diversity jurisdiction case are Plaintiff City of Lansing ("the City's") Motion for Preliminary Injunction (ECF No. 1-1 at PageID.541) and Motion to Appoint a Receiver (ECF No. 1-1 at PageID.511). Defendant Woodside Meadows Apts Owner LLC ("Woodside") opposes both motions (*see* ECF No. 10; ECF No. 11). Intervenor-Defendant Arbor Realty Participation, LLC ("Arbor RP") supports both motions and seeks revisions to the City's proposed orders (*see* ECF No. 12). The Court conducted an evidentiary hearing on the motions on August 29, 2024. For the following reasons, the Court grants the City's Motion to Appoint a Receiver and dismisses as moot the City's Motion for Preliminary Injunction.

# I.     BACKGROUND

## A.  Factual Findings

Woodside operates a rental housing complex called Sycamore Townhomes ("Sycamore") in Lansing, Michigan.  Woodside purchased Sycamore in 2020.  Sycamore consists of 67 different buildings containing approximately 339 units.  This case arises from yearslong efforts by the City to bring Sycamore into compliance with housing and safety regulations.  Based on the record before the Court, including the documentary evidence and testimony presented at the evidentiary hearing, the Court finds that the conditions at Sycamore have been, are currently, and absent judicial intervention will continue to be incompatible with human health and safety.  The following salient findings of fact undergird the Court's conclusion.

### 1.  The 2022 Inspection and Initial Efforts to Bring Woodside into Compliance

Between approximately April and June 2022, the City inspected Sycamore for compliance with housing and safety regulations.  The City identified hundreds of code violations.[1]  Consistent with testimony at the hearing, these recorded issues included: units damaged by fire; units lacking smoke detectors; deteriorating roofs; unsecured windows and doors; plumbing issues such as leaking pipes; inoperable furnaces or furnaces replaced without proper permits; and infestations of vermin.  In light of the 2022 inspection, the City did not issue Woodside a valid rental certificate for any of its 67 buildings.  In the following months, Woodside did not request any subsequent inspections.  As a result, the City was unable to know whether Woodside had made sufficient efforts—or any efforts at all—to come into compliance with housing and safety regulations.

Starting in approximately November of 2022, the City took its first enforcement action against Woodside in relation to the failed 2022 inspection.  This first enforcement action was to

---

[1] The City's records of code violations at Sycamore since 2022 span at least 470 pages.

send Woodside notices of its failure to comply with the City's housing code.  These notices indicate the location of the underlying violation and state that continued failure to comply "shall leave [the City] no alternative but to issue a civil infraction notice of violation (ticket) with set fines due, and/or issue a civil infraction citation with a request to the courts to take whatever legal action is necessary to secure compliance."  In May 2023, with the City still having received no requests from Woodside to inspect the property for compliance, a City official visited Sycamore to "pink-tag" every one of its apartments.  Pink tags notify tenants that the apartment lacks a valid rental certificate and cannot be re-leased to new occupants if the current occupants vacate.

At around the same time, in approximately May 2023, the City met with Woodside in an attempt to resolve the issues cited in the 2022 inspection reports.  This was the first of a series of meetings, which spanned until approximately January or February 2024.  In follow-up to the March 2023 meeting, in approximately July or August 2023, Woodside submitted to the City a capital improvement plan ("CIP"), indicating how Woodside intended to resolve the issues on their property.  The City determined that Woodside's CIP did not adequately address critical issues that had been raised in the inspection reports.  The City further determined that Woodside's proposed timeline for their repairs and improvements—which Woodside indicated would take five years—was not acceptable.  In response to the first proposed CIP, the City provided a checklist to direct Woodside as to what their CIP should contain.  Woodside submitted a second CIP, which the City determined to be improved over the first CIP.  The second CIP proposed a 2-year timeline for Woodside's capital improvements.

2.   *Compliance Action in the State District Court*

Dissatisfied with Woodside's progress toward resolving the issues cited in the 2022 inspection reports, on or about September 22, 2023, the City filed a compliance case against Woodside in the 54-A District Court in Lansing.  That case remains ongoing.  The court in that case has ordered Woodside to bring three buildings into compliance.  A witness for the City testified to this Court at the evidentiary hearing that, if Woodside can bring these three buildings into compliance, the parties intend to move tenants from other properties on the complex into these compliant buildings.  After this relocation of tenants, Woodside can move forward with repairs to the remaining buildings.

On June 19, 2024, in opposition to Plaintiff's Motion for preliminary injunction, Woodside submitted a declaration by a representative of Woodside's property management contractor contending that it has gone to great lengths in an attempt to restore the issues with the property, and that about nine of Woodside's apartment units are nearing total renovation (ECF No. 10-2 at PageID.976-977).  The declaration stated that "Woodside anticipates that these units will pass inspection next week."  At the August 29, 2024 evidentiary hearing, Woodside produced a number of photographs depicting the improved units.  But Woodside acknowledged that it had not yet requested that any of these units be inspected.  When asked why, Woodside acknowledged that it was still waiting for permits to be issued and trade inspections to occur before it could seek to receive the necessary approval.

Despite being under court order in the state district court, Woodside's progress in making improvements to three buildings has been painstakingly slow, and as of the evidentiary hearing those units remained uninspected and not approved for habitation.  The Court has reviewed the docket of the state district court case and takes notice of the fact that, on June 5, 2024, the state district court found that all 67 of Woodside's properties remained out of compliance and fined

4

Woodside $500 per property, totaling $33,500.  Order of the 54A District Court, Case No. 23008991-ON, June 5, 2024.  On July 9, 2024, the court fined Woodside an additional $10,000 for failing to pay that fine.  In addition, since the commencement of the state district court action, the court has fined Woodside $10,000 for violating a stipulated order of compliance and has required Woodside to place $14,250 in escrow with the district court to ensure future compliance. Consistent with entries in the state court docket, the City represented to this Court that Woodside only paid these fines after show cause orders were issued.  Thus, this Court finds that Woodside is wasting its own financial assets by failing to comply with court orders and timely pay fines.

   *3. Effect of Noncompliance on Habitability*

   Due to Woodside's failure to remediate existing code violations, approximately 147 units on Woodside's property have been and remain 'red-tagged' by the City.  Consistent with testimony at the hearing, the City cited the following non-exhaustive list of reasons for red-tagging units at Woodside: fire damage; deteriorated roofs; broken or missing windows; gaps/holes in exterior walls; missing/damaged exterior doors/screens; infestations of vermin; lack of functioning hard-wired smoke detectors; furnaces in poor working order that have repeatedly failed; gasoline/combustibles/automotive batteries improperly stored in basements; improperly installed electrical outlets/wiring/breaker panels; exposed, loose, and hanging wires; accumulation of trash, combustibles, and feces; and lack of working utilities.  A red tag indicates that the premises are not fit for habitation and cannot be leased.  As a result, over 40 percent of the units at Sycamore townhomes are vacant.

4.  *Property Mismanagement Issues Plague Property Appearance and Utility Security*

In May 2024, the City issued a notice to Woodside due to failure to mow and maintain its property.  Photographic evidence produced at the evidentiary hearing depicts landscaping that was so unkempt the apartment complex appeared to have been abandoned.  The lawns were approximately three feet high. When the Court asked why the lawns were so overgrown, Woodside's property manager admitted that it had been in a dispute with the lawn company over unpaid bills. Ultimately, the City dispatched personnel to mow the lawn at Sycamore.  Later that month, the City twice issued a notice to Woodside due to large accumulations of demolition debris on Woodside's property.  Woodside contends that the demolition debris was illegally dumped in a Sycamore parking lot by a Woodside contractor.  After an unsuccessful attempt by Woodside to remove the demolition debris, the City once again dispatched personnel to abate the code violation.

Also in May 2024, in an email exchange between Woodside and the Lansing Board of Water & Light ("the BWL") (ECF No. 10-12 at PageID.1037), the BWL informed Woodside that Woodside owed $84,809.49.  This amount, which covered both Woodside's monthly bill and past due amounts, was to be paid by June 10, 2024. On that date, emails Woodside provided to the Court show that Woodside paid $35,000 and stated that it would "send [the BWL] the rest of the payment breakdown next week as we are still reviewing all the accounts internally."  The BWL replied that "[a]t this time, as long as you are working with us on getting these accounts paid, services will not be interrupted."  At the hearing, no witness could testify to the exact amount in past due that Woodside currently owes to the BWL.  However, in response to questioning by the Court, Woodside's witness testified that Woodside is not paying the BWL for any accounts tied to its red-tagged units.

5. *Vagrancy and Criminal Conduct are Occurring in Woodside's Red Tagged Units*

In May 2024, the City issued a notice to Woodside due to an apparent forcible entry at an unsecured, vacant unit on Woodside's property.  In response, the City conducted an "emergency board-up" of the unit, securing it.  The City took this action in coordination with the Lansing Police Department.  But the May 2024 break-in was not an isolated incident.  In July and August 2024, the City responded to multiple Woodside units due to forcible entry and/or unauthorized habitation by squatters.  The City conducted emergency board-ups of the unsecured units.  The City documented the condition of these units via photographs, which the Court reviewed during the evidentiary hearing.

One set of photographs, dated July 31, 2024, is attached to the emergency board-up notice for 4801 Roscommon Drive.  The notice states that the City conducted the emergency board-up at the request of the Lansing Police Department.  These photographs show the walls torn apart to reveal internal components of the building's construction.  Copper pipes have been sawed off and removed.  The unit is missing a smoke detector.

Another set of photographs, dated July 31, 2024, is attached to the emergency board-up notice for 4112 Woodbridge Drive.  The notice states that the City conducted the emergency board-up at the request of the Lansing Police Department.  According to a witness for the City, the Lansing Police Department had responded to an unauthorized occupant overdosing inside the unit and subsequently called the City to conduct an emergency board-up.  Photographs of the kitchen show that the stove has been removed.  In the bedroom, there are signs of regular habitation by one or more unauthorized occupants:  an air mattress strewn with clothes, a bedside table with a lamp, beverage containers, and food containers, and a box fan on the ground.  In the bathroom, the

toilet has been removed.  The floor of the basement is strewn with hypodermic needles, unclean clothing, and other detritus.

A third set of photographs, dated August 8, 2024, is attached to the emergency board-up notice for 4100 Woodbridge Drive.  Trash, including food and uncleaned food containers, cover the floor and surfaces of this unit.  Hypodermic needles are visible among the trash.  A child's mathematics textbook, a stuffed animal, puzzle pieces, crayons, and a DVD of a children's movie are also visible among the trash.  Inner components of the building's construction, such as wires and ductwork, have been pulled to the ground and copper pipes have been sawed off and removed.

The City also produced photographs of the exterior of a number of Woodside's buildings.[2] They depict portions of the roof falling apart, doors that have been kicked in, left ajar, or boarded up, and boarded up windows.  To the casual observer, some of these photographs show buildings that could easily be entered without anyone taking notice, let alone action.

At the evidentiary hearing, Woodside's property manager testified that, although its director of operations is "not a fan" of security, it has recently hired a private security company to provide round-the-clock monitoring of its property.  The security company began its services on or about August 27, 2024, which was two days before the evidentiary hearing before the Court.

### B.  Procedural Posture

On May 31, 2024, the City initiated an action against Woodside in state court, asking the court to (1) find that Woodside's property is a public nuisance, (2) grant the City injunctive relief, and (3) appoint a receiver over Woodside's property (ECF No. 1-1 at PageID.20).  The City attached to its Complaint the instant Motion for Appointment of Receiver (*id.* at PageID.511) and

---

[2] Several photos were attached to the Complaint, and several were produced at the evidentiary hearing.  The Court also heard testimony at the hearing from a City employee describing the current state of the buildings and premises.

a second Motion requesting three forms of relief: an Ex Parte Motion for Entry of Temporary Restraining Order, an Order to Show Cause, and a Preliminary Injunction (*id.* at PageID.541).

On June 5, 2024, Woodside removed the matter to this Court, citing this Court's diversity jurisdiction (ECF No. 1). On June 6, 2024, the Court denied the City's request for a Temporary Restraining Order, concluding that "the Court is not convinced that the factual allegations clearly show that immediate and irreparable injury, loss, or damage will result to Plaintiff before Defendant can be heard in opposition and the Court has the benefit of a more complete record" (ECF No. 4 at pageID.570). The City's instant request for a Preliminary Injunction remained pending.

On June 7, 2024, Arbor RP filed a Motion to Intervene pursuant to Federal Rule of Civil Procedure 24 (ECF No. 5), which was denied without prejudice (ECF No. 6). Following the parties' stipulations (ECF Nos. 7 and 33), the Court entered an Order permitting Arbor RP's intervention (ECF No. 8, as modified by ECF No. 35). On July 24, 2024, Arbor RP filed a Motion to Remand, which was denied on August 27, 2024 (*see* ECF No. 43).

On June 26, 2024, Woodside filed a Motion to Dismiss, seeking to dismiss two counts of the City's complaint on the grounds that they seek equitable remedies, rather than state causes of action (*see* ECF No. 14). That Motion remains pending.

On August 21, 2024, Arbor RP via its counsel informed the Court that Arbor RP, through an affiliated LLC, has commenced a state court foreclosure action against Woodside, seeking, *inter alia*, appointment of a receiver over the property (ECF No. 41).

The Court held a hearing on August 29, 2024 to consider the parties' evidence and oral arguments on the City's Motions to Appoint a Receiver and for Preliminary Injunction.

## II.  ANALYSIS

### A.  Receivership

**1.**                          **Motion Standard**

The City's motion was initially filed in state court.  In this removed case, federal procedural law applies.  *See Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 374 (6th Cir. 2009) ("Under the *Erie* doctrine, federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law.").

Equity receiverships are "increasingly rare," but there is a class of cases in which a federal court may exercise its equitable powers and institute a receivership over disputed assets in a suit otherwise falling within the federal court's jurisdiction, but which falls outside the statutory bankruptcy proceedings or other legislated domain.  *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006).  "Given a receivership's origins in equity, few laws delineate its scope." *Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772, 778 (6th Cir. 2023).  As the Sixth Circuit points out, Federal Rule of Civil Procedure 66 provides merely that "the practice in administering an estate by a receiver or similar court-appointed officer must accord with the historical practice in federal courts or with a local rule."  *Id.*  (citing FED. R. CIV. P. 66 and also directing attention to 28 U.S.C. § 959(b) (instructing that a "receiver … appointed in any cause pending in any court of the United States … shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof")).

The Sixth Circuit has indicated that "[a] district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Liberte, supra.*  The Sixth

Circuit has also indicated that "[t]he receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Id.* According to the Sixth Circuit, "[a] receivership is an 'extraordinary remedy' that a court should employ with the 'utmost caution' and grant 'only in cases of clear necessity to protect plaintiff's interests in the property.'" *Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015) (citation omitted).

In deciding whether to appoint a receiver, district courts consider a number of factors, including (1) "whether the property at issue is in 'imminent danger of ... being lost, concealed, injured, diminished in value, or squandered;'" (2) "whether the defendant engaged in fraudulent conduct;" (3) "'the inadequacy of the available legal remedies;'" (4) "the lack of less drastic equitable remedies;" and (5) "the likelihood that the appointment will do more good than harm." *Id.* (citation omitted). When relevant, district courts also consider "whether there is inadequate security for a debt and whether a debtor is insolvent." *See id.* at 414–15 (citations omitted).

The Sixth Circuit reviews a district court's order of appointment for an abuse of discretion. *Pension Ben.*, 630 F. App'x at 414.

   2.   **Discussion**

Based on the factual findings and according to its discretion, the Court concludes that appointment of a receiver is warranted in this case.

As a threshold matter, the Court concludes that Sycamore is an asset disputed in litigation before the Court. *See Liberte*, 462 F.3d at 551. The City's underlying claim is for public nuisance (ECF No. 1-1 at PageID.17). As a federal court sitting in diversity, this Court applies Michigan substantive law. *See Biegas* 573 F.3d at 374. Under Michigan common law, public nuisance is

11

an act or omission that is "harmful to the public health, or [] an interference in the use of a way of travel, or affect[s] public morals, or prevent[s] the public from the peaceful use of their land and the public streets." *Garfield Twp. v. Young*, 82 N.W.2d 876, 879 (Mich. 1957) (citations omitted); *Nationwide Recovery* 2021 WL 1051247 at *6 (Mich. App. Mar. 18, 2021) (collecting cases). Public nuisance is found when there are conditions at a property that pose "clear and immediate risks to the general health, safety, and welfare." *Ypsilanti Charter Twp. v. Kircher*, 761 N.W.2d 761, 775 (Mich. Ct. App. 2008).  In the *Kircher* case, "[c]ode violations such as exposed live electrical wires, significant accumulations of trash and rubbish, insect and vermin infestations, falling bricks and windows, collapsing walls, and sanitary sewer leakages certainly posed substantial risks to the general health, safety, and welfare of the tenants [of the subject property]."[3] *Id*.  The Michigan Court of Appeals considered these to be "the types of major property maintenance code violations that constitute[] bona fide nuisance conditions."  *Id*. at n.7.

     1.  *Imminent danger that property will be lost, concealed, injured, diminished in value, or squandered*

Turning to the factors relevant to deciding whether to appoint a receiver, the first factor to consider is "whether the property at issue is in 'imminent danger of ... being lost, concealed, injured, diminished in value, or squandered.'" *Pension Ben.*, 630 F. App'x at 414.  Woodside contends that it is endeavoring to improve and repair, not diminish or squander, the value of its property.  It points to the recent renovations of several units at Sycamore.  However, the status of the significant number of red-tagged units scattered across the 64 buildings that are not subject to the district court's compliance order weighs against Woodside.  Woodside's witness testified that

_____

[3] In the *Kircher* case, a Michigan township brought an action against the owner of an apartment complex seeking to compel the owner to abate a public nuisance allegedly existing at the complex. *Kircher*, 761 N.W.2d at 255–58.  After the owner failed to correct the identified nuisance conditions, despite repeated warnings and requests, the circuit court appointed a receiver over the property.  *Id.* at 273.

the maintenance team does not work on any red-tagged units as a matter of course and that Woodside does not pay the portion of its utility bills that is tied to these units. These units were deemed uninhabitable by the City for reasons including: fire damage; deteriorated roofs; infestations of vermin; furnaces in poor working order that have repeatedly failed; gasoline/combustibles/automotive batteries improperly stored in basements; improperly installed electrical outlets/wiring/breaker panels; exposed, loose, and hanging wires; and accumulation of trash, combustibles, and feces. Absent attention from the Woodside maintenance team, these units will only fall even further into disrepair. Moreover, some of the red-tagged units have become a haven for brazen acts of criminality and other dangerous activity, such as unauthorized habitation, drug abuse, and further debilitation through copper stripping and the removal of other fixtures.

To this last point, Woodside highlights its recent hiring of a private security firm. The Court considers this fact insufficient to mitigate the imminent danger facing Sycamore. While private security may decrease the likelihood of unauthorized habitation and other illegal activity, the security sub-contractor is unlikely to mitigate the dangers left behind by the unauthorized habitation of red-tagged units that has occurred to date. These dangers include sawed-off pipes and hanging wires, hypodermic needles and other drug paraphernalia, and trash that may attract vermin. The Court also weighs Woodside's prior relationships with other contractors—specifically, with its lawn care company, demolition removal service, and the BWL. All of these relationships have been punctuated by service interruptions, or threatened service interruptions, due to Woodside's alleged failures to pay its balances. Concerningly, Woodside's witness testified that a member of Woodside's contracted property management team, the team which hired the security sub-contractor, is not a fan of security. The Court also heard testimony that Woodside hired the private security firm to begin its services on the eve of the evidentiary hearing. Taken

together, these circumstances raise significant questions as to whether Woodside's new commitment to security is genuine.

### 2. *Fraudulent conduct*

The second factor to consider is "whether the defendant engaged in fraudulent conduct." *Pension Ben.*, 630 F. App'x at 414. There is no evidence that Woodside engaged in fraudulent conduct. The Court notes, however, that some of Woodside's code violations and related concerns are due to payment disputes with service providers.

### 3. *Inadequacy of legal remedies*

The third factor to consider is "the inadequacy of the available legal remedies." *Id.* With regard to this factor, the Court concludes that an eventual damages award would be inadequate to compensate the City for the harm it seeks to avoid, which is harm to the wellbeing of the public. In fact, the Court concludes that monetary penalties are counter-productive in this case, as Woodside is squandering the resources better spent on improving conditions at Sycamore.

### 4. *Lack of less drastic equitable remedies*

The fourth factor to consider is "the lack of less drastic equitable remedies." *Id.* In its efforts short of seeking a receivership, the City has issued notices, held years' worth of meetings with Woodside's representatives seeking to encourage compliance, and made compromises. After over a year of good-faith efforts, the City resorted to suing Woodside in the district court in Lansing for public nuisance. The district court has put Woodside under a compliance order and has levied tens of thousands of dollars in fines for noncompliance. This entire painstaking process has produced, at most, three nearly habitable buildings out of the 67 buildings on Woodside's property. As noted by the City's attorney at the evidentiary hearing, at this pace, bringing Sycamore into compliance will take at least 20 years. The Court therefore concludes that the City's efforts to

14

bring Woodside into compliance to date have either exhausted remedies short of a receivership or revealed that such remedies would be ineffective.

5. *Likelihood that appointment of a receiver will do more good than harm*

The fifth and final[4] factor is "the likelihood that the appointment will do more good than harm." *Pension Ben.*, 630 F. App'x at 414. With regard to this factor, the health and safety of the public counsels strongly in favor of appointing a receiver. The residents of Sycamore's nearly 200 habitable units have endured fires, badly deteriorated roofs, leaking pipes, inoperable furnaces, vermin, and mold, among other issues. Most recently, they have faced the dangers foreseeably posed by a large concentration of poorly secured, vacant units—dangers which include unauthorized habitation, drug abuse, and the brazen removal of copper pipes, appliances, and fixtures. And now, they live among boarded-up units filled with rotting trash. Woodside's track record since its property failed the City's inspection over two years ago convinces the Court that Woodside either will not or cannot ensure the health and safety of Sycamore's tenants. A court-appointed receiver that seeks to remediate the apartment complex's ongoing health and safety issues will do more good than is currently being accomplished by Woodside. Thus, the Court concludes that the benefit of a receivership for the health and safety of the public outweighs the harm to Woodside's private interests.

In sum, only the second factor does not weigh in favor of appointing a receiver. The first, third, fourth, and fifth factors weigh in favor of appointing a receiver. For the foregoing reasons, the City's Motion to Appoint a Receiver over Woodside's property (ECF No. 1-1 at PageID.511) is granted.

---

[4] District courts may also consider "whether there is inadequate security for a debt and whether a debtor is insolvent." *See id.* at 414–15. That factor is not relevant to this case, which arises out of a claim for public nuisance.

**B.  Preliminary Injunction**

In its Motion for Preliminary Injunction, the City asks that the Court enjoin Woodside to take and to refrain from taking several actions related to its property and assets.  At oral argument during the evidentiary hearing, counsel for the City represented that an Order granting the City's request for a receiver would moot the City's request for injunctive relief. The Court agrees. The City's Motion for Preliminary Injunction (ECF No. 1-1 at PageID.541) is dismissed as moot.

**III.  CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Motion to Appoint a Receiver is GRANTED and a separate Order of Appointment will issue.

**IT IS FURTHER ORDERED** that the Motion for Preliminary Injunction is DISMISSED as moot.

Dated:  September 18, 2024                         /s/ Jane M. Beckering
                                                                    JANE M. BECKERING
                                                                    United States District Judge